# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**David Olabayo Olaniyi,**
2985 Prairie Du Chien Road
Iowa City, Iowa 52240

                         Plaintiff

              -against-

**The United States of America,**

        **Serve:**  Honorable Alberto Gonzales
                 United States Attorney General
                 U.S. Department of Justice
                 950 Pennsylvania Avenue, NW
                 Washington, DC 20530-0001

        **Serve:**  Chief Counsel's Office
                 United States Secret Service
                 950 H Street N.W., Suite 8300
                 Washington, D.C. 20223

        **Serve:**  General Counsel's Office
                 United States Capitol Police
                 499 South Capitol Street
                 Washington, D.C. 20003

                         Defendant.

CASE NUMBER  1:06CV02165

JUDGE: Reggie B. Walton

DECK TYPE: General Civil

DATE STAMP: 12/20/2006

JURY ACTION

# COMPLAINT

    Plaintiff David Olabayo Olaniyi, by and through his undersigned attorneys, brings this civil action against the United States of America under and pursuant to the Federal Tort Claims Act for False Arrest, False Imprisonment, Malicious Prosecution, Intentional Infliction of Emotional Distress, Conversion of Property, and Damage to Reputation.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1367.

2.      Venue is proper in this District under 28 U.S.C. § 1391 because the events giving rise to this claim occurred in the District of Columbia.

3.      The United States District Courts have

> exclusive jurisdiction of civil actions on claims against the United States, for money damages...for injury...caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable.

28 U.S.C. § 1346(b)(1) (2006).

## PARTIES

4.      David Olabayo Olaniyi ("Olaniyi"), the Plaintiff, is a resident of Iowa.

5.      The United States Capitol Police (the "USCP") was, at all times relevant, a federal law enforcement agency which provided security for the United States Capitol Building and related Buildings.

6.      The United States Secret Service (the "Secret Service") was, at all times relevant, an agency of the United States Department of Homeland Security and the United States of America responsible for the protection of the President of the United States.

## FEDERAL TORT CLAIMS ACT

7.      Olaniyi timely filed his administrative claim seeking damages from the USCP on February 25, 2005, pursuant to 28 U.S.C 2675(a), alleging false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress. Moreover, Olaniyi sought compensation for the destruction of his artwork and other monetary damages resulting from his unlawful arrest and detention on March 6, 2003 and the following days.

8.     The USCP have not yet responded to Olaniyi's claim for damages and more than six months have elapsed from the filing of the claim.  Accordingly, Olaniyi is now able to bring suit against the United States seeking damages, pursuant to 28 U.S.C. 2675(a).

9.     Olaniyi timely filed his administrative claim seeking damages from the Secret Service on February 25, 2005, pursuant to 28 U.S.C. 2675(a), alleging false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress.  Olaniyi also sought compensation for other money damages resulting from his unlawful arrest and detention on March 6, 2003 and following.

10.     The Secret Service have not yet responded to Olaniyi's claim for damages and more than six months have elapsed from the filing of the claim.  Accordingly, Olaniyi is now able to bring suit against the United States seeking damages, pursuant to 28 U.S.C. 2675(a).

## FACTUAL BACKGROUND

11.     In the wake of the September 11, 2001 terrorist attacks, an atmosphere of heightened anxiety and concerns over safety and security has been pervasive in the United States.  Congress responded to the terrorist attacks by passing the USA PATRIOT Act, which, among other things, permitted the government to detain suspected non-citizen "terrorists" for up to seven days without charges and strengthened federal law enforcement surveillance powers over citizens and non-citizens associated with "terrorism."  In addition, President Bush issued an executive order allowing military tribunals to try alleged non-citizen terrorists and, with Congress, created the Department of Homeland Security.  These developments culminated in a society frequently marked with overzealousness and suspicion, and impeded civil liberties across America.  It was

in this context that Olaniyi and his wife Reena Patel Olaniyi ("Patel"), visited the U.S. Capitol Building.

12.    Olaniyi was and is an artist who immigrated to the United States from Nigeria. He has been an artist-in-residence at the University of Michigan, the New Mexico Artist-In-Residence Program, the Nike Center for Arts and Culture in St. Thomas, Virgin Islands, and the National Black Theatre in New York City.

13.    Through the years, Olaniyi developed a stage play entitled "David/Dafidi" in which he would illustrate to audiences across the United States the way in which objects in one's physical space tend to shade one's views of different experiences.

14.    On March 6, 2003, Olaniyi visited the U.S. Capitol Building to tour and conduct research for his stage play. Olaniyi's visit followed shortly after public announcements in which Homeland Security Advisor Thomas Ridge advised the public to purchase duct tape, among other items, to protect against chemical warfare. While in the D.C. metropolitan area, Olaniyi created a costume out of the most popular materials he found from the D.C. environment during his stay, including newspapers, shampoo bottles, empty glass jars, and duct tape.

15.    As part of his research, Olaniyi wrapped the locally-obtained objects in the duct tape, and attached them to his clothing, which was an African type white robe.

16.    Olaniyi also carried with him into the U.S. Capitol Building a small, hand-carved mask sculpture that he had created.

17.     Olaniyi passed through four layers of security in the U.S. Capitol Building. The first layer consisted of a magnetometer, x-ray machines, explosive detectors, and security dogs. Olaniyi explained to the guards stationed there that he was an artist conducting research for an upcoming performance and security allowed him through. At the second layer, Olaniyi passed through a metal detector, and, at the third layer, a guard used a hand held metal detector to examine Olaniyi. He was allowed through all three checks. At the last layer of security, a guard asked for his U.S. Capitol Building passes to enter, which were provided, and Olaniyi was allowed through. After interacting and cooperating with the USCP at every security checkpoint, Olaniyi was cleared to proceed to the Capitol Crypt.

18.     Once inside the U.S. Capitol Building and through its levels of security, Olaniyi took pictures. Tourists approached Olaniyi and took pictures with him. Olaniyi described the themes of "David/Dafidi," and its accompanying philosophy, "Life is a Performance," to them.

19.     Just after 1:00 p.m., Officer Preston Nutwell, of the USCP, was called to the Crypt area of the Capitol, approached Olaniyi, and asked him what he was holding. Olaniyi, who was carrying the hand-carved sculpture , explained that it was a hand-carved mask sculpture. Officer Nutwell instructed Olaniyi to "drop it."

20.     Olaniyi explained that if he dropped the sculpture it would break and, subsequently, Officer Nutwell grabbed the piece and shattered it on the ground.

21.     Reena Patel, who was with Olaniyi at the time, took pictures of the incident. Officer Nutwell demanded that she put down the camera, and its film was later confiscated.

22.     In an affidavit later provided by Officer Nutwell for Olaniyi's criminal proceedings, Officer Nutwell alleged that at this time he heard Olaniyi say, "were [sic] all children of 'Allah.'"  Olaniyi was raised Catholic, is not Islamic, and never said the word "Allah" in his encounter with Officer Nutwell.

23.     Officer Nutwell told Olaniyi to put his hands behind his head and handcuffed him. Within minutes, several more police officers arrived.  One officer pointed a gun at Olaniyi's head.

24.     Approximately thirty to forty more officers, including officers from the USCP Hazardous Device Unit and the FBI Joint Terrorism Task Force, soon arrived on the scene. Among those to arrive was Detective Joseph DePalma of the USCP.  When asked if there were any wires or explosives in his outfit, Olaniyi replied in the negative, explaining that it was an artistic costume.

25.     USCP agents cut Olaniyi's costume from his body and x-rayed it.  They also tested the empty glass jars for hazardous materials.  According to an affidavit signed by Detective DePalma, all tests came back negative and the Hazardous Devices Unit determined that there were no explosives on Olaniyi.   Although the Capitol Crypt area was evacuated, the USCP did not evacuate the House of Representatives (the Senate was not in session) during its challenge and arrest of Olaniyi.

26.     Despite the determination that Olaniyi had no explosives on his person, police reports indicate that although Olaniyi was initially detained around 1:17 p.m., he was not arrested until 2:45 p.m.  It was dark outside by the time he was transported to the Capitol Hill Police Prisoner

Processing Center, at which time he was interrogated without an attorney, despite his request for one, and was denied a phone call. Numerous agents from the USCP and the FBI questioned him for approximately two or three hours, after which they transported him to another station. While waiting to be transferred to the D.C. Jail, federal officers and agents ordered Olaniyi to spend nearly one hour outside in the winter cold with no shoes or jacket.

27.    The USCP and FBI confiscated Olayini and Patel's costumes, as well as their personal items. The USCP and FBI found car keys in Olaniyi's pocket, and asked Olaniyi if he had a car. Olaniyi stated that he had a black 2002 GMC Savanna van. The USCP and FBI located the vehicle approximately four blocks from the Capitol and, despite the fact that neither Olaniyi nor Patel consented to a search of the van, two canine technicians searched the exterior of the vehicle with negative results. Despite those negative results and the fact that no explosives were found on their persons, the USCP and FBI nevertheless conducted a search of the interior of the van during which numerous pieces of original artwork were destroyed. The van was registered in the business name of Bayo Arts & Design (the company under which Olaniyi conducts business) and in the name of Reena Patel.

28.    That evening, Olaniyi was placed in a holding cell where he remained overnight. The following day, Friday, March 7, 2003, Olaniyi appeared before Magistrate Judge John Facciola in the United States District Court of the District of Columbia and a preliminary hearing was set for Monday, March 10, 2003.

29.    Olaniyi was then transferred from the regular ward of the D.C. Jail to the Mental Health Unit after a clinician assessment indicated he had "delusions of grandeur."

30.     While in custody in the Mental Health Unit, clinicians informed Olaniyi that tests indicated he had diabetes and he would therefore be administered medication for the diabetes. Olaniyi, who does not have diabetes, refused the medication and informed clinicians that he did not have diabetes. Clinicians told Olaniyi, however, "you can either cooperate or be physically restrained while we inject you." Under duress, Olaniyi cooperated. Olaniyi was then forcibly administered a medication which caused him to lose consciousness until the following morning. On information and belief, the medication was an antipsychotic drug because it caused Olaniyi to lose consciousness for several hours. All written reports later gathered from the Mental Health Unit, although having large lapses in time, indicate that Olaniyi was "cooperative" and "consistent," and that he had no history of diabetes.

31.     Olaniyi remained in the Mental Health Unit of the D.C. Jail until his return to the United States District Court for the District of Columbia on March 10, 2003, at which time he and Patel were charged with violations of 19 U.S.C. § 844(e) for False Bomb Threat; 40 U.S.C. § 193f(b)(7) for Disorderly Conduct on Capitol Grounds; 18 U.S.C. § 2 for Aiding and Abetting; and 22 D.C. Code § 404 for Assault or Threatened Assault. During his imprisonment in the holding cell and the Mental Health Unit, Olaniyi was unable to speak with his two young children, who were currently visiting his ex-wife for the weekend. (Olaniyi has and had full custody of his children from his previous marriage).

32.     Olaniyi was released from confinement following the entry of the criminal charges against him on March 10, 2003 and his posting of a bond. After his release, Olaniyi returned to his home in Michigan. Judge Facciola ordered that Olaniyi could not travel for six weeks upon returning home to Michigan unless clearance with the court was obtained beforehand. On April

1, 2003, the case was assigned to Judge Richard J. Leon of this Court and Olaniyi was indicted on all three counts. On April 10, 2003, Judge Leon modified the conditions of Olaniyi's release so he could travel only in the states of Michigan Pennsylvania, New Mexico and Colorado from April 21, 2003 to May 3, 2003. Olaniyi requested this modification to allow for continued research for his stage play "David/Dafidi," and to otherwise promote and exhibit his artwork. Judge Leon again modified the conditions of Olaniyi's release on May 17, 2003, so that he could travel only in the states of Michigan and New York and the District of Columbia from May 23, 2003 to May 31, 2003, for purposes of attending exhibitions of his artwork, performing, and meeting with counsel in preparation of his case. On May 29, 2003, Olaniyi was arraigned before Judge Leon and pled not guilty to all three counts against him. Judge Leon then granted an oral motion by Olaniyi to travel out of Michigan from June 15, 2003 to June 29, 2003. On June 13, 2003, Judge Leon modified the condition of Olaniyi's release to allow him to travel out of Michigan only to Santa Fe, New Mexico and Iowa City, Iowa, again for purposes of promoting "David/Dafidi" and his artwork. On July 3, 2003, Judge Leon granted Olaniyi's request to move from his residence in Michigan to Iowa City, Iowa. Judge Leon also ruled that Olaniyi report to Pretrial Services for the Southern District of Iowa to request travel outside of the state for work-related purposes.

33.    On August 4, 2003, without any prior notification to Olaniyi or explanation, the government filed a motion with Judge Leon to dismiss all three counts pending against Olaniyi. On August 13, 2003, the court granted the Government's motion to dismiss all charges. The government's abrupt and unexplained abandonment of its criminal case against Olaniyi came after nearly five months of court-restricted movement for Olaniyi, which hindered both his career and reputation as a traveling performer and his ability to see his children. In addition, his

custody battle against his ex-wife, Laurie Christine Olaniyi ("Laurie"), was seriously jeopardized.

34.    In January 2004, Olaniyi returned to D.C. with his children and Patel to retrieve several pieces of artwork and other belongings confiscated by the USCP and the FBI during the arrest and subsequent the search of his van in March of 2003.    While driving near the U.S. Capitol Building in his black GMC van, Olaniyi and his family were stopped by a USCP officer.

35.    Detective Joseph DePalma, the lead investigator in the criminal proceedings against Olaniyi, did not make the initial "traffic stop" but soon was on the scene and seemed to be supervising the activities.    Detective DePalma stated that the USCP had pulled over Olaniyi and his family because there was snow on the van and because the Michigan tags made them "suspicious."

36.    Detective DePalma was surprisingly aware of the ongoing custody battle between Olaniyi and his ex-wife, Laurie , and apparently had been in contact with her.    During the "traffic stop," Detective DePalma directed several inappropriate comments and questions to Olaniyi; asking him why he and Patel were back in D.C.; why they had the children with them; whether Olaniyi had custody of the children; whether he had the authority to remove them from Michigan; and whether he had papers on his person authorizing their transportation.    Detective DePalma made other intimidating remarks and threatened to call Child Services in Michigan to retrieve the details of the custody settlement.

37.     During this January 2004 "traffic stop," Detective DePalma had dogs search the van while the children were in it.  USCP asked Olaniyi to come into the station for questioning, but Olaniyi refused to do so without an attorney present.

38.     Prosecutor Frederick Yvette was also in communication with Laurie during this time regarding Olaniyi's status as a resident of the United States.

39.     Soon after these incidents occurred, Secret Service Agent Charles J. Hull and Deputy Mike Sheetz appeared at Olaniyi's residence in Iowa City.

40.     Olaniyi answered the door and, after introducing themselves, Agent Hull and Deputy Sheetz accused Olaniyi with the following: "we understand you want to kill the President." Olaniyi denied the accusation, but invited them into his home.  Agent Hull  explained that Laurie went to authorities in Michigan and said he was going to kill the President.  They asked him personal questions about his life, his parents, his arrest, his travel destinations, and his immigration status.  At one point, Agent Hull threatened, with regard to Olaniyi's immigration papers, "what if I take these away?"  They asked invasive questions about the children, and even asked if they could talk to them.  They asked Oba-Santos, Olaniyi's son, if Olaniyi had ever said he was going to kill the President.  Oba-Santos replied "no."  Agent Hull and Deputy Sheetz stated that they did not want Olaniyi returning to D.C., and were at Olaniyi's house for two to three hours.

41.     Olaniyi has endured severe emotional distress as a result of the arrest, imprisonment, and subsequent harassment.  It has caused him to become abnormally fearful and paranoid, has hampered his ability to deal with authority, and has wreaked havoc on his personal life and

professional reputation.  Despite the passage of more than three years' time, Olaniyi still thinks of the Mental Health Unit and hears the screaming of its patients in his head.  Today he has headaches, but is afraid to go to the hospital for treatment.  Due to the severe emotional trauma that was a direct cause of being administered drugs against his will in the Mental Health Unit, he is not emotionally equipped at this time to consult with a physician about his condition.  In addition, Olaniyi believes that he suffers from sleep disorder, depression, and paranoia, and he is unable to fully enjoy his life.  Furthermore, Olaniyi has not spoken to anyone in the community about what has happened to him.  He feels that, because he is a black foreigner, people in the community would not be able to empathize with his fear and would ridicule him because of it.

42.    Olaniyi's emotional distress also stems from the destruction of his artwork.  Several pieces of valuable and irreplaceable art, created by Olaniyi and his family members either to sell or to remain in the family's permanent collection, were unnecessarily destroyed by the USCP and FBI at the time of the arrest and in the subsequent search of his van.

## FIRST CLAIM FOR RELIEF - FALSE ARREST AND FALSE IMPRISONMENT
## (MARCH 2003)

43.    The Plaintiff re-alleges paragraphs 1 – 42 as if fully restated herein.

44.    The FTCA establishes liability for false arrest or false imprisonment when such torts are committed by federal law enforcement officers.  28 U.S.C. § 2680(h).  Under the District of Columbia's common law, a defendant is liable for false imprisonment if (1) he intends to confine the plaintiff within fixed boundaries; (2) his acts result in such confinement; and (3) the plaintiff is aware of the confinement.

45.    Thus, Olaniyi was falsely arrested and imprisoned when he was arrested against his will, confined by the USCP and the FBI and imprisoned in the D.C. Jail for five nights in March 2003. The arrest was unlawful because the USCP and the FBI possessed no arrest warrant and lacked probable cause to detain him.

## SECOND CLAIM FOR RELIEF - FALSE ARREST AND FALSE IMPRISONMENT
## (JANUARY 2004)

46.    The Plaintiff re-alleges paragraphs 1 – 42 as if fully restated herein.

47.    The FTCA establishes liability for false arrest or false imprisonment when such torts are committed by federal law enforcement officers. 28 U.S.C. § 2680(h). Under the District of Columbia's common law, a defendant is liable for false imprisonment if (1) he intends to confine the plaintiff within fixed boundaries; (2) his acts result in such confinement; and (3) the plaintiff is aware of the confinement.

48.    Thus, under the common law of the District of Columbia, Olaniyi was falsely arrested and imprisoned when his vehicle was stopped and he was confined and detained in January 2004. Olaniyi's movement was limited to a fixed area near Detective DePalma, whose words and conduct limited Olaniyi's free movement. Detective DePalma, under the color of law, made an illegal traffic stop on Olaniyi's van without probable cause, ordered Olaniyi out of the van, and asked Olaniyi questions about why he was back in the District of Columbia, although Olaniyi had a right to be there. Detective DePalma also asked about Olaniyi's custody status of his children and made other intimidating remarks. Detective DePalma also had dogs search Olaniyi's van while Olaniyi's children remained in it.

49.    Olaniyi did not believe that he was free to leave the scene (and was thus detained or confined at) the "traffic stop" because of Detective DePalma's position as a law enforcement officer and felt confined to that immediate area.

## THIRD CLAIM FOR RELIEF - MALICIOUS PROSECUTION

50.    The Plaintiff re-alleges paragraphs 1 – 42 as if fully restated herein.

51.    The FTCA establishes liability for malicious prosecution when it is committed by federal law enforcement officers. 28 U.S.C. § 2680(h). Olaniyi brings a claim against the United States for malicious prosecution.

52.    Though in theory it is the prosecutor who initiates criminal proceedings, the defendant in a malicious prosecution proceeding can be anyone who procures them. The USCP and the FBI maliciously procured criminal proceedings against Olaniyi by detaining and arresting him, and by initiating proceedings against him despite having determined on the scene that Olaniyi possessed no explosives and that there was insufficient evidence to sustain charges against Olaniyi.

53.    The Government dropped all charges against Olaniyi on August 14, 2003 without prior notice to Olaniyi and without a motion by Olaniyi for such a dismissal. This dismissal is effectively an admission that Olaniyi's arrest and imprisonment was wholly without merit and justification.

54.    Detective DePalma used and continued to use the criminal proceedings to promote his agenda of harassing and intimidating Olaniyi.

# FOURTH CLAIM FOR RELIEF – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

55.     The Plaintiff re-alleges paragraphs 1 – 42 as if fully restated herein.

56.     The FTCA establishes liability for the intentional infliction of emotional distress when such torts are committed by federal law enforcement officers. 28 U.S.C. § 2679.

57.     The USCP and the Secret Service intentionally inflicted severe emotional distress on Olaniyi.  The unlawful arrest and imprisonment, and especially his time in the Mental Health Unit of the D.C. Jail, caused Olaniyi severe emotional distress, including sleep disorder, depression, paranoia, and impairment of his enjoyment of life.

58.     Detective DePalma stopped the Olaniyi's van, which he knew belonged to the Plaintiff, in January 2004 without any probable cause and interrogated Olaniyi on the side of the road.  Detective DePalma also had canine officers search the vehicle without a warrant and left Olaniyi's children in the car, alone, during the search.

59.     Additionally, Detective DePalma, prosecutor Yvette, and Special Agent Hull of the Secret Service continually harassed and intimidated Olaniyi for more than twelve months.

60.     Moreover, Detective DePalma, prosecutor Yvette and Special Agent Hull harassed and intimidated Olaniyi by having communications with ex-wife Laurie.  These acts inflicted additional emotional distress on Olaniyi as they undermined Olaniyi's efforts to obtain custody over his children.

61.     Finally, Special Agent Hull intentionally inflicted emotional distress upon Olaniyi by threatening him, an innocent man, with deportation for no legal reason.

## COUNT FIVE – CONVERSION OF PROPERTY

62.     The Plaintiff re-alleges paragraphs 1 – 42 as if fully restated herein.

63.     The FTCA establishes liability for property damages when committed by federal law enforcement officers.  28 U.S.C. §§ 1346(b) and 2675(a).  Olaniyi brings a property damages (conversion) claim under the FTCA against the United States for the destruction of his artwork.

64.     The general rule for measure of damages for the destruction of property is the difference between the value of property before and after injury.  Olaniyi had several pieces of artwork destroyed when the USCP and the FBI accosted him in the U.S. Capitol Building and later searched his van.

65.     Dr. Fredrick Woodard owns and operates Arbor Gallery in Iowa, and has exhibited Olaniyi's work on several occasions.  In his capacity of owner and operator of Arbor Gallery, Dr. Woodard is accustomed to appraising artwork.  He appraised Olaniyi's artwork destroyed by the USCP and FBI at $36,200.

66.     Cannon Hersey is a curator who runs CrossPathCulture, a nonprofit organization which sponsors art exhibitions, shows, and performances.  CrossPathCulture is based in New York City and has several international offices.  Mr. Hersey is very familiar with Olaniyi's work, and has purchased Olaniyi's work in the past.  Mr. Hersey appraised Olaniyi's artwork destroyed by the USCP and FBI at $66,550.

67.    Olaniyi also places a monetary value on his artwork.  Unlike the appraisers who objectively appraised Plaintiff's art at its estimated fair market value, Olaniyi has a sentimental, spiritual, and familial attachment to several of the pieces.  Accordingly, those pieces, including the "Axe of Shango," "Ten Million Dollar Sculpture," "Small Beaded Bell," and "Red Beaded Object," were not for sale but were instead part of his personal permanent collection.  The destruction of these original pieces by the USCP and FBI has caused Olaniyi a great amount of grief, sorrow, and mental anguish, as many of the pieces were family heirlooms and, as such, are irreplaceable.

## COUNT SIX – LOSS OF FUTURE EARNINGS, HUMILIATION & DAMAGE TO REPUTATION

68.    The Plaintiff re-alleges paragraphs 1 – 42 as if fully restated herein.

69.    Olaniyi also seeks damages for loss of future earnings, humiliation, and damage to reputation.  Under District of Columbia law, "loss of future earnings" is the difference between the present value of plaintiff's demonstrated earning capacity and the present value of actual earning capacity.

70.    Prior to the arrest, "David/Dafidi" was performed at the Lensic Performing Arts Center in Santa Fe, New Mexico, with ticket profits of $880.00.  Because of the arrest, Olaniyi's supporters withdrew all funding and all future productions of his stage play, "David/Dafidi," were cancelled.  As a result, "David/Dafidi" could not be staged at the following venues: Hancher Auditorium, Iowa City, Iowa; Hill Auditorium, Ann Arbor, Michigan; Fox Theatre, Detroit, Michigan; Miller Auditorium, Kalamazoo, Michigan; Paramount Theatre, Seattle, Washington; East County Performing Arts Center, San Diego, California; The Orpheum Theatre, Los Angeles, California; The Golden Gate Theatre, San Francisco, California; The Chicago

Theatre, Chicago, Illinois; Sanders Theatre, Harvard University, Boston, Massachusetts; Carnegie Hall, New York, New York; The National Black Theatre, Harlem, New York; Alliance Theatre at the Woodruff Arts Center, Atlanta, Georgia; Lincoln Theatre, Washington D.C.; and Saenger Theatre, New Orleans, Louisiana.

71.    Furthermore, Olaniyi suffered humiliation and damage to his reputation as a result of the arrest.  The D.C. Circuit allows compensatory damages for humiliation and damage to reputation.  Numerous newspapers and magazines ran articles covering the arrest.  As a result, many of Olaniyi's supporters withdrew their support for "David/Dafidi" after the arrest because they did not want to be associated with a "terrorist."

72.    Additionally, some of Olaniyi's best patrons stopped purchasing Plaintiff's artwork.

### PRAYER FOR RELIEF

Olaniyi respectfully prays this Court to enter relief on each of the claims made herein against the United States of America for compensatory damages in an amount to be determined at trial but that does not exceed Olaniyi's administrative claims.

Olaniyi respectfully prays that this Court enter relief against the United States of America for reasonable attorney fees, costs, and such other relief as this Court deems just and proper.

## JURY DEMAND

The Plaintiff hereby demands a trial by the maximum number of jurors allowed on all issues of facts presented herein.

Dated: December 20, 2006

Respectfully submitted,

David F. Williams (Bar No. 298380)
Jennafer B. Neufeld (Bar No. 489233)
Keith R. Wesolowski  (Bar No. 494415)
CADWALADER, WICKERSHAM & TAFT LLP
1201 F Street, N.W., Suite 1100
Washington, D.C. 20004
(202) 862-2200

*Counsel for Plaintiff David Olabayo Olaniyi*

## CERTIFICATE OF SERVICE

I certify that this complaint has been filed with the Clerk of the Court and personally served or sent via United States Mail upon the following:

Honorable Alberto Gonzales
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530


Chief Counsel's Office
United States Secret Service
950 H Street, N.W., Suite 8300
Washington, D.C. 20223


General Counsel's Office
United States Capitol Police
499 South Capitol Street
Washington, D.C. 20003

Jennifer B. Neufeld, Esq.

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

**I (a) PLAINTIFFS**

DAVID OLABAYO OLANIYI

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   88888
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

CADWALADER, WICKERSHAM & TAFT LLP
1201 F Street NW, Suite 1100
Washington, DC 20004
(202) 862-2200

**DEFENDANTS**

UNITED STATES OF AMERICA

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF

CASE NUMBER   1:06CV02165

JUDGE: Reggie B. Walton

DECK TYPE: General Civil

DATE STAMP: 12/20/2006

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

**III CITIZENSHIP OF ...**
FOR PLAINTIFF AND ONE BOX FOR DEFENDA...

|  | PTF | DFT |  | Ptf |  |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

Court Name: District of Columbia
Division: 1
Receipt Number: 4616001072
Cashier ID: lwebb
Transaction Date: 12/20/2006
Payer Name: Cadwalader Wickersham Taft
----------------------------------
CIVIL FILING FEE
For: Cadwalader Wickersham Taft
  Amount:      $350.00
----------------------------------
CHECK
  Check/Money Order Num: 14786
  Amt Tendered: $350.00
----------------------------------
Total Due:       $350.00
Total Tendered:  $350.00
Change Amt:        $0.00

Only when the bank clears the check, money order, or verifies credit of funds, is the fee or debt officially paid or discharged. A $45 fee will be charged for a returned check.

**...SIGNMENT AND NATURE OF SUIT**
epresents your cause of action and one in a corresponding Nature of Suit)

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**OR**   ○ **F. Pro Se General Civil**

☐ ...peal 28 USC 158
☐ ...thdrawal 28 USC 157

...etitions
☐ ...eath Penalty
☐ ...andamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

☐ 470 Racketeer Influenced & Corrupt Organization
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| G. *Habeas Corpus/ 2255* | H. *Employment Discrimination* | I. *FOIA/PRIVACY ACT* | J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| K. *Labor/ERISA (non-employment)* | L. *Other Civil Rights (non-employment)* | M. *Contract* | N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Federal Tort Claims Act, 28 U.S.C. 2675(a) et seq., for damages to Plaintiff by U.S. Government agencies on or about March 6, 2003

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ _____ | Check YES only if demanded in complaint |
|---|---|---|---|
| | | **JURY DEMAND:** | YES ☒  NO ☐ |

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

DATE  December 20, 2006    SIGNATURE OF ATTORNEY OF RECORD  *Jennifer B. Hunfeld*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.