## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,       )
                              )
       Plaintiff         )
                              )
     v.                 )       Civil Action No. 05-00455(RBW)
                              )
DISTRICT OF COLUMBIA, et al.    )
                              )
       Defendant.      )
_____ )

## THE FEDERAL DEFENDANTS' MOTION TO DISMISS
## PLAINTIFF'S SECOND AMENDED COMPLAINT,
## OR ALTERNATIVELY, FOR SUMMARY JUDGMENT

The Federal Defendants[1] move, pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure ("Federal Rules"), for dismissal of Plaintiff's Second Amended

Complaint against them for failure to state a claim upon which relief can be granted.

Alternatively, the Federal Defendants move for summary judgment pursuant to Rule 56 of

the Federal Rules because there are no genuine issues in dispute and the Federal

Defendants are entitled to judgment as a matter of law.

---

[1]The Federal Defendants are Jordan Blieden, Charlie V. Boswell, Donald Bracci, Tyrone D. Brooks, Rose B. Cabezes, Mark Crawford, Joseph DePalma, John T. Dineen, Gregory W. Guthrie, Noe J. Gutierez, Elaine A. Hinkle, Shawn K. Huycke, John E. King, Danny Malloy, Danny L. McElroy, Robert B. Meikrantz, Preston Nutwell and John Salb, Ryan S. Schauf, John Shark, Kathleen Talbot, Mary Ann P. Turner, and Gilman Udell, Jr., former or current officers with the United States Capitol Police and Giulio J. Arseni, Jennifer Cejpeck, Sandra I. Chinchilla, Mary B. Collins-Morton, Douglas Edmonson, Kevin D. Finnerty, John Gardner, Jr., Paul A. Garten, Chris A. Ginsburg, Melissa R. Godbold, Ronald E. Menold, II, Michelle Rankin, Kara D. Sidener, and Gerhard S. Vienna, former and current Special Agents with the Federal Bureau of Investigation.

In support of this motion, the Court is respectfully referred to the accompanying

*Memorandum of Points and Authorities* and *Statement of Material Facts to Which There*

*is No Genuine Dispute*.  Additionally, a proposed order consistent with the motion is

attached hereto.

Date: March 30, 2007               Respectfully Submitted,

                                   /s/ Jeffrey A. Taylor /rcl
                                   _____
                                   JEFFREY A. TAYLOR, D.C. BAR #498610
                                   United States Attorney


                                   /s/ Rudolph Contreras /rcl
                                   _____
                                   RUDOLPH CONTRERAS, D.C. BAR #434122
                                   Assistant United States Attorney


                                   /s/ Beverly M. Russell
                                   _____
                                   BEVERLY M. RUSSELL, D.C. Bar #454257
                                   Assistant United States Attorney
                                   U.S. Attorney's Office for the District of Columbia,
                                    Civil Division
                                   555 4th Street, N.W., Rm. E-4915
                                   Washington, D.C. 20530
                                   Ph:  (202) 307-0492
                                   Fax: (202) 514-8780
                                   E-Mail: beverly.russell@usdoj.gov

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DAVID OLABAYO OLANIYI,            )
                                 )
        Plaintiff            )
                                 )
        v.                   )            Civil Action No. 05-00455(RBW)
                                 )
DISTRICT OF COLUMBIA, et al.     )
                                 )
        Defendant.           )
_____  )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE FEDERAL DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT,
OR ALTERNATIVELY, FOR SUMMARY JUDGMENT**

The Federal Defendants[2] in their individual capacities move to dismiss Plaintiff's

Second Amended Complaint alleging First, Fourth and Fifth Amendment violations of the

U.S. Constitution for failure to state a claim upon which relief can be granted (Fed. R.

Civ. P. 12(b)(6)), or alternatively, move for summary judgment because there are no

genuine issues in dispute and the Federal Defendants are entitled to judgment as a matter

---

[2]The Federal Defendants are Jordan Blieden, Charlie V. Boswell, Donald Bracci, Tyrone D. Brooks, Rose B. Cabezes, Mark Crawford, Joseph DePalma, John T. Dineen, Gregory W. Guthrie, Noe J. Gutierez, Elaine A. Hinkle, Shawn K. Huycke, John E. King, Danny Malloy, Danny L. McElroy, Robert B. Meikrantz, Preston Nutwell and John Salb, Ryan S. Schauf, John Shark, Kathleen Talbot, Mary Ann P. Turner, and Gilman Udell, Jr., former or current officers with the United States Capitol Police and Giulio J. Arseni, Jennifer Cejpeck, Sandra I. Chinchilla, Mary B. Collins-Morton, Douglas Edmonson, Kevin D. Finnerty, John Gardner, Jr., Paul A. Garten, Chris A. Ginsburg, Melissa R. Godbold, Ronald E. Menold, II, Michelle Rankin, Kara D. Sidener, and Gerhard S. Vienna, former and current Special Agents with the Federal Bureau of Investigation.

of law (Fed. R. Civ.P. 56).  The relevant facts and arguments supporting this disposition

follow.

## I.    BACKGROUND

This suit stems from a perilously misguided effort at artistic creativity on

Plaintiff's part.  Pl.'s Second Am. Compl. ¶ 65.  Acknowledging a pervasive "atmosphere

of heightened anxiety and concerns over safety and security[,]" Plaintiff, on March 6,

2003,  nevertheless presented himself in the U.S. Capitol with a duct-taped apparatus

strapped to his person.  Id. ¶¶ 66.  The apparatus was made from "various materials from

the D.C. environment, including newspapers, shampoo bottles, empty honey jars and [of

course] duct tape."  Id.  He wore this apparatus in the U.S. Capitol "in an effort to study

people's interactions with him" and because he "wanted to spread a message of tolerance

and understanding during times of war..."  Id.  By wearing the duct-taped apparatus

(widely publicized as an unfortunate and deadly weapon of choice of suicide bombers),

Plaintiff hoped "to promote acceptance of those who looked different."  Id.

Just after 1:00 p.m. on March 6, 2003, Plaintiff alleges that he was approached by

U.S. Capitol Police ("USCP") Officer Preston Nutwell who asked Plaintiff what he was

holding.[3]  Id. ¶ 70.  Officer Nutwell allegedly asked Plaintiff to drop the item.  Id.  The

piece, a sculpture, subsequently shattered on the ground.  Id.  Plaintiff claims that he was

then handcuffed and asked if he had any wires or explosives in his outfit.  Id. ¶ 71.  He

---

[3]Renal Patel, Plaintiff's companion, was present.  Second Am. Compl. ¶ 70.

2

purportedly responded in the negative.  Id. Plaintiff's vehicle, parked within close

proximity to the U.S. Capitol, was searched.  Id. ¶ 73.

Plaintiff was detained overnight, id. ¶ 74, and subsequently charged with

violations of 18 U.S.C. § 844(e) for false bomb threat, 40 U.S.C. § 193f(b)(7) for

disorderly conduct on Capitol grounds, 18 U.S.C. § 2 for aiding and abetting, and a

District of Columbia code provision for assault or threatened assault, id. ¶ 76.  The

charges were later dropped.  Id. ¶ 78.   Nevertheless, Plaintiff brought this suit alleging

First, Fourth and Fifth Amendment violations of the U.S. Constitution.[4]  See R. 1, Compl.

On May 6, 2005, the Federal Defendants named in Plaintiff's initial complaint

(Joseph DePalma, Preston Nutwell, and the Federal Bureau of Investigation) moved to

dismiss that complaint, and on February 17, 2006, this Court dismissed plaintiff's First

and Fifth Amendment claims, as well as his Fourth Amendment claims based on his

initial detention and search of his person.  Olaniyi v. District of Columbia, 416 F.Supp.2d

43 (D.D.C. 2006).  Plaintiff filed his Second Amended Complaint on October 31, 2006.

It is in this Complaint that Plaintiff substantially expanded the number of defendants.

---

[4]Constitutional claims against federal officers in their personal capacity are usually
brought pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of
Narcotics, 403 U.S. 388 (1971). .

II.    **STANDARD OF REVIEW**

   B.    **Motion for Failure to State a Claim (Fed.R.Civ.P. 12(b)(6))**

   A motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6) should be granted

if the plaintiff can prove no set of facts in support of his claim that would entitle him to

relief.  Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Although the plaintiff is given the benefit of all inferences that reasonably can be derived

from the facts alleged in the complaint, the court need not accept inferences that are not

supported by such facts, nor must the court accept plaintiff's legal conclusions cast in the

form of factual allegations. Id.  Additionally, if a party relies on matters outside the

pleading to support a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), such motion

is treated and disposed as one for summary judgment.  Fed.R.Civ.P. 12(b)(6).

   B.    **Summary Judgment (Fed.R.Civ.P. 56)**

   Summary judgment may be granted when the pleadings and evidence demonstrate

that there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986);

Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  A genuine issue is one that

could change the outcome of the litigation.  See Anderson v. Liberty Lobby, Inc, 477 U.S.

242, 243 (1986).  While all evidence and the inferences drawn therefrom must be

considered in the light most favorable to the nonmoving party, see Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the nonmoving party - when

faced with a summary judgment motion - has the burden of establishing more than the

4

"mere existence of a scintilla of evidence" demonstrating a genuine issue in dispute for purposes of defeating the moving party's motion.  See Lester v. Natsios, 290 F.Supp.2d 11, 19-20 (D.D.C. 2003), citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-250.  As the Supreme Court has stated, "[o]ne of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."  Celotex, 477 U.S at 323-324.

## III.    ARGUMENT

A.    **With the Exception of Plaintiff's Fourth Amendment Claim Based on the Search of the Van, Plaintiff's Claims Are Barred By the Court's Decision in Olaniyi v. District of Columbia, 416 F.Supp.2d 43 (D.D.C. 2006)**

The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  Burlington Ins. Co. v. Okie Dokie, Inc., 439 F.Supp.2d 124, 132 (D.D.C. 2006), quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988). The doctrine "rests on a simple premise: 'the *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*.'"  Kimberlin v. Quinlan, 199 F.3d 496, 500 (D.C. Cir. 1999), quoting LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C.Cir.1996) (en banc)(emphasis in original).  The intent of the doctrine is to promote "finality and efficiency of the judicial process by protecting against the agitation of

settled issues." <u>Flanagan v. Wyndham Intern. Inc.</u>, 231 F.R.D. 98, 103 (D.D.C. 2005,

quoting <u>Christianson</u>, 486 U.S. at 815-16.

Collateral estoppel prevents a party in the same or subsequent action from gaining

a redetermination of an issue of fact or law, <u>see</u> <u>Kidwell v. Army</u>, 56 F.3d 279, 286-7

(D.C.Cir. 1995), where: (1) the issue was, after full and fair opportunity, actually litigated

in the first action; (2) the issue was necessarily determined in the first action by a

disposition that is sufficiently final, on the merits, and valid; (3) the subsequent litigation

is between the same parties or their privies; and (4) there are no special considerations of

fairness, relative judicial authority, or changes of law.  <u>Burlington Resources Oil & Gas</u>

<u>Co. v. United States Dep't of the Interior</u>, 21 F.Supp.2d 1, 3 (D.D.C. 1998); <u>Bazuaye v.</u>

<u>U.S.</u>, 41 F.Supp.2d 19, 25, n.8 (D.D.C. 1999)("Collateral estoppel or issue preclusion

bars subsequent litigation of factual issues even if those issues pertain to different claims

in the subsequent litigation."); <u>Metropolitan Washington Airports Authority Professional</u>

<u>Firefighters Local 3217, Intern. Ass'n of Firefighters, AFL-CIO-CLC v. Metropolitan</u>

<u>Washington Airports Authority</u>, 159 F.3d 630, 634 n.2 (D.C. Cir. 1998)(Relitigation of

underlying facts may be barred under the doctrine of issue preclusion.)

Here, and as indicated above, this Court previously dismissed Plaintiff's First and

Fifth Amendment claims, as well as his Fourth Amendment claim based on his initial

detention and search of his person.  <u>Olaniyi v. District of Columbia</u>, 416 F.Supp.2d 43

(D.D.C. 2006); <u>see also</u> R. 69, <u>Olaniyi v. District of Columbia</u>, Civil Action No. 05-

455(RBW)(Nov. 10, 2006)(Order).  Accordingly, these claims as presented in Plaintiff's

Second Amended Complaint are subject to dismissal on grounds of collateral estoppel and the law of the case doctrine. Thus, the sole remaining claim in this suit relates to Plaintiff's Fourth Amendment based on the search of his vehicle.

In this regard, USCP Defendants Blieden, Boswell, Brooks, Cabezas, Crawford, DePalma, Dineen, Guthrie, Gutierrez, Hinkle, Huycke, McElroy, Meikrantz, Nutwell, Salb, Schauf, Shark, Talbot, Turner and Udell, and FBI Defendants Arseni, Gardner, Garten[5], Godbold, Ginsburg and Vienna were not involved in the physical search of the van on March 6, 2003, the impoundment of the van, or the inventory search on March 7, 2003. See Ex. 1, 2 (pp. 4-5, 11-15), 3 and 5. They are therefore entitled to dismissal of this action as against them or summary judgment. See, e.g. Risley v. Hawk, 108 F.3d 1396, 1396-97 (D.C. Cir. 1997).

---

[5]Special Agents Garten and Godbold conducted the field screening of three jars of liquid after the inventory search was completed on March 7, 2003, in order to determine whether it was safe to store the jars in FBI space. Ex. 3, Decl. of Garten and Godbold, pp. 10-17 and 20-30. However, they had no involvement in the search of the van as presented in Plaintiff's Second Amended Complaint. Even if Plaintiff's Second Amended Complaint was construed so broadly as to encompass this safety testing, Special Agents Garten and Godbold would be entitled to qualified immunity as the field screening was justified for the same reasons as the inventory search (explained below), as well as on "exigent circumstances" grounds (also explained below), as the screening was done for safety reasons. See, e.g. United States v. Walsh, 299 F.3d 729, 734 (8th Cir. 2002); United States v. Newbourn, 600 F.2d 452, 456 (4th Cir. 1979).

### B.    Plaintiff's Suit Against Those Federal Defendants Involved in the Search of the Van Is Barred By Qualified Immunity

"[P]ermitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." Anderson v. Creighton, 483 U.S. 635, 638 (1987). Accordingly, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established legal rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Farmer v. Moritsugu, 163 F.3d 610, 613 (D.C. Cir. 1998). This affirmative defense serves the public interest because "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken `with independence and without fear of consequences.'" Harlow, 457 U.S. at 819, quoting Pierson v. Ray, 386 U.S. 547, 554 (1967).

"Clearly established" means "settled, indisputable law" and "basic, unquestioned" rights. Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983). That does not mean abstract rights, however. Instead, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640; see also Saucier v. Katz, 533 U.S. 194, 202 (2001) ("The relevant, dispositive inquiry in

8

determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (citation omitted)).  Apart from that, where a claim of constitutional right depends on application of a well-established general rule to particular facts, officials are immune unless in the light of pre-existing law the unlawfulness of their conduct would have been apparent. See Crawford-El v. Britton, 523 U.S. 574, 592-93 (1998) ("Even when the general rule has long been clearly established (for example the First Amendment bars retaliation for protected speech), the substantive legal doctrine on which the plaintiff relies may facilitate" dismissal of the claim where "there may be doubt as to the illegality of the defendant's particular conduct.")

In addition to focusing closely on the specific conduct alleged, appropriate qualified immunity analysis requires an individualized determination of the personal culpability of each government official named in the lawsuit.   An individualized analysis is necessary because government officials may be held liable in constitutional tort actions based only upon their personal actions and not on any type of vicarious liability theory. See Risley v. Hawk, 108 F.3d 1396, 1396-97 (D.C. Cir. 1997); Simpkins v. District of Columbia Government, 108 F.3d 366, 369 (D.C. Cir. 1997); Cameron v. Thornburgh, 983 F.2d 253, 258 (D.C. Cir. 1993).  They may not be held liable for any act of a subordinate that they did not personally participate in or direct the subordinate to commit.  Id.; see also Meyer v. Reno, 911 F. Supp. 11, 15 (D.D.C. 1996).  Nor may they be held liable based upon the position or office they occupy in the government.   Id.  To state a viable

9

constitutional tort claim against an official, it is not enough merely to allege some clearly established unconstitutional conduct; the complaint must also describe the official's personal involvement in and responsibility for the conduct. Cf. Anderson, 483 U.S. at 640 ("the contours of the right must be sufficiently clear that a reasonable official would understand that *what he is doing* violates that right" (emphasis added)).[6]

Application of the Harlow test calls for a two-step inquiry: First, the court must address the threshold issue of whether the plaintiff has alleged the deprivation of an actual constitutional right by a personally involved defendant. See Saucier, 534 U.S. at 201. If not, "there is no necessity for further inquiries concerning qualified immunity." Id. If the complaint does allege the violation of a constitutional right, the next step is to ask whether that right was clearly established. Once again, that inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. See also Butera v. District of Columbia, 235 F.3d 637, 646 (D.C. Cir. 2001).

---

[6]This personal misconduct requirement derives directly from the fundamental purpose underlying the constitutional tort claim against federal officials. As the Supreme Court noted, the intent of the claim "from its inception has been * * * the deterrence of *individual* officers who commit unconstitutional acts." Correctional Services Corp. v. Malesko, 534 U.S. 61, 71 (2001)(emphasis added).

1.    **Exigent Circumstances Justified the Search of the Van for Explosive Devices or Other Hazards**.

As set forth in the attached declarations of the Federal Defendants, only USCP Special Agent/Bomb Technicians Donald Bracci and John King entered the van while it was parked near the Capitol. Ex. 2. Special Agents Bracci and King entered the van in order to inspect it for possible explosive devices or other hazards, and they did so at the instruction of Captain Udell of the USCP Hazardous Devices Section, who was in charge of the scene. Bracci Decl. (Ex. 2, at 2); King Decl. (Ex. 2, at 7).

When they reached the vehicle, Special Agents Bracci and King were told that several residents and restaurant employees had become suspicious of the van, which had expired out of state tags and had been parked in the same location for several days. Id. USCP K-9 officers stated that the dogs showed no interest in the exterior of the van but that the officers had seen large containers in the rear of the van that were covered by blankets and clothing. Id. At that point, Captain Udell ordered that the street be cleared of all vehicular and pedestrian traffic for at least a city block until the suspect vehicle could be rendered or determined safe. Id. He then ordered Special Agents Bracci and King to inspect the vehicle for explosive devices, explosives, or other hazards, and if any were found, to render them safe immediately. Id.

While performing the diagnostic inspection of the van's exterior, Special Agents Bracci and King confirmed the presence of large containers in the back of the van that were covered. Id. While still outside the van they could also see that inside the van were

11

three clearly visible large unmarked glass jars of unknown liquid.  Id.  The bottom

portions of the jars could not be seen. Id.  Special Agent Bracci noted that "from [his]

experience and training as a military Bomb Technician, [he] knew that many hazardous

chemicals that are used as weapons must be stored in glass containers because of their

corrosive nature."  Bracci Decl. (Ex. 2, at 2).  The jars in Plaintiff's vehicle became a

particular concern, so the agents donned Personal Protective Equipment down range

before returning to enter the van.  Bracci Decl. (Ex. 2, at 2); King Decl. (Ex. 2, at 7-8).

They then entered the van with extreme caution via the passenger door.  King Decl. (Ex.

2, at 8).   They carefully and painstakingly inspected the interior of the van for explosive

devices and other hazardous material, and took great care when touching or moving any

object inside the van.  Bracci Decl. (Ex. 2, at 2); King Decl. (Ex. 2, at 8). The glass jars

were handled with appropriate chemical precautions and were triple over-packed in

approved HAZMAT containers.  Bracci Decl. (Ex. 2, at 2-3); King Decl. (Ex. 2, at 8).

They left the jars in the van for further analysis by the FBI.  Bracci Decl. (Ex. 2, at 3).

"The test for exigent circumstances is whether the police had 'an urgent need' or

'an immediate major crisis in the performance of duty afford[ing] neither time nor

opportunity to apply to a magistrate. '" United States v. Johnson, 802 F.2d 1459, 1461

(D.C. Cir. 1986)(quoting Dorman v. United States, 435 F.2d 385, 391 (D.C. Cir.

1970)(internal quotation marks omitted).  Law enforcement officials must have probable

cause to rely on the exigent circumstances exception.  United States v. Halliman, 923

F.2d 873, 878 (D.C. Cir. 1991).  Relevant to the determination whether exigent

12

circumstances exist is the potential danger to the community.  Dorman, supra, at 393;

United States v. Duran, 884 F.Supp. 552 (D.D.C. 1995).  "Exigent circumstances" are

frequently found when dangerous explosives are involved."  United States v. Lindsey,

877 F.2d 777, 781 (D.C. Cir. 1989).

Exigent circumstances existed here, as there was probable cause to believe that the

van contained explosives or other hazardous materials and therefore posed an immediate

and serious threat to the public.  In Illinois v. Gates, 462 U.S. 213 (1983), the Supreme

Court explained that the probable cause standard is a practical, nontechnical concept

which deals with probabilities -- not hard certainties -- derived from the totality of the

circumstances in a factual situation.  Probable cause to believe a particular contention is

determined by evaluating "the factual and practical considerations of everyday life on

which reasonable and prudent men, not legal technicians, act;" it is "a fluid concept ... not

readily, or even usefully, reduced to a neat set of legal rules."  462 U.S. at 231-32.

The courts have broadly defined the parameters of probable cause.  While it

requires more than an unfounded suspicion, courts have repeatedly explained that

probable cause requires a lesser showing than the rigorous evidentiary standards

employed in trial proceedings.  In Gates, 462 U.S. at 235, the Supreme Court explained

that probable cause is less demanding than the evidentiary standards of beyond a

reasonable doubt, preponderance of the evidence or even a prima facie case -- all that is

required to establish probable cause is a "fair probability" that the asserted contention is

true.  See also Maryland v. Pringle, 540 U.S. 366, 371 (2003).

13

Since probable cause is a lower standard than preponderance of the evidence, a law enforcement official can demonstrate probable cause to believe a factual contention without proving that contention even to a 51% certainty, as required under the preponderance of the evidence standard. See, e.g. Paff v. Kaltenbach, 204 F.3d 425, 436 (3d Cir. 2000) (probable cause is a lesser showing than preponderance of the evidence); United States v. Cruz, 834 F.2d 47, 50-51 (2d Cir. 1987) (probable cause does not require a showing that it is more probable than not that a crime has been committed).[7]

In this case, Plaintiff and Ms. Patel had just been arrested in the crypt of the U.S. Capitol after displaying what appeared to be suicide bomber belts hidden under their outer clothing. Ex. 2, Decl. of Bracci, Dineen, Malloy and King. While the field inspection of the belts was negative for hazardous materials [8], USCP and FBI personnel were concerned that plaintiff's actions were an effort to probe security at the Capitol in advance of an actual suicide bombing, in other words, a "dry run," which is a tactic known to be used by terrorists. Ex. 2, Decl. of Bracci, Dineen, Malloy, Meikrantz, King,

---

[7]Courts have instructed judges to apply no higher standard when they review warrants for probable cause. The magistrate reviewing an application for a criminal search warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238.

[8]Notably, the field testing was not definitive, i.e., it did not rule out the possibility that hazardous materials were present. King Decl. (Ex. 2, p. 6) and Ex. 4, Declaration of Kevin D. Finnerty, ¶ 4. That is why Special Agent Finnerty sent the items gathered at the Capitol to the FBI Laboratory for explosive residue testing. Id.

Udell; Ex. 4, Finnerty Decl. ¶ 3 and Ex. 3, Declaration of Douglas R. Edmonson, ¶ 2; see

also MacWade v. Kelly, 460 F.3d 260, 266 (2d Cir. 2006)(noting expert testimony that

terrorists "rehearse [the attack], they train it, they do dry runs").  They were concerned

that Plaintiff's vehicle might contain explosives for the actual bombing to follow the dry

run, or possibly explosives aimed at killing law enforcement officials who, after the

incident in the Capitol, would naturally be expected to have an investigative interest in

Plaintiff's vehicle.  Ex. 2, Decl. of Bracci, King, Udell.[9]   They were concerned that

unknown third parties may have been involved and may have been able to remotely

trigger a device inside the vehicle.  Id.  They were told that members of the public were

suspicious of the vehicle and when they looked inside the vehicle, they saw large

containers covered by clothing and blankets as well as glass jars containing unknown

liquid.  Id.

    These facts and circumstances established probable cause to believe that the

vehicle posed a serious threat which required immediate action potentially affecting life

and death.  See, e.g., United States v. Duran, 884 F.Supp. 552 (D.D.C. 1995)("render

safe" inspection of vehicle after incident near the White House justified under exigent

---

[9]See also, e.g. January 31, 2002 Law & Order 75, "Bomb Threat Recognition,"
available on Westlaw at 2002 WLNR 5056128 (describing booby-trapped explosive
devices and secondary devices aimed at law enforcement officers and other first
responders); July 1, 2002 Fire Int'l 14, "Fire International," available on Westlaw at 2002
WLNR 4451138 (describing acts of terror in Israel aimed at emergency responders and
citing terrorism experts' fear that suicide "belt" bombers may soon strike in the United
States).

circumstances exception to warrant requirement).  From Plaintiff's perspective, the

actions of the law enforcement agencies may appear to have been an overreaction to his

"performance art."  But the sad reality of our times is that car bombs do exist; they are

real threats; and irrefutably, there are people who would stop at nothing to commit a

terrorist act in or near the U.S. Capitol.  The USCP faced the risk that delaying immediate

action to clear the van could result in a terrorist act causing death and destruction.

Balanced against this risk of calamity was the possibility that there was no immediate

threat and that the entry into the vehicle would infringe to some degree on Plaintiff's

privacy interest in the vehicle -- interests which are "significantly less" than one's privacy

interest in one's home or office.  California v. Carney, 471 U.S. 386, 390, 391

(1985)("the expectation of privacy with respect to one's automobile is significantly less

than that relating to one's home or office").  Even with 20/20 hindsight, the decision to

conduct the inspection cannot be considered "unreasonable" for purposes of the Fourth

Amendment.

      **2.**      **The Search was Justified under the Automobile Exception to the Warrant Requirement**

     "One of the circumstances in which the Constitution does not require a search

warrant is when the police stop an automobile on the street or highway because they have

probable cause to believe it contains contraband or evidence of a crime."  Arkansas v.

Sanders, 442 U.S. 753, 760 (1979)(citations omitted).  One of the principal bases

underlying the automobile exception is the "ready mobility" of automobiles.  California v.

Carney, 471 U.S. 386, 390 (1985).  The exception is also a recognition that "the

expectation of privacy with respect to one's automobile is significantly less than that

relating to one's home or office."  Id at 391.  Thus, when a search is conducted of a

vehicle on the road or parked on the street, both justifications for the vehicle exception

come into play.  Id. at 392.  In either circumstance, however, probable cause must exist.

Chambers v. Maroney, 399 U.S. 42, 51 (1970); United States v. Holly, 219 F.Supp.2d

117, 123 (D.D.C. 2002).

      As explained above, the officers had probable cause to believe that the van posed

an immediate and serious threat which justified the inspection.  The same facts and

circumstances which formed the basis for that conclusion also support the conclusion that

the van contained contraband in the form of explosive or other hazardous materials,

which would justify the inspection under the "automobile exception."  Furthermore, even

aside from the concern about the immediate threat posed by the van, there was probable

cause to believe that the van contained evidence relating to the crimes for which Plaintiff

had been arrested.  The out-of-state tags, King Decl. (Ex. 2, at 7), suggested that they had

used the van to travel from outside Washington, D.C. in order to reach the U.S. Capitol.

The van was reported to have been parked in the same location for several days.  Decl. of

Bracci, Malloy and King (Ex. 2, at 2, 7, and 10).  Thus, there was probable cause to

believe that the van would contain evidence of planning and preparation by Plaintiff, Ms.

Patel, and possibly third parties, for the actions at the Capitol.  Therefore, the "automobile

exception" to the warrant requirement applies, and there was no Fourth Amendment violation.

### 3. It Was Not Clearly Established that the Inspection of the Van was Unconstitutional

Even if the Court concludes that the facts known to the Federal defendants at the time did not amount to exigent circumstances which would justify the inspection of the van, and did not justify the inspection under the "automobile exception," the Federal Defendants are still entitled to qualified immunity, as it was not clearly established that the inspection was unconstitutional. Saucier, 533 U.S. at 205 ("[i]f [an] officer's mistake as to what the law requires is reasonable ... the officer is entitled to the immunity defense); Hunter v. Bryant, 502 U.S. 224, 229 (1991)(per curiam)("This accommodation for reasonable error exists because [officers] should not err always on the side of caution because they fear being sued"). Stated another way, qualified immunity is warranted because a reasonable law enforcement official could have mistakenly believed that the inspection of the van was not unconstitutional. Anderson v. Creighton, 483 U.S. 635 (1987)(FBI agent entitled to qualified immunity if he mistakenly, but reasonably, concluded that probable cause was present to conduct warrantless search); Malley v. Briggs, 475 U.S. 335, 341 (1986) ("if officers of reasonable competence could disagree on [the] issue, immunity should be recognized").

The case of United States v. Duran, 884 F.Supp. 552 (D.D.C. 1995), which involved analogous facts, demonstrates that it was not "clearly established" that the van

18

search was unconstitutional.  In that case, Duran had allegedly fired numerous rounds from a semiautomatic weapon in the vicinity of the White House.  Id. at 554.  He was arrested by Secret Service officers.  They recovered from his wallet a note addressed to the Secret Service stating that he had parked his pick-up truck in the vicinity of the White House and requested that the vehicle be returned to his wife at a certain address in Colorado.  Id.

Secret Service officers located his vehicle on the east side of 17th Street, N.W., just north of D Street, and law enforcement officers immediately closed 17th Street, N.W. between D and E Streets for fear that the vehicle might contain an explosive device.  Id. A canine sweep of the exterior of the vehicle was negative.  Id.  Authorities then decided to impound the vehicle and tow it to the FBI, but before doing so, a bomb technician and his assistant entered the truck and conducted a "render safe procedure" and declared the vehicle free of explosives.  Id.

Duran later sought to suppress evidence found in the truck on the grounds that, inter alia, the warrantless search of the truck violated the Fourth Amendment.  Id. at 553. The court rejected this argument, for two reasons.  First, the court stated that "'[a] warrantless search of a motor vehicle parked in a public place is permissible, with or without exigent circumstances, provided the searching authorities have probable cause to believe the vehicle contains contraband' or evidence of a crime."  Id. at 555 (quoting United States v. Wilder, 951 F.2d 1283, 1286 (D.C. Cir. 1991)).  The court explained that federal authorities had probable cause to arrest Duran after he fired his weapon in the

19

vicinity of the White House and that after finding the note in his wallet describing the truck as parked near the White House "'there was a 'fair probability' that the vehicle contained additional evidence of [criminal] activity and therefore probable cause to search it.'" Id. (quoting Wilder, 951 F.2d at 1286).

After noting that probable cause must be considered from the viewpoint of the officer involved in the search or seizure, the court explained that "[i]n the instant case, the Secret Service agents relied on their knowledge and experience to conclude that the Defendant's note indicated that the vehicle could be connected, through use of explosives or other contraband, to a wider plot to harm the President or the agents themselves." Id. at 555. The court also pointed to the gravity of the potential danger to the President as an important factor in deciding that the search was justified. Id. at 556.

The court also found that the warrantless inspection of the vehicle was justified because exigent circumstances existed necessitating prompt action to ensure against any threat to the public. Id. Although the agents had entered the truck several hours after the negative canine swept, the court found that the investigating agents "reasonably suspected that the vehicle itself posed a threat to the President, federal agents, and the public and acted upon this suspicion by sending bomb technicians in to secure the vehicle." Id. The court rejected Duran's claim that the canine sweep was sufficient to allay any fear of explosives, noting testimony that a canine sweep is always followed by a manual check to ensure the safety of the vehicle. Id.

20

The <u>Duran</u> case shows that it was far from "clearly established" that the search of the van in this case was improper.  As with the threat against the White House in <u>Duran</u>, the actions of Plaintiff here could reasonably be construed as a potentially serious threat against the Capitol or against law enforcement.   The USCP agents did not know at the time whether Plaintiff and Ms. Patel's actions were merely a case, on the one hand, of bizarre and extremely bad judgment or, on the other hand, an indication of an actual terrorist act to follow.  Ex. 2, Decl. of Bracci, Dineen, Malloy, Meikrantz, King, Udell. There was no "clearly established" law that would have made it clear to every reasonable law enforcement officer that under the particular circumstances faced by the agents, an inspection of the van was unconstitutional.  Thus, qualified immunity should be granted.

### 4. The Inventory Search on March 7, 2003 Did Not Violate the Fourth Amendment[10]

After USCP Special Agents Bracci and King finished searching the van for explosives and other hazardous substances, it was towed to FBI space for safekeeping and possible further investigation.  Ex. 3, Edmonson Decl. ¶ 3 (p. 8) and Ex. 4, Finnerty ¶ 6. In accordance with FBI policy, an inventory search was conducted by a team of FBI agents.  Ex. 3, Decls. of Cejpek, Chinchilla, Collins-Morton, Menold, Rankin, and Sidener; Ex. 4, Finnerty Decl. ¶ 6.  The agents were careful not to cause any damage

---

[10]Plaintiff, in his Second Amended Complaint, does not allege that the inventory search was unconstitutional although he does identify as defendants FBI agents who conducted the inventory search.  Accordingly, to the extent Plaintiff's complaint might be construed as including such a claim and to ensure a comprehensive response, the Federal Defendants assert that the inventory search did not violate the Fourth Amendment for reasons explained herein.

during the inventory search.  Id.  In addition, after the inventory search, FBI Special

Agents Godbold and Garten were requested to conduct field screening of three containers

found in the van containing liquid, to ensure that they were not hazardous.  Decls. of

Godbold, ¶ 2, Garten, ¶ 2 (Ex. 3, at 10 and 20).

An inventory search is an exception to the warrant requirement of the Fourth

Amendment.  Colorado v. Bertine, 479 U.S. 367, 371 (1987); Texas v. Brown, 460 U.S.

730 (1983); South Dakota v. Opperman, 428 U.S. 364 (1976); United States v. Holly, 219

F.Supp.2d 117, 128-29 (D.D.C. 2002).  Lawful possession of a vehicle is a condition

precedent to a proper inventory search of the vehicle.  Holly, supra.  The existence of

probable cause to believe that a vehicle contains evidence of a crime is one basis for law

enforcement agencies to impound a vehicle.  See United States v. Ross, 456 U.S. 798,

807 n. 9 (1982);  Chambers v. Maroney, 399 U.S. 42, 51-52 (1970).  Another basis for

impoundment is a "community caretaking" function to safeguard the vehicle for the

benefit of the owner.  South Dakota v. Opperman, 428 U.S. 364, 368-69 (1976).

Here, the FBI clearly had proper possession of the van, on grounds that it likely

contained evidence and on community caretaking grounds.  The FBI was concerned that

Plaintiff's actions at the Capitol may have been an effort to probe security at the Capitol

in advance of an actual attack, and they believed that the van would contain evidence

relevant to an investigation of the incident.  Edmonson Decl. ¶ 3 (Ex. 3, at 8),  and Ex. 4,

Finnerty Decl. ¶ 6.  While it now appears that there was no terrorism connection, Fourth

Amendment claims must be analyzed based upon the information known to the agents at the time, not on 20/20 hindsight.  Anderson v. Creighton, 483 U.S. 635, 641 (1987).

At the time, the agents knew that the Capitol was a target for terrorists.  Ex. 4, Finnerty Decl. ¶ 3; Edmonson Decl.  ¶ 2 (Ex. 3, at 7); see also U.S. v. Moussaoui, 333 F.3d 509, 512 (4th Cir. 2003)(stating that the fourth plane involved in the attacks on September 11, 2001, was apparently headed for the Capitol Building).  They also knew that terrorists do "dry runs" in advance of actual attacks, id., see also MacWade v. Kelly, 460 F.3d 260, 266 (2d Cir. 2006)(noting expert testimony that terrorists "rehearse [the attack], they train it, they do dry runs") and they were concerned that Plaintiff was either knowingly involved or may have been a unwitting "dupe" or "patsy" who was being used by third parties who were probing security at the Capitol.  Ex. 4,  Finnerty Decl. ¶ 6; Edmonson Decl.  ¶ 2 (Ex. 3, at 8).

The actions of Plaintiff and Ms. Patel certainly could be construed by a reasonable law enforcement official as an effort to probe security at the Capitol.  They passed through several levels of security wearing robes which hid the duct taped harnesses that they were wearing underneath, and it appears that they only removed those robes after passing through the final security screen.  Second Am. Compl.  ¶¶ 66, 68; Ex. 4, Finnerty Decl. ¶ 2 (and photographs attached thereto as Exhibits A and B).  In the complaint, Plaintiff hints in a roundabout way that his duct taped harness was supposed to evoke concerns about terrorism (Second Am. Compl. ¶¶  65 and 66), but in any case the photographs (see Exhibit B attached to Ex. 4, Finnerty Decl.) make it clear that it looked

23

like a suicide bomber belt.  Ex. 2, Decl. of Bracci, Dineen, Malloy and King.  And

according to the complaint, Plaintiff did not disclose to security what his actual intentions

were.  He alleges that he told security guards that he was an artist "doing research" for an

upcoming performance (Second Am. Compl. ¶ 68)  -- perhaps a technically truthful

statement, but certainly not the whole truth.  An objective observer could reasonably view

these actions as a way for Plaintiff to determine the extent and effectiveness of security at

the Capitol, perhaps to facilitate a return visit by Plaintiff or by a third party intending an

actual terrorist attack.

　　　The fact that the field tests conducted by the USCP were negative certainly did not

rule out that Plaintiff and Ms. Patel were knowingly, or unwittingly, probing security at

the Capitol in advance of an actual attack.[11]   For that reason, the FBI sent the duct tape

harnesses, the containers and other items collected from the floor of the Capitol to the FBI

Laboratory Division for explosive residue testing.  Ex. 4, Finnerty Decl. ¶ 4.

　　　At a minimum, Plaintiff's actions at the Capitol crypt appeared to constitute a

bomb hoax, in violation of 18 U.S.C. § 844(e).  As already stated, it reasonably appeared

his actions may have been a precursor to an actual terrorist act.  In either case, there was

probable cause to believe that the van, which he and Ms. Patel had apparently used to

reach the U.S. Capitol would contain evidence pertaining to Plaintiff's and Ms. Patel's

---

[11]In any case, those field tests are not considered definitive determinations as to
whether any explosive residue is present.  Ex. 4, Finnerty Decl. ¶ 4 and King Decl. (Ex. 2,
at 6).

24

actions and intentions, and possibly the actions and intentions of third parties. Thus, there was probable cause to impound the van.

The decision to tow the van was also permissible under the "community caretaking" exception to the warrant requirement. South Dakota v. Opperman, 428 U.S. 364, 368-69 (1976); United States v. Coccia, 446 F.3d 233, 238 (1st Cir. 2006). Since both Plaintiff and Ms. Patel had been arrested and would remain in custody for an unknown period of time, it was reasonable for the FBI to impound the van in order to protect it and its contents from theft or vandalism. Coccia, supra, at 240 ("[b]ecause Coccia would be indisposed for an indeterminate, and potentially lengthy, period, the officers properly made arrangements for the safekeeping of the vehicle, which was packed with his personal belongings. Because Coccia's car was filled with many of his belongings, it was a possible target for theft or vandalism"); Vega-Encarnacion v. United States, 344 F.3d 37, 41 (1st Cir. 2003)("Caselaw supports the view that where a driver is arrested and there is no one immediately on hand to take possession, the officials have a legitimate non-investigatory reason for impounding the car.") Because it was permissible for the FBI to impound the van and conduct an inventory search, there was no Fourth Amendment violation.

     **5.**     **It Was Not Clearly Established that the Inventory Search Violated the Fourth Amendment**

If the Court determines that the Fourth Amendment was violated when the FBI impounded the van or conducted an inventory search, the Federal Defendants are still

entitled to qualified immunity.  As with the inspection of the van by the USCP bomb

technicians, the case of  United States v. Duran, 884 F.Supp. 552 (D.D.C. 1995) certainly

would suggest that it was reasonable to believe that the van contained evidence relevant

to the incident at the Capitol, and therefore could be impounded.  The case law would

also lead a reasonable officer to conclude that the van could be impounded to safeguard it

and its contents.  United States v. Coccia, supra.  The Federal Defendants are not aware of

any controlling precedent that would have placed a reasonable law enforcement officer on

notice that under the particular circumstances here it was clearly wrong to do so.  See

Johnson v. District of Columbia, 445 F.Supp.2d 1, 10 (D.D.C. 2006)(finding qualified

immunity and noting that the parties had not pointed the court to any cases relevant to the

situation confronted by the defendant officer).  Thus, qualified immunity should be

granted.

        In any event, the decision to impound the vehicle was made by a supervisory FBI

official at the Washington Field Office, not by any of the defendants.  Edmonson Decl., ¶

3 (Ex. 3, at 8).  Therefore, the Federal Defendants are entitled to qualified immunity on

this ground alone.  Bilida v. McCloud, supra, 211 F.3d at 174-75;  Lauro v. Charles,

supra, 219 F.3d at 216 n. 10.  In addition, as inventory searches of impounded vehicles

are required under FBI policy, see, e.g., Sidener Decl. ¶ 3 (attaching policy)(Ex. 3, at 39-

55), and it was requested by Special Agent Finnerty (Ex. 4, Finnerty Decl.  ¶ 6), the FBI

defendants involved in the inventory search (Special Agents Cejpek, Chinchilla, Collins-

Morton, Menold, Rankin and Sidener) are entitled to qualified immunity.   Bilida, supra;

Lauro, supra.

### C.    The Allegations of Property Damage Fail to State A Bivens Claim

Plaintiff alleges that numerous Federal Defendants violated his Fourth Amendment

rights by seizing, destroying or damaging his artwork in his van.  Second Am. Compl. at ¶

98.  However, not every wrong, whether real or merely perceived, rises to the level of a

constitutional violation.   The Supreme Court has explained, in the context of a due

process claim:

> [W]e have made it clear that the due process guarantee does not entail a body of
> constitutional law imposing liability whenever someone cloaked with state
> authority causes harm. In Paul v. Davis, 424 U.S. 693, 701 ... (1976), for example,
> we explained that the Fourteenth Amendment is not a ""font of tort law to be
> superimposed upon whatever systems may already be administered by the
> States,"" and in Daniels v. Williams, 474 U.S., at 332 ... we reaffirmed the point
> that ""[o]ur Constitution deals with the large concerns of the governors and the
> governed, but it does not purport to supplant traditional tort law in laying down
> rules of conduct to regulate liability for injuries that attend living together in
> society."" We have accordingly rejected the lowest common denominator of
> customary tort liability as any mark of sufficiently shocking conduct, and have
> held that the Constitution does not guarantee due care on the part of state officials;
> liability for negligently inflicted harm is categorically beneath the threshold of
> constitutional due process. See id., at 328 ...; see also Davidson v. Cannon, 474
> U.S., at 348 ... (clarifying that Daniels applies to substantive, as well as procedural,
> due process).

County of Sacramento v. Lewis, 523 U.S. 833, 848-49 (1998).

As with due process claims, the Fourth Amendment does not protect against

seizures conducted in a negligent manner.  See, e.g., McCoy v. City of Monticello, 342

F.3d 842, 847 n. 3 (8th Cir. 2003)("[t]he fourth amendment ... only protects individuals

against ""unreasonable"" seizures, not seizures conducted in a ""negligent""

manner)(quoting Dodd v. City of Norwich, 827 F.2d 1, 7-8 (2d Cir. 1987)).  Moreover,

even if there were evidence that property in the van was intentionally damaged -- and no

such evidence exists -- the proper remedy would be under the Federal Tort Claims Act,

not a Bivens action.  Cf. Hudson v. Palmer, 468 U.S. 517, 533-34 (1984)(unauthorized

intentional deprivation of property by a state employee does not constitute a violation of

the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a

meaningful postdeprivation remedy for the loss is available); Mac'Avoy v. Smithsonian

Institution, 757 F.Supp. 60, 69 (D.D.C. 1991)(availability of a tort remedy under the

FTCA bars due process claim seeking injunctive relief); Rodriguez-Mora v. Baker, 792

F.2d 1524, 1527 (11th Cir. 1986)(no due process claim for loss of inmate's property as

FTCA was adequate post-deprivation remedy; Bigbee v. United States, 359 F.Supp.2d

806, 809-810 (W.D. Wis. 2005)(same).  For these reasons, Federal Defendants are

entitled to dismissal or summary judgment as to the property damages claim.

### D.    Plaintiff's Suit Against All But Defendants Nutwell and DePalma Barred by Applicable Statute of Limitations

A Bivens suit must be filed within the District of Columbia's three year statute of

limitations period unless the plaintiff demonstrates reasons for tolling the statute.   See,

e.g. Weaver v. Bratt, 421 F.Supp.2d 25, 37-38 (D.D.C. 2006). Here, with the exception of

defendants Nutwell and DePalma, Plaintiff brought this suit related to incidents occurring

in March 2003 against the named Federal Defendants in October 2006 beyond the

limitations period.  Plaintiff was directed to identify "John Does" by March 16, 2006,

Olaniyi, 416 F.Supp.2d at 51, but failed to do so, and further, did not seek an extension of

the period by which to identify and serve the "John Does" until August 2006.[12]

Importantly, the Federal Defendants produced their initial disclosures to Plaintiff on or around May 24, 2006 identifying those involved in the search of the vehicle. Yet, Plaintiff failed to effectuate service until October 2006 against these individuals. Thus, Plaintiff's suit against the Federal Defendants should be dismissed as untimely as Plaintiff has not exercised the due diligence required for tolling the statute. Irwin v. Dep't of Veterans Affairs, 498 U.S. 89 (1990).

## IV.   **CONCLUSION**

For reasons stated herein, the Federal Defendants respectfully request that the Court dismiss this suit as against them or grant the Federal Defendants summary judgment.

---

[12]The Federal Defendants opposed this Motion for an Extension. Further, Plaintiff's omission here is readily distinguishable from that described in the Court's February 2006 Memorandum Opinion as related to the Defendant's jurisdictional argument. Olaniyi, 416 F.Supp.2d at 51. When the Court issued its opinion, the time by which Plaintiff had to identify and serve John Does had not expired. Id.

Date: March 30, 2007        Respectfully Submitted,

/s/ Jeffrey A. Taylor /rcl

_____

JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney

/s/ Rudolph Contreras /rcl

_____

RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

/s/ Beverly M. Russell

_____

BEVERLY M. RUSSELL, D.C. Bar #454257
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia,
  Civil Division
555 4th Street, N.W., Rm. E-4915
Washington, D.C. 20530
Ph:  (202) 307-0492
Fax: (202) 514-8780
E-Mail: beverly.russell@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the ***Federal Defendants' Motion to Dismiss***

***Plaintiff's Second Amended Complaint, or Alternatively, for Summary Judgment*** was

made by the Court's Electronic Case Filing System this <u>30th</u> day of March, 2007 to:

> David Finley Williams
> Keith Wesolowski
> Jennafer P. Neufeld
> Cadwalader, Wickersham & Taft LLP
> 1201 F Street, N.W.
> Washington, DC 20004

> Melvin W. Bolden, Jr.
> Office of the Attorney General for the
> District of Columbia
> 441 4th Street, N.W.
> Washington, D.C. 20001


/s/ Beverly M. Russell

_____

BEVERLY M. RUSSELL
Assistant United States Attorney

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,        )
                                   )
        Plaintiff             )
                                   )
        v.                   )        Civil Action No. 05-00455(RBW)
                                   )
DISTRICT OF COLUMBIA, et al.      )
                                 )
        Defendant.         )
_____ )

## THE FEDERAL DEFENDANTS' STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to Local Rule 7(h), the Federal Defendants hereby submit the following statement of material facts as to which there is no genuine dispute.

1. Acknowledging a pervasive "atmosphere of heightened anxiety and concerns over safety and security[,]" Plaintiff, on March 6, 2003, nevertheless presented himself in the U.S. Capitol with a duct-taped apparatus strapped to his person. Id. ¶¶ 66. The apparatus was made from "various materials from the D.C. environment, including newspapers, shampoo bottles, empty honey jars and [of course] duct tape." Id.

2. Just after 1:00 p.m. on March 6, 2003, Plaintiff was approached by U.S. Capitol Police ("USCP") Officer Preston Nutwell who asked Plaintiff what he was holding. Id. ¶ 70. Officer Nutwell allegedly asked Plaintiff to drop the item. Id. The piece, a sculpture, subsequently shattered on the ground. Id.

3. Plaintiff was next handcuffed and asked if he had any wires or explosives in his outfit. Id. ¶ 71. He purportedly responded in the negative. Id.

4.    Plaintiff's vehicle, parked within close proximity to the U.S. Capitol, was searched. Id. ¶ 73.

5.    Plaintiff was detained for one night, id. ¶ 74, and subsequently charged with violations of 18 U.S.C. § 844(e) for false bomb threat, 40 U.S.C. § 193f(b)(7) for disorderly conduct on Capitol grounds, 18 U.S.C. § 2 for aiding and abetting, and a District of Columbia code provision for assault or threatened assault, id. ¶ 76.  The charges were later dropped.  Id. ¶ 78.

6.    USCP Defendants Blieden, Boswell, Brooks, Cabezas, Crawford, DePalma, Dineen, Guthrie, Gutierrez, Hinkle, Huycke, McElroy, Meikrantz, Nutwell, Salb, Schauf, Shark, Talbot, Turner and Udell, and FBI Defendants Arseni, Gardner, Garten, Godbold, Ginsburg and Vienna were not involved in the physical search of the van on March 6, 2003, the impoundment of the van, or the inventory search on March 7, 2003.  See Fed. Defs. Ex. 1, 2 (pp. 4-5, 11-15),  3 and 5.

7.    Only USCP Special Agent/Bomb Technicians Donald Bracci and John King entered the van while it was parked near the Capitol.  Ex. 2.  They entered the van in order to inspect it for possible explosive devices or other hazards, and they did so at the instruction of Captain Udell of the USCP Hazardous Devices Section, who was in charge of the scene.  Bracci Decl. (Ex. 2, at 2); King Decl. (Ex. 2, at 7).

8.    The van had expired out of state tags and the Agents were informed that the van had been parked in the same location for several days.  Id.  Containers in the rear of the vehicle were covered.  Id

2

9.     Captain Gilman Udell ordered that the street be cleared of all vehicular and pedestrian traffic for at least a city block until the suspect vehicle could be rendered or determined safe.  Id.

10.     Captain Udell ordered Special Agents Bracci and King to inspect the vehicle for explosive devices, explosives, or other hazards, and if any were found, to render them safe immediately.  Id.

11.     While performing the diagnostic inspection of the van's exterior, Special Agents Bracci and King confirmed the presence of containers in the back of the van that were covered.  Id. While still outside the van they could also see that inside the van were three visible large unmarked glass jars of unknown liquid.  Id.  The bottom portions of the jars could not be seen. Id.

12.     The agents donned Personal Protective Equipment down range before returning to enter the van.  Bracci Decl. (Ex. 2, at 2); King Decl. (Ex. 2, at 7-8).   They inspected the interior of the van for explosive devices and other hazardous material. Bracci Decl. (Ex. 2, at 2); King Decl. (Ex. 2, at 8). The glass jars were handled with appropriate chemical precautions and were triple over-packed in approved HAZMAT containers.  Bracci Decl. (Ex. 2, at 2-3); King Decl. (Ex. 2, at 8).  They left the jars in the van for further analysis by the FBI.  Bracci Decl. (Ex. 2, at 3).

Date: March 30, 2007              Respectfully Submitted,

                                 /s/ Jeffrey A. Taylor /bmr
                                 _____
                                 JEFFREY A. TAYLOR, D.C. BAR #498610

3

United States Attorney

/s/ Rudolph Contreras /bmr
_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

/s/ Beverly M. Russell
_____
BEVERLY M. RUSSELL, D.C. Bar #454257
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia,
 Civil Division
555 4th Street, N.W., Rm. E-4915
Washington, D.C. 20530
Ph:  (202) 307-0492
Fax: (202) 514-8780
E-Mail: beverly.russell@usdoj.gov

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,     )
                              )
       Plaintiff           )
                              )
v.                            )     Civil Action No. 05-00455(RBW)
                              )
DISTRICT OF COLUMBIA, et al.     )
                              )
       Defendant.       )

## DECLARATION OF JORDAN BLIEDEN

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

I responded to the Capitol Crypt to assist fellow USCP officers with a situation involving the plaintiff, Mr. Olaniyi, who appeared to have explosives strapped to his body. I helped to evacuate staff from the Crypt and searched for any possible secondary explosive devices. After the plaintiff had been placed under arrest, I escorted him to a USCP office within the Capitol. I then resumed my regular duties and had no further involvement with the plaintiff or any other activity related to this matter.

I, Jordan Blieden, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_____
Jordan Blieden

_____2-6-07_____
Date

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,     )
                                )
       Plaintiff           )
                                )
v.                         )     Civil Action No. 05-00455(RBW)
                                )
DISTRICT OF COLUMBIA, et al.    )
                                )
       Defendant.      )

## DECLARATION OF CHARLES BOSWELL

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

As an officer assigned to United States Capitol Police (USCP) Capitol Division, it is my duty to provide security and protection for members of congress, congressional staff and Capitol visitors.

I responded to the Capitol Crypt to assist fellow USCP officers in a situation involving the plaintiff, Mr. Olaniyi, who appeared to have explosives strapped to his body. When I arrived, the plaintiff/subject had already been apprehended. I remained on the scene while USCP Hazardous Devices Unit (HDU) examined the suspicious apparatus attached to the plaintiff, Mr. Olaniyi. I then escorted the individual to the USCP Capitol detail office for processing. I remained in the hallway outside of the USCP Capitol detail office until I assisted in transporting Mr. Olaniyi to USCP Headquarters for further processing. I was not on the scene during the search of the vehicle associated with the plaintiff.

I, Charles Boswell, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_Charles V. Boswell Jr._
Charles Boswell

_02/20/07_
Date

Def.'s Ex. 1 - USCP Declarations
3 of 16

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,    )
    )
    Plaintiff    )
    )
v.    )    Civil Action No. 05-00455(RBW)
    )
DISTRICT OF COLUMBIA, et al.    )
    )
    Defendant.    )

## DECLARATION OF TYRONE BROOKS

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

At the time of this incident I was and still am assigned to the United States Capitol Police (USCP) Capitol Division. Capitol Division duties include ensuring the security of the Capitol Building. I was in the Capitol Crypt when I observed the plaintiff, Mr. Olaniyi, and another individual chanting, wearing robes and some type of belts constructed of plastic containers and duct tape around their persons. The apparatus on the plaintiff's person appeared to be explosives. I became concerned for the safety of the Capitol visitors in the immediate vicinity.

At that point I called for a USCP supervisor and any available units to respond. After backup USCP units arrived on the scene, I helped to establish a safety perimeter by clearing the area of tourists and others in the Capitol Crypt. I helped to maintain the secured area for approximately 45 minutes until the plaintiff was removed from the area and the examination of the apparatus by USCP units was complete. At this time, I resumed my regular duties. At no time did I interact with or otherwise come in contact with the plaintiff, Mr. Olaniyi.

I, Tyrone Brooks, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_____
Name

_____
2/12/07
Date

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,     )
           )
     Plaintiff      )
           )
v.           )     Civil Action No. 05-00455(RBW)
           )
DISTRICT OF COLUMBIA, et al.     )
           )
     Defendant.     )

## DECLARATION OF ROSE CABEZAS

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

At the time of this incident I was assigned to the United States Capitol Police (USCP) Capitol Division. Capitol Division duties include ensuring the security of the Capitol Building. A congressional staff person alerted a USCP officer who put out a call for assistance because there was a suspicious person in the Capitol Crypt. I immediately responded to the Capitol Crypt when I observed the plaintiff, Mr. Olaniyi, and another individual chanting, wearing robes and some type of belts constructed of plastic containers and duct tape around their persons.

The plaintiff, Mr. Olaniyi, was taken into custody by USCP officers and escorted to the Capitol Division Office for interviewing and processing. I assisted with the interviewing and processing in the Capitol. Shortly thereafter, the plaintiff was taken to USCP Headquarters for further processing which I was not involved with.

I was not on the scene or otherwise involved with the search of a vehicle associated with the plaintiff.

I, Rose Cabezas, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_Rose Cabezas_
Rose Cabezas

_2-27-07_
Date

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,        )
        )
     Plaintiff        )
        )
v.        )     Civil Action No. 05-00455(RBW)
        )
DISTRICT OF COLUMBIA, et al.        )
        )
     Defendant.        )

## DECLARATION OF MARK CRAWFORD

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

As a Special Agent for the United States Capitol Police (USCP), assigned to the Criminal Investigations Section (CIS), my regular duties include following up on initial reports on offenses occurring on Capitol Grounds.

I responded to the Capitol Building after the plaintiff, Mr. Olaniyi had already been placed in USCP custody and taken to the Capitol Detail Office. My initial response was limited to the Capitol Crypt where, upon arrival, I was advised of this circumstance. I then responded to the Capitol Detail Office where I observed the plaintiff for the first time, but did not ask any questions related to his actions. Shortly thereafter, the plaintiff was transported to USCP Headquarters/Prisoner Processing where I also observed him and asked him questions related to his actions in the Capitol Crypt.

I, Mark Crawford, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_____
Mark Crawford

_____
Date    2/12/07


## · **Declaration**

I, Joseph DePalma, declare under penalty of perjury that on March 6, 2003:

1. I did not participate, directly or indirectly, in the search of the vehicle belonging to David Olabayo Olaniyi;

2. I did not order or suggest to anyone to search the vehicle;

3. I did not issue any notice that Mr. Olaniyi had a vehicle, or that such vehicle was on Capitol Grounds;

4. I did not take Mr. Olaniyi's keys, nor was I ever in possession of the keys;

5. I was not aware that Mr. Olaniyi had a vehicle on Capitol Grounds until Mr. Olaniyi informed me of that fact during my interview during arrest processing.

6. I was not aware that the search of the vehicle took place until after it was completed, and was only told of the search in passing by other USCP employees.

Executed this _16_ day of May, 2006.


_Jm DePalma_
Signature

_DETECTIVE  USCP_
Title

US Capitol Police

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,    )
             )
   Plaintiff      )
             )
v.            )  Civil Action No. 05-00455(RBW)
             )
DISTRICT OF COLUMBIA, et al.  )
             )
   Defendant.     )

## DECLARATION OF GREGORY GUTHRIE

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

Upon my arrival on the scene in the Crypt of the Capitol Building, I observed USCP Officers actively involved with bringing the plaintiff, Mr. Olaniyi, under control. With the assistance of another USCP officer, I cleared the Crypt of visitors and began establishing a safety perimeter. At no time did I ever interact with or have direct contact with the plaintiff.

I, Gregory Guthrie, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_____
USCP Sergeant Gregory Guthrie

_____
   2-5-07
Date

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,                )
                                      )
            Plaintiff                 )
                                      )
v.                                    )        Civil Action No. 05-00455(RBW)
                                      )
DISTRICT OF COLUMBIA, et al.          )
                                      )
            Defendant.                )

## DECLARATION OF NOE GUTIERREZ

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

     I was in the area of the U. S. Capitol Building Senate steps. I responded to the Capitol Crypt after receiving a radio call from USCP Communications about two suspicious individuals at that location. Upon my arrival in the Crypt, I observed the plaintiff in this case, Mr. Olaniyi, jumping, shouting and wearing a vest with duct taped containers (cylindrical objects) and a robe. For the safety of all persons in the Crypt, including Mr. Olaniyi, Mr. Olaniyi was asked to kneel down. When the USCP Hazardous Device Section responded to the scene, I exited the Capitol Crypt via the North Door. I had no further contact with Mr. Olaniyi.

I, Noe Gutierrez, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_Noe Gutierrez_
USCP Sgt. Noe Gutierrez

_Feb 2, 2007_
Date

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DAVID OLABAYO OLANIYI, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-00455(RBW) |
| | ) | |
| DISTRICT OF COLUMBIA, et al. | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF ELAINE HINKLE

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

As an officer assigned to the United States Capitol Police (USCP) First Responders Unit (FRU), I responded to the Crypt of the U.S. Capitol Building after a USCP radio call went out requesting backup for an incident involving two individuals standing in the Crypt wearing what appeared to be vests and belts with bomb materials attached to them. Upon arrival, I saw that a person, I believe to be the plaintiff in this matter, along with a female had been apprehended and placed in handcuffs. The USCP Hazardous Devices Unit (HDU) responded to assess the vests that the two individuals were wearing. Shortly after HDU's arrival, I departed the Crypt to secure an adjacent hallway. I had no direct contact or interaction with the plaintiff, Mr. Olaniyi, at any time.

I, Elaine Hinkle, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_____
Elaine Hinkle

2/13/07
_____
Date

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,                    )
                                          )
          Plaintiff                       )
                                          )
v.                                        )          Civil Action No. 05-00455(RBW)
                                          )
DISTRICT OF COLUMBIA, et al.              )
                                          )
          Defendant.                      )

## DECLARATION OF SHAWN HUYCKE

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

As an officer assigned to United States Capitol Police (USCP) Capitol Division, it is my duty to provide security and protection for members of congress, congressional staff and Capitol visitors.

I was a first responder on the scene at the Capitol Crypt. I spoke with an officer who made a radio call for a suspicious person in the area of the Memorial Door. That officer pointed into the Crypt where I observed the plaintiff, Mr. Olaniyi, wearing an apparatus that I was trained to identify as a suicide vest. I took a position of cover and concealment behind a column on the east side of the Crypt. At that time, another officer approached the individual from the west side of the Crypt. I then approached the plaintiff from the east side. The plaintiff did not respond to officer commands and was taken into custody. I was not on the scene during the search of the vehicle associated with the plaintiff.

I, Shawn Huycke, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_____
Shawn Huycke

_____
Date          2/20/07

Def.'s Ex. 1 - USCP Declarations
11 of 16

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,      )
     )
       Plaintiff             )
     )
v.                        )      Civil Action No. 05-00455(RBW)
     )
DISTRICT OF COLUMBIA, et al.    )
     )
       Defendant.        )

## DECLARATION OF DANNY McELROY

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

     As an officer assigned to United States Capitol Police (USCP) Capitol Division, it is my duty to provide security and protection for members of congress, congressional staff and Capitol visitors.

     I was walking through the Capitol Crypt when I heard a call for assistance. When I responded, I followed orders from a USCP supervisor to cover the elevators that lead up to the fourth floor of the Capitol (H-405 and S-407) and inform other USCP officers stationed on the fourth floor, the Crypt is on the first floor and the elevator I secured does not stop on the second and third floors of the Capitol, that no one should be allowed access to the elevators until after the Crypt area has been cleared. I remained on the fourth floor of the Capitol, carrying out my assignment until given notice that the area three floors below had been cleared. I then resumed my regular duties.

     I briefly saw the plaintiff, Mr. Olaniyi from a distance of approximately 20 feet. However, I had absolutely no interaction with him. Also, I was not on the scene or otherwise involved with the search of a vehicle associated with the plaintiff.

     I, Danny McElroy, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

Danny McElroy

02/23/07
Date

Def.'s Ex. 1 - USCP Declarations
12 of 16

## Declaration 

I, Preston Nutwell, declare under penalty of perjury that on March 6, 2003:

1. I did not participate, directly or indirectly, in the search of the vehicle belonging to David Olabayo Olaniyi.

2. I did not order or suggest to anyone to search the vehicle.

3. I did not issue any notice that Mr. Olaniyi had a vehicle, or that such vehicle was on Capitol Grounds.

4. I did not take Mr. Olaniyi's keys, nor was I ever in possession of the keys.

5. I was not aware that Mr. Olaniyi had a vehicle on Capitol Grounds until he was being interviewed as part of the arrest process.

6. I was not aware that the search of the vehicle took place until after the search was complete, and was not informed of any details of the search until the following day.

Executed this _8_ day of March, 2006.

_____
Signature

_____
Title   Sergeant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DAVID OLABAYO OLANIYI, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-00455(RBW) |
| | ) | |
| DISTRICT OF COLUMBIA, et al. | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF JOHN SALB

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

I responded to the Capitol Crypt to assist USCP officers in clearing the Crypt after a USCP radio broadcast was aired for a suspicious person. I remained outside of the Crypt until the incident was cleared. I saw the plaintiff across the Crypt from where I was located but never interacted with or otherwise came in contact with him.

I, John Salb, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_____  2/2/07
USCP Officer John Salb

_____
FEB 2, 2007
Date

US Capitol Police 12.08:44 p.m. 03-21-2007 38/43

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,              )
                                    )
            Plaintiff               )
                                    )
v.                                  )       Civil Action No. 05-00455(RBW)
                                    )
DISTRICT OF COLUMBIA, et al.        )
                                    )
            Defendant.              )

## DECLARATION OF RYAN SCHAUF

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

As a USCP officer assigned to the House Chamber Section, it is my duty to provide security and protection for the Chambers of the United States House of Representatives. At approximately 1300 hours, I responded to the Capitol Crypt pursuant to a radio call for an incident involving suspicious persons from United States Capitol Police (USCP) Communications. Upon arrival in the Crypt, I assisted other USCP officers in securing the area by establishing and expanding a safety perimeter during the incident. After the plaintiff, Mr. Olaniyi was removed from the area, I assisted in breaking down the safety perimeter as instructed before resuming my regular duties. I had no direct interaction with the plaintiff, Mr. Olaniyi, at any time during this incident.

I, Ryan Schauf, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_Ryan S. Schauf_
Ryan Schauf

2-14-07
Date

Def.'s Ex. 1 - USCP Declarations
15 of 16

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,                     )
                                            )
            Plaintiff                       )
                                            )
v.                                          )        Civil Action No. 05-00455(RBW)
                                            )
DISTRICT OF COLUMBIA, et al.                )
                                            )
            Defendant.                      )


## DECLARATION OF KATHLEEN TALBOT


My involvement in this matter that occurred on March 6, 2003 was limited to the following:

As an officer assigned to United States Capitol Police (USCP) Capitol Division, it is my duty to provide security and protection for members of congress, congressional staff and Capitol visitors.

I responded to the Crypt of the U.S. Capitol Building after a USCP radio call went out requesting backup for an incident involving two individuals standing in the Crypt wearing what appeared to be vests with bomb materials attached to them. Upon arrival, I apprehended a female who was with the plaintiff, placed her in handcuffs and awaited the USCP Hazardous Devices Unit (HDU) to respond and assess the vests that the two individuals were wearing. Once HDU deemed the vests safe, I accompanied the female to prisoner processing for paperwork. I had no direct contact or interaction with the plaintiff, Mr. Olaniyi at any time. I was not on the scene during the search of the vehicle associated with the plaintiff.


I, Kathleen Talbot, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.


_Kathleen Talbot_ (signature)
_____
Kathleen Talbot


_2-20-2007_
_____
Date

Def.'s Ex. 1 - USCP Declarations
16 of 16

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,                )
                                      )
      Plaintiff                )
                                      )
v.                                    )      Civil Action No. 05-00455(RBW)
                                      )
DISTRICT OF COLUMBIA, et al.          )
                                      )
      Defendant.              )

## DECLARATION OF MARY ANN P. TURNER

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

As a Special Agent/Detective assigned to United States Capitol Police (USCP) Threats Assessment Section (TAS), it is my duty to assist in conducting threat assessments for individuals that may potentially endanger USCP protectees.

When I responded to the Capitol Crypt as directed by my supervisor in response to an incident involving a suspected suicide bomber, I learned that the plaintiff, Mr. Olaniyi, had been transported to USCP Headquarters for processing. USCP Crime Scene Search (CSS) and USCP Hazardous Devices Unit (HDU) were processing the various devices, including the duct taped jars, containers, and harnesses that the plaintiff was wearing. I was directed to respond to Senator Levin's office to interview any staff member that had contact with plaintiff, as a gallery pass issued by Senator Levin's office was found during a search of the plaintiff. I also interviewed the plaintiff, along with an investigator from the USCP Criminal Investigations Division (CID) while in USCP prisoner processing.

I do not recall any discussion of a vehicle associated with the plaintiff and I was not at the scene of the search of any vehicle associated with the plaintiff.

I, Mary Ann P. Turner, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_Maryann P. Turner_
Mary Ann P. Turner

_February 22, 2007_
Date

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,        )
                                      )
      Plaintiff                )
                                        )
v.                                )    Civil Action No. 05-00455(RBW)
                                        )
DISTRICT OF COLUMBIA, et al.       )
                                        )
      Defendant.             )

## DECLARATION OF DONALD BRACCI

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

     As a Special Agent/Bomb Technician with the United States Capitol Police (USCP) Hazardous Devices Section (HDS) at the time of this incident it was my duty to locate, identify and render safe suspicious items, packages, vehicles or other potential hazards, including explosives, chemical, biological and radiological devices. In June of 2004 I left the USCP in good standing to become a police officer in the state of Georgia. I am currently employed by the Georgia Southern University Police Department.

     I was dispatched to the Capitol Crypt by USCP Communications for the report of a suspected suicide bomber. Once I arrived at the Capitol I was informed that there were two suspected suicide bombers in the Crypt that had been detained by USCP officers. Sergeant Malloy of HDS then ordered Special Agent King and I to remove the suspect device from the female suspect and render it safe. Once on scene in the Crypt, I observed Special Agent Dineen and Special Agent Meikrantz removing what appeared to be a suicide bomber's vest from a male suspect. I also observed a female suspect that was being detained by a USCP Officer. Upon my initial approach to the female suspect I formed my initial diagnosis of the device, and observed several things that were of great concern. First I observed what appeared to be an explosive laden suicide belt around the suspect's waist. Suicide belts are the weapons of choice for terrorist groups when deploying female suicide bombers. The belt had multiple compartments that each appeared to be bearing a heavy load. Each compartment appeared to be wired together as if the device was electrically initiated. Electrical initiation is the method of choice for all major terrorist group deploying suicide bombers.

     Special Agent King and I then carefully inspected and removed the device from the suspect. At this point a USCP officer removed the female suspect to a safe location while Special Agent King and I diagnosed the device, and tested it for biological and radiological hazards. After the suspect was removed from the Crypt I had no further contact with her. After our tests were complete the suspect device was turned over to the FBI, and I had no further contact with the device. Because no explosives were found on the suspects I was concerned that the suspects were probing our security

measures. This appeared to be reasonable seeing that they had chosen to go through the security screening process with their devices concealed by their clothing. The other point of concern was that this incident in the Capitol might have been by design a diversion from bombers or bombs that had been placed in other locations. At this point we were dispatched to the 300 block of Third Street NE.

Once on scene at the 300 Block of Third Street NE we were informed that several residents and some restaurant employees had become suspicious of a van, with expired out of state tags, that had been parked there for days. USCP K-9 Officers had performed a check of the exterior of the vehicle and had noticed large containers in the rear of the van that were covered by blankets and clothing. Captain Udell of HDS took command of the scene and ordered that the entire block be cleared of all vehicular and pedestrian traffic.

Having served as both a military Bomb Technician and a USCP Bomb Technician my training and experience had taught me that time is never on your side when trying to protect the public from explosive hazards. A Bomb Technician must always consider the threat of a timed device that is counting down to a detonation while you are weighing options. You must also consider that the incident you are working on may involve a command-detonated device, such a device could be triggered by an as yet unidentified accomplice of the person who had been taken into custody in the Capitol. In these situations the longer that you wait the less chance you have to prevent an explosive device from detonating.

At this point keys to the vehicle were brought to the scene by a USCP officer. Captain Udell stated that we were given clearance to perform a diagnostic inspection of the van's exterior and interior. The scope of this inspection was to determine if the vehicle contained any explosive devices or any other hazards. If any hazards were present, we were to render them safe. Captain Udell then ordered Special Agent King and I to perform the diagnostic inspection of the van. At this point I was operating under lawful orders in an exigent circumstance. At all times during this incident I was acting within the scope of my duties, and in good faith.

While performing the diagnostic inspection of the van's exterior Special Agent King and I confirmed the presence of the large containers in the back of the van that were covered. While still outside the van we observed that the van contained unmarked glass jars filled with suspicious looking liquids. From my training and experience as a military Bomb Technician I knew that many hazardous chemicals that are used as weapons must be stored in glass containers because of their corrosive nature. At this point Special Agent King and I donned personal protective equipment to safeguard against any chemical hazards. At this point the threat that the van posed to public safety was very high. This assessment was based on the van's ability to contain large amounts of explosives, the fact that the van contained suspicious liquids, and the van's close proximity to unprotected civilians, USCP Headquarters and the Hart Senate Office Building.

At this point the interior of the van was carefully accessed and painstakingly inspected for explosive devices and other hazardous materials that posed a threat to the public's safety. Great care was taken when touching or moving any object inside of the van. When checking the containers in the rear of the van each one was opened carefully. All items that were removed from the containers were handled with great care, and carefully placed back in their containers in the same condition

they were found in. The glass jars containing suspicious liquids were handled with appropriate chemical precautions, and packed in HAZMAT approved containers. The liquids were then turned over to the FBI. The rest of the van's contents were left in the same condition that they were found. At this point I had no further contact with the vehicle or it's contents. Special Agent Edmondson of the FBI then had the vehicle towed. At no time did I communicate with or otherwise interact with the plaintiff, Mr. Olaniyi.

I, Donald Bracci, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_Donald Bruci_
Name

_2/26/07_
Date

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DAVID OLABAYO OLANIYI, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-00455(RBW) |
| | ) | |
| DISTRICT OF COLUMBIA, et al. | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF JOHN DINEEN

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

As a Special Agent/Bomb Technician with the United States Capitol Police (USCP) Hazardous Devices Section (HDS) at the time of this incident it was my duty to locate, identify and render safe suspicious items, packages, vehicles or other potential hazards, including explosives, chemical, biological and radiological devices.

At approximately 1300 hours I cleared a 10-100 (call for suspicious packages/items) for letters sent to the House of Representatives. At approximately 1320 hours, USCP Communications called for HDS to respond to the Capitol Crypt in reference to individuals with duct taped harnesses and wires attached to their bodies. Upon arrival I saw that two individuals, including the plaintiff, Mr. Olaniyi, were under the control of USCP officers. The plaintiff had what appeared to be a vest-like body bomb attached to his upper torso, constructed of two tube-like cylinders attached to the harness on his chest. Tightly wound duct tape protruded from the top of the tubes and reconnected with the harness. There were also taped cylinders and the plaintiff's waist and a taped glass mason jar hanging between his legs. Also, it appeared that the plaintiff had dropped a clay figurine that broke leaving a powder-like residue on the floor of the Crypt.

We then deployed a VDR-2 radiation detection device and an M-90 chemical blood blister agent detector. Then we started to work towards the real threat as I saw it at the time, which was the vest and the various objects attached to the plaintiff. The apparatus was methodically removed from the plaintiff and x-rayed looking for any indications of improvised explosive device components. Nothing appeared to be of a hazardous nature at the time. The Federal Bureau of Investigations, Terrorism Task Force took custody of all evidence.

Immediately upon concluding my duties in the Crypt, HDS, was dispatched to the 300 block of 3rd Street NE where a vehicle associated with the plaintiff had been located. I responded to a command post that had been established approximately ½ block away from the suspect vehicle. Various security procedures had been implemented prior to my arrival on the scene, including the

establishment of a security perimeter prohibiting pedestrian and vehicular traffic near the van. One concern of my unit was that the plaintiff was checking Capitol security by engaging in a practice or "dry-run" scenario to learn about USCP security procedures and homemade/unstable hazardous devices and/or components may have been present inside the vehicle. I was aware that suspicious items, including jars of unidentified liquids and a paper with a handwritten diagram, were visible from the exterior of the van.

At all times during the physical search of the vehicle, I remained at the command post. I was assigned to the backup team for rescue in case of any emergency. At no time did I enter or search the vehicle or touch any items that were in or about the vehicle. At the conclusion of the physical search, several jars containing unknown liquids were over packed in containers for safety and preservation for FBI analysis. At some point that afternoon, the Federal Bureau of Investigations, Terrorism Task Force took custody of the van and its contents for further analysis. My unit cleared the scene at that time.

I, John Dineen, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_John Dineen_____
Name

___02/23/07_____
Date

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,      )
                               )
        Plaintiff            )
                               )
v.                             )      Civil Action No. 05-00455(RBW)
                               )
DISTRICT OF COLUMBIA, et al.    )
                               )
        Defendant.        )

## DECLARATION OF JOHN KING

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

As a Special Agent/Bomb Technician with the United States Capitol Police (USCP) Hazardous Devices Section (HDS) at the time of this incident it was my duty to locate, identify and render safe suspicious items, packages, vehicles or other potential hazards, including explosives, chemical, biological and radiological devices. Approximately two years ago, I was promoted and transferred to the USCP Senate Division where I hold the rank of Sergeant.

On March 6, 2003, I responded to the Capitol Crypt pursuant to a 1320 hours dispatch from USCP Communications in reference to individuals with possible suicide vest bomb/explosive type apparatus attached to their bodies. When I entered the crypt area of the Capitol, Special Agent Dineen and Special Agent Meikrantz were removing the device(s) strapped or taped to a male suspect. Special Agent Bracci and I approached the female suspect, and the hair on my neck stood up because the suspect device appeared real. Sergeant Malloy ordered us to diagnose and remove the suspected device from the female suspect. We methodically removed the waistband device that consisted of several round heavily duct taped objects about six inches in diameter connected by colored wires that turned out to be beads strung together.

Special Agent Bracci and I removed the waist device and x-rayed each heavily taped item, performed a biological assay test, and checked the suspect device for radiological hazards. Preliminary tests revealed no positive results for hazardous materials. However, field-tests such as the tests performed in this instance are considered "presumptive" and do not rule out the possibility that hazardous materials actually are present. Complete laboratory analysis is required to confirm or deny the presence of hazardous materials. I have been trained never to draw conclusions as to the presence or type of hazardous materials until all testing and laboratory analysis has been completed.

At this point, the suspects, including the plaintiff, Mr. Olaniyi, had been removed, and I never had any further contact or interaction with them. The FBI took all of the evidence and

suspect's property for "explosive residue testing" as stated by FBI Special Agent Kevin Finnerty on the scene. I had no part of the arrest or processing of the suspects.

Immediately upon leaving the scene at the Capitol Crypt, my unit was dispatched by USCP Communications to a vehicle located on the 300 block of 3rd street NE, between Massachusetts Avenue and C Street. USCP officers informed me that neighbors and the restaurant employees, who had noticed the suspicious van parked in this location, with expired, out-of-state tags for several days had concerns about the vehicle, its contents and its occupants. These neighbors were told to go to the backside of their homes and seek cover until someone knocked on their doors. USCP K-9 officers stated that the dogs showed no interest on the exterior of the van; however, they also stated that there were some large objects covered with what appeared to be blankets and clothing that were evident through the side window of the van.

Captain Udell was in charge of the scene assisted by FBI Special Agent Doug Edmondson of the WFO. Captain Udell ordered that the street be cleared for at least a city block and secure the area until the suspect vehicle could be rendered or determined to be safe. At this point, I had no idea who or what we were dealing with. There were many questions going through my head; was this a dry run for the real devices? Was there a sleeper agent in the area watching us as a back up with a radio control? Was there a timed explosive device (ticking time bomb) inside the vehicle? Under the circumstances presented, and based on my training and years of experience as a certified bomb and HAZMAT technician, the list of possible bad outcomes was endless.

Bomb Technicians are always working against time with the primary mission being the safety and protection of lives. Usually, one Bomb Technician would go down on the target; however, the technique for access required two Bomb Technicians, one as the spotter and one as the operator.

A USCP officer immediately transported the van keys to the scene. Captain Udell was on the phone, and when he completed the call he informed us that we had permission and to perform a diagnostic procedure to determine if there were any explosive devices, explosives or other hazardous present which could endanger the public. Therefore, I was operating under direct and lawful orders in an exigent circumstance in the best interest of public safety. The scope of the diagnostic procedure / search was to be limited to explosive devices, explosives, or other hazards, and if any were found, to render them safe / defuse them immediately. Over the years, we have had vast numbers of similar situations, and the priority has always been life safety, and safety of the public, not evidence or convictions. The Hazardous Devices Section and other Bomb Technicians have always operated under same premise.

Captian Udell assigned Special Agent / Bomb Technician King and Special Agent Bomb Technician Bracci to perform the diagnostic assessment / search and render safe procedures on the van. A visual and delicate physical diagnostic procedure was performed on the outside and undercarriage on the van. Next, the Bomb Technicians did a visual inspection through the windows. The van contained a large amount of items in the back of the van, which were covered by what appeared to be blankets and clothing. Additionally, between the front seats of the vehicle, there were three clearly visible large unmarked glass jars of unknown liquid. Bottom portions of the jars could not be seen. The jars became an obvious area of concern, so Personal Protective Equipment

(PPE) was donned down range before assessing the van.  The van was entered via the passenger door with extreme caution.  The jars were examined as potential hazards, i.e. explosive, incendiary or chemical devices or hazards.  The jars had nothing attached to them.  They were triple over-packed in approved HAZMAT containers.  The jars remained in the van for FBI laboratory analysis.  The rest of the van was then examined, and diagnostic techniques were performed on the inside of the van.  These procedures were carefully and methodically done, and no other obvious potential hazards were located.  Lastly, the K-9 handlers ran the dogs by the open doors of the van, and the dogs showed no interest.

When the Bomb Technicians believed that no immediate hazards were present, FBI Special Agent Doug Edmonson, requested a tow truck and impounded the vehicle for safekeeping and for evidence, and I believe the FBI did an inventory search.

At no point, did the USCP maintain custody of the vehicle after bomb technicians determined there were no obvious hazards present.  Additionally, the van and its contents were in their original condition and not damaged in any way when the van was turned over to the FBI.

I, John King, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

Name _____ John King _____

Date _____ 3/7/2007 _____

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,     )
    )
    Plaintiff     )
    )
v.     )     Civil Action No. 05-00455(RBW)
    )
DISTRICT OF COLUMBIA, et al.     )
    )
    Defendant.     )

## DECLARATION OF DANIEL MALLOY

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

At the time of this incident, I was a sergeant assigned to the United States Capitol Police (USCP) Hazardous Devices Section (HDS). The mission of HDS is to locate, identify and render safe suspicious items, packages, vehicles or other potential hazards, including explosives, chemical, biological and radiological devices.

At the request and directive of the USCP Dispatcher, I along with several HDS Technicians responded to the Crypt, U.S. Capitol Building for the report of a suspected suicide bomber. My immediate observations revealed that there were two individuals, one male, one female, displaying what appeared to be suicide bomber vests and belts. The female was chanting and dancing and otherwise making indistinguishable noises. Several USCP officers surrounded the male, who I now understand to be the plaintiff, Mr. Olaniyi. At which point, I directed that the safety perimeter be extended beyond the boundaries of the Crypt. Only a limited number of USCP personnel remained positioned near the plaintiff to minimize loss of life and other safety risks.

I was extremely concerned with the plaintiff's appearance, in part, because I had just returned from an official visit to Israel to learn about techniques used by Israeli anti-terror experts to identify suicide bomber methods and trends.

At this point, the plaintiff was directed to comply with the instructions of USCP officers. Then HDS began a systematic and methodical diagnostic examination, analysis and processing of the suspicious apparatus consisting of numerous types of wires, duct taped plastic and plaster containers and jars. After the plaintiff was separated from the apparatus, he was removed from the Crypt area. The Federal Bureau of Investigation's Hazardous Response Team arrived on the scene and assisted HDS in the examination of the suspicious materials.

At the request and directive of the USCP Dispatcher, I along with several HDS Technicians responded to 3rd & Massachusetts Ave, N.E., to inspect a vehicle, reported to belong to the plaintiff, for explosives, nuclear, biological, and chemical hazards.

Again, in part, because of what I had learned from Israeli anti-terror experts, my biggest concern was that the plaintiff was probing Capitol security by engaging in a practice or "dry-run" scenario to learn about USCP security procedures and response capabilities. I was also concerned that homemade/unstable hazardous devices and/or components may have been present inside the vehicle and that such devices could be triggered by as yet unidentified associates of the plaintiff.

A safety perimeter was established prohibiting vehicle and pedestrian traffic from entering within a one-block radius of the vehicle. Traffic on Massachusetts Avenue NE near 3rd Street had been stopped at approximately 1400 hours. I recall a neighbor, living on the block where the van had been parked, reporting that the van had been in that same location for at least two days, and that individuals appeared to be living inside the van. An HDS technician observed what appeared to be bottles and jars within the vehicle containing unknown liquids. The Federal Bureau of Investigation's Hazardous Response Team was also on the scene at the time.

At this point, because of concern for the safety of all involved, the stoppage of traffic on a major artery approaching rush hour, and the close proximity of the van to USCP Headquarters and the Senate Hart Building, HDS technicians put on protective gear and entered the vehicle with extreme caution. I was positioned at the intersection of 3rd and Massachusetts Avenue NE and discussing an appropriate plan of action with HDS team members and FBI counterparts.

The vehicle was methodically searched. Every precaution was taken to avoid damaging items within the van and, to the best of my knowledge, the search was completed without damaging any items within the van. The jars that were viewed within the vehicle and that had caused the greatest concern were examined as potential hazards, i.e. explosive, incendiary or chemical devices or other hazards. The jars had nothing attached to them. They were over-packed in sealed containers. The jars along with the van and its contents were then released to the FBI for safekeeping and further laboratory analysis.

I, Daniel Malloy, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_Daniel Malloy_
Name

_Feb. 22, 2007_
Date

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DAVID OLABAYO OLANIYI, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-00455(RBW) |
| | ) | |
| DISTRICT OF COLUMBIA, et al. | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF ROBERT MEIKRANTZ

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

As a Special Agent/Bomb Technician with the United States Capitol Police (USCP) Hazardous Devices Section (HDS) at the time of this incident it was my duty to locate, identify and render safe suspicious items, packages, vehicles or other potential hazards, including explosives, chemical, biological and radiological devices.

On March 6, 2003, I responded to the Capitol Crypt pursuant to a 1320 hours dispatch from USCP Communications in reference to individuals with possible suicide vest bomb/explosive type apparatus attached to their bodies. Upon arrival I saw that two individuals, including the plaintiff, Mr. Olaniyi, had been taken into custody by USCP officers. It appeared to me that these individuals did indeed have suspicious items/apparatus strapped to their bodies. The apparatus was constructed of duct tape harnesses and various containers obscured by the duct tape wrap. I used a military VDR-2 (a radiation detecting instrument) and Special Agent Dineen used an instrument to detect chemical agents. Once we observed negative readings on both of these instruments, Special Agent Dineen and I approached the plaintiff. At that time Special Agent Dineen, inquired as to the nature of the device. The plaintiff responded that it was his artwork. At that point in time, I had no idea what type of situation we were being presented with. Because of the unusual construction and appearance of the articles attached to the plaintiff, I conducted physical inspection with utmost caution, looking for any indication that there were any available triggering devices on the plaintiff in the small of his back, in his sleeves or otherwise. I then proceeded to separate the plaintiff from the apparatus in a deliberate and methodical manner so as not to expose others and myself to any undetected dangers. We x-rayed the vest looking for any indications of improvised explosive device components. We identified several items including homemade containers, glass jars and a small bottle of a crème-like substance. Nothing appeared to be of a hazardous nature at the time and the Federal Bureau of Investigations, Terrorism Task Force took custody of all evidence.

At this point in time and to the best of my recollection, while concluding the examination of the suspect materials, my unit, the HDS, was dispatched to a location where a vehicle associated with the plaintiff had been observed. I responded to a command post that had been established approximately ½ block to a block away from the suspect vehicle. I recall that my unit as well as the Federal Bureau of Investigations, Terrorism Task Force was very concerned that there were dangerous devices or substances within the vehicle that could be triggered or accessed by unknown associates of the plaintiff who was then in custody. Our concern was that the plaintiff was checking Capitol security by engaging in a practice or "dry-run" scenario to learn about USCP security procedures and homemade/unstable hazardous devices and/or components may have been present inside the vehicle.

During the physical search of the vehicle, I remained at the command post for rescue and back up in case of any emergency. At no time did I enter or search the vehicle. At the conclusion of the physical search, several jars containing unknown liquids were over packed in containers for safety and preservation for FBI analysis. At some point that afternoon, the Federal Bureau of Investigations, Terrorism Task Force took custody of the van and its contents for further analysis. My unit cleared the scene at that time.

I, Robert Meikrantz, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_____
Robert Meikrantz

02/15/07
_____
Date

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DAVID OLABAYO OLANIYI, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-00455(RBW) |
| | ) | |
| DISTRICT OF COLUMBIA, et al. | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF JOHN SHARK

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

  As part of my duties as an officer assigned to USCP Crime Scene Search, I photographed the items that were removed from the plaintiff, Mr. Olaniyi, where he was apprehended in the Capitol Crypt and also photographed the related van search in the 300 block of 3rd Street NE. Also, I collected the plaintiff's wallet from an FBI official as requested by USCP Detective DePalma. The wallet was then inventoried in accordance with standard USCP Crime Scene Search procedures.

I, John Shark, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_John Shark_

John Shark, USCP Retired

2-12-07

Date

Def.'s Ex. 2 - USCP Declarations
14 of 15

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,                    )
                                          )
      Plaintiff                    )
                                          )
v.                                        )    Civil Action No. 05-00455(RBW)
                                          )
DISTRICT OF COLUMBIA, et al.              )
                                          )
      Defendant.                   )

## <u>DECLARATION OF GILMAN G. UDELL Jr.</u>

My involvement in this matter that occurred on March 6, 2003 was limited to the following:

As Commander of the Hazardous Incident Response Division (HIRD) it was my duty to maintain a safe environment in and around the Capitol Grounds. When an item is suspected of containing a possible explosive device or hazardous materials, a team of bomb technicians is dispatched to establish a safe perimeter then examine the suspect item, and perform render safe procedures.

While monitoring my United States Capitol Police (USCP) radio on Thursday, March 6, 2003, during the late afternoon hours, I heard the USCP dispatcher advise a Hazardous Devices Unit (HDU), a subunit of HIRD, that a vehicle thought to belong to an individual who was placed under arrest in the Capitol Building for being strapped to an apparatus that was thought to be a body bomb, was located in the 300 block of 3rd Street, N.E. This location is within one and a half blocks of both the Senate Hart Building and USCP Headquarters.

I responded to the 300 block of 3rd Street, N.E. and met with the USCP bomb technicians. The USCP K-9 Division had just completed an exterior search of the van.

USCP Patrol Division personnel had the area secured by having both vehicular and pedestrian traffic stopped. Pedestrians were prohibited from entering the secured area. I was positioned at the Command Post, set up at the corner of 3rd and Massachusetts, N.E., where the FBI Terrorism Task Force and USCP Crime Scene Search (CSS) stood-by, approximately ½ a block away, when bomb technicians began to conduct an interior search of the van for explosive devices and hazardous materials.

With the discovery of the harness and his suspicious actions in the Capitol Crypt, it was believed that the plaintiff, Mr. Olaniyi, may have been conducting a "Dry-Run" to see how hard or easy it was to get through security at the Capitol entrances and once inside, how First Responders would respond to a suicide bomber.

Based on this information, it was believed that Mr. Olaniyi may have explosives in his van that could have been accessed by Mr. Olaniyi or other unknown accomplices. It was also believed that after reconnaissance inside the Capitol, the plaintiff may have intended to go back out to his vehicle and load up with explosive/hazardous materials had he not been arrested.

Based on my training and experience as a certified bomb technician since 1974, any situation such as this, where bomb technicians believe that there is a substantial possibility that explosives or hazardous materials are present within a vehicle, requires a physical vehicle search immediately following the k-9 search. Above all, it is the policy of the USCP to protect both life and property.

At no time did I see USCP bomb technicians damage or destroy any material in the van. The way all USCP bomb technicians have been trained to conduct a bomb search is to be slow, methodical, and careful in moving items as the possibility of a booby trap may be employed on items that have to be moved. All USCP bomb technicians received such training on how to conduct bomb searches at the School of Munitions and Explosives at Redstone Arsenal, Huntsville, Alabama.

After the search, the vehicle and its contents were released to a USCP Crime Scene Search Officer for further disposition. At no time did I personally enter or otherwise physically come in contact with the van.

I, Gilman G. Udell Jr., declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_Gilman G. Udell Jr._
Gilman G. Udell Jr.

_2/09/07_
Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI          )
                               )
        Plaintiff,             )
                               )
          v.                   )          CIVIL ACTION NO. 05 CV 455 (RBW)
                               )
DISTRICT OF COLUMBIA, ET AL.   )
                               )
        Defendants.            )
                               )

## DECLARATION OF GIULIO J. ARSENI
## FEDERAL BUREAU OF INVESTIGATION

I, Giulio J. Arseni, pursuant to 28 U.S.C. § 1746, do declare and state as follows:

1.      I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI). I was assigned to the Washington Field Office (WFO) of the FBI from December 1999 to November 2006. As of March 2003, I was on the Joint Terrorism Task Force (JTTF)/National Capital Response Squad (NCRS) of WFO. The statements made herein are based upon my personal knowledge.

2.      On March 6, 2003, I was advised that U.S. Capitol Police (USCP) Officers were investigating suspicious individuals that had entered the U.S. Capitol Building and that their vehicle was parked in the 300 block of Massachusetts Avenue, S.E., Washington, D.C. I was asked to respond to the vehicle location and determine if additional assistance was necessary. When I arrived at the scene, I learned that the USCP bomb technicians were in the process of clearing, or had cleared, the vehicle, i.e., searched it for potential explosive/hazardous materials. During this time, I stayed a block or so away from the vehicle, along with other law enforcement personnel. To my knowledge, no FBI or FBI Joint Terrorism Task Force personnel were

involved in the search of the vehicle while it was parked on Capitol Hill, as is claimed by plaintiff.

3.    After the USCP bomb technicians had cleared the subjects' vehicle, I was asked to accompany the vehicle as it was towed to a secure FBI facility for storage. I escorted the tow truck and vehicle to the FBI Facility. After ensuring the vehicle was parked in an appropriate location, I secured the vehicle inside the FBI facility. I engaged in no further activity related to the subjects or their vehicle.

4.    I am aware that plaintiff claims that his artwork in the vehicle was damaged at some point in time. I did not damage plaintiff's artwork or any other property, and I am not aware of any other person causing damage to his artwork or any other property.


I declare under penalty of perjury that the foregoing is true and correct. Executed this 5ᵀᴴ day of March, 2007 at Mansfield, Ohio.


Giulio J. Arseni

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID OLABAYO OLANIYI )<br><br>Plaintiff, )<br><br>v. )<br><br>DISTRICT OF COLUMBIA, ET AL. )<br><br>Defendants. ) | CIVIL ACTION NO. 05 CV 455 (RBW) |

## DECLARATION OF JENNIFER CEJPEK
## FEDERAL BUREAU OF INVESTIGATION

I, Jennifer Cejpek, pursuant to 28 U.S.C. § 1746, do declare and state as follows:

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI).  As of March 2003, I was assigned to the Washington Field Office of the FBI.  The statements made herein are based upon my personal knowledge and my review of documents which were contained in official FBI files.

2.      I was part of a group of FBI personnel who on March 7, 2003, photographed and inventoried items found in a black GMC Savana 1500 van, bearing Michigan license plate WAH896 (hereafter "the vehicle"),  related to FBI case no. 174C-WF-226342.  I helped remove items from the vehicle to be photographed and inventoried.

3.      The photographing and inventorying of property in the vehicle was carried out in accordance with FBI policy.  Specifically, sections 5-8, 5-8.1 and 5-8.2 of the Legal Handbook for Special Agents require that FBI personnel conduct an inventory search of seized personal property, and they describe the scope of the inventory search and particular procedures when vehicles have been

seized.

4.      The inventory search of the vehicle was carried out in a careful manner so as to not cause damage to any property in the vehicle. I am aware that plaintiff claims that his artwork in the vehicle was damaged at some point in time. I did not damage plaintiff's artwork or any other property and I am not aware of any other person causing damage to his artwork or any other property.

5.      I was not involved in the arrest of plaintiff or the search of the vehicle that is alleged to have taken place on March 6, 2003 while it was parked several blocks from the Capitol.

        I declare under penalty of perjury that the foregoing is true and correct. Executed this __1__ day of __March__, 2007 at Washington, D.C.


                                                _____
                                                Jennifer Cejpek

-2-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI          )
                               )
        Plaintiff,             )
                               )
              v.               )          CIVIL ACTION NO. 05 CV 455 (RBW)
                               )
DISTRICT OF COLUMBIA, ET AL.   )
                               )
        Defendants.            )
                               )

## DECLARATION OF SANDRA I. CHINCHILLA
## FEDERAL BUREAU OF INVESTIGATION

I, Sandra I. Chinchilla, pursuant to 28 U.S.C. § 1746, do declare and state as follows:

1.      I am a retired Special Agent of the Federal Bureau of Investigation (FBI).  I retired in

October 2003.  As of March 2003, I was assigned to the Washington Field Office of the FBI.  The

statements made herein are based upon my personal knowledge and my review of  documents which

were contained in official FBI files.

2.      I was part of a group of FBI personnel who on March 7, 2003, photographed and

inventoried items found in a black GMC Savana 1500 van, bearing Michigan license plate WAH896

(hereafter "the vehicle"),  related to FBI case no. 174C-WF-226342.  I helped remove and inventory

items from the vehicle.

3.      The photographing and inventorying of property in the vehicle was carried out in

accordance with FBI policy.  Specifically, sections 5-8, 5-8.1 and 5-8.2 of the Legal Handbook for

Special Agents require that FBI personnel conduct an inventory search of seized personal property,

and they describe the scope of the inventory search and particular procedures when vehicles have been seized.

4.      The inventory search of the vehicle was carried out in a careful manner so as to not cause damage to any property in the vehicle. I am aware that plaintiff claims that his artwork in the vehicle was damaged at some point in time. I did not damage plaintiff's artwork or any other property and I am not aware of any other person causing damage to his artwork or any other property.

5.      I was not involved in the arrest of plaintiff or the search of the vehicle that is alleged to have taken place on March 6, 2003 while it was parked several blocks from the Capitol.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 4 day of March, 2007 at Rehoboth, Delaware.

Sandra I. Chinchilla

-2-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DAVID OLABAYO OLANIYI | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. 05 CV 455 (RBW) |
| DISTRICT OF COLUMBIA, ET AL. | ) | |
| Defendants. | ) | |

## <u>DECLARATION OF DOUGLAS R. EDMONSON</u><br><u>FEDERAL BUREAU OF INVESTIGATION</u>

I, Douglas R. Edmonson, pursuant to 28 U.S.C. § 1746, do declare and state as follows:

1.      I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI). As of March 2003, I was assigned as a bomb technician in the Washington Field Office of the FBI. I have served as a bomb technician in the FBI since April 2, 1999. The statements made herein are based upon my personal knowledge.

2.      On March 6, 2003, I was advised of an incident on Capitol Hill wherein someone wearing what appeared to be a suicide bomber vest had been apprehended by the U.S. Capitol Police (USCP) and that the USCP had located a vehicle associated with this person in the 300 block of Massachusetts Avenue, S.E., Washington, D.C. As an experienced bomb technician and FBI Special Agent, I was aware that the U.S. Capitol was considered to be a target for terrorists. I was also aware that persons planning suicide bombings have been known to probe security conditions at their target before actually carrying out the attack. In my capacity as a bomb technician, I attempted to respond to the location of the vehicle, but when I approached the vehicle, I saw that USCP bomb technician John King and another USCP bomb technician were

handling the search. For safety reasons, I therefore moved approximately a block away from the vehicle. To my knowledge, no FBI or FBI Joint Terrorism Task Force personnel were involved in the search of the van while it was parked on Capitol Hill, as is claimed by plaintiff.

3.    The USCP subsequently advised me that their bomb technicians had completed their search of the van for chemical and explosive devices and/or hazards and that based on their preliminary inspection they suspected that a fluid found in containers in the van was urine. However, based on my experience and knowledge as an FBI bomb technician, I was aware that this preliminary inspection of the containers by the USCP was just that -- preliminary -- and that further analysis would be needed to reach a more definitive conclusion as to whether the fluid was hazardous. Moreover, based on my conversations with other FBI and USCP personnel regarding the incident in the Rotunda, I believed that Mr. Olaniyi and Ms. Patel may have been intentionally carrying out a "dry run" of a terrorist attack in order to probe security in advance of an actual attack, or they may have been encouraged or duped into their actions at the Rotunda by third parties who wanted to have security probed in advance of an actual attack. I believed that the van was likely to contain evidence relevant to an investigation of the incident. Furthermore, I knew that Mr. Olaniyi and Ms. Patel had been arrested, so I did not want to leave their van on the street and run the risk that it would be vandalized, stolen, or towed because of a parking violation. The situation was discussed with a supervisory FBI official at the Washington Field Office who decided that the FBI should take custody of the van. Therefore, a towing service was called to tow the van to an FBI storage facility. .

4.    I am aware that plaintiff claims that his artwork in the vehicle was damaged at some point in time. I did not damage plaintiff's artwork or any other property and I am not aware

-2-

of any other person causing damage to his artwork or any other property.

     5.     I was not involved in the arrest of plaintiff or the inventory search of the vehicle, which I am advised occurred on March 7, 2003.

     I declare under penalty of perjury that the foregoing is true and correct. Executed this _15_ day of _March_, 2007 at _Columbia, SC_ .

Douglas R. Edmonson

-3-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID OLABAYO OLANIYI<br><br>Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA, ET AL.<br><br>Defendants. | )<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 05 CV 455 (RBW)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF PAUL A. GARTEN
## FEDERAL BUREAU OF INVESTIGATION

I, Paul A. Garten, pursuant to 28 U.S.C. § 1746, do declare and state as follows:

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI). As of March 2003, I was assigned to the Washington Field Office (WFO) of the FBI and was a member of the WFO Hazardous Materials Response Team (HMRT). The statements made herein are based upon my personal knowledge and my review of documents which were contained in official FBI files.

2.      On March 7, 2003, HRMT member SA Melissa R. Godbold and I were called to conduct a field screening of three jars found during an inventory search earlier that same day of a 2002 GMC Savanna van at the WFO storage facility, in order to determine whether it was safe to store the jars in FBI space. As is reflected in the attached FD-302 dated March 10, 2003 (a true and correct copy of which is attached hereto as Exhibit A), one mason jar contained a yellow liquid; a second jar labeled "Wildflower Honey" contained a viscous yellow material; and a third jar also labeled "Wildflower Honey" contained a clear liquid. Tests were negative for hazardous materials.

3.     I am aware that plaintiff claims that his artwork in the vehicle was damaged at some point in time.  I did not damage plaintiff's artwork or any other property and I am not aware of any other person causing damage to his artwork or any other property.

4.     I was not involved in the arrest of plaintiff, the inventory search or the search of the vehicle that is alleged to have taken place on March 6, 2003 while it was parked several blocks from the Capitol.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _8th_ day of _MARCH_, 2007 at  Quantico, Virginia.

Paul A. Garten

-2-

FD-302 (Rev. 10-6-95)



- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    03/10/2003

On 03/07/2003, at approximately 9:15 AM, Special Agents (SA) Kara D. Sidener, Ronald E. Menold II, Michelle L. Rankin, and Sandra I. Chinchilla arrived at the FBI Washington Field Office's V Street Facility, in order to photograph and inventory items found in a vehicle related to the below captioned investigation. SAs Mary B. Collins-Morton and Jennifer Cejpek arrived at approximately 10:30 AM and also participated in the inventory.

The vehicle to be photographed and inventoried was a black GMC Savana 1500 Van, bearing Michigan license plate WAH896 and VIN 1GDFG15R721231621.

At approximately 9:25 AM, SA Menold began taking photographs of the vehicle. SAs Rankin and Sidener assisted in the preparation of photograph logs. SA Sidener also documented vehicle information on an FD-653 (Motor Vehicle Inspection Inventory Record) and prepared administrative worksheets.

Beginning at approximately 9:35 AM, items in the vehicle were removed for the purpose of being photographed and inventoried. The following is a list of items in the vehicle and the location where they were found:

Driver's side dash
Seller's Disclosure Statement for 12750 Scully Manchester, Michigan, Lenawee County
University of Michigan class roster
One piece of paper bearing handwriting "story of my life..." and graphs

Driver's side floorboard
Metropolitan Map of Washington, DC
One business card, "Memories Past Antiques"
Two Michigan lottery ticket stubs dated 02/26/2003

Dash/console
Two compact discs (CD)
One New York lottery ticket
Two pens
One pom-pom

Investigation on   03/07/2003   at   Washington, DC

File #  174C-WF-226342-12                                          Date dictated N/A

by  SA Kara D. Sidener:kb, SA Ronald E. Menold II, SA Michelle L. Rankin
    SA Sandra I. Chinchilla, SA Mary B. Collins-Morton, SA Jennifer Cejpek

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

174C-WF-226342-12

## EXHIBIT A

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of   Vehicle Inventory   , On 03/07/2003 , Page   2

One Clinique tube
$0.09 in pennies
One tied piece of clear plastic containing unknown black substance
Miscellaneous trash (gum wrappers, etc.)

Floor next to console (driver's side)
Arlington County Parking Ticket, dated 03/06/2003
Three CDs and one CD holder
One package of sewing needles
One business card, "bedecidos"
Two Michigan lottery tickets, dated 02/18/2003 and 02/19/2003
One plastic bag
One large glass jar containing various rounds of ammunition
One black and white striped piece of material

Center console
Three jars filled with honey-colored substance
One cup
One partial loaf of bread
One white washcloth

Center floor in front of console
One book entitled, "Beyond Indigo" (Address Book)
One business card, "Douglas Ginsberg...Des Moines, IA"
Six scraps of paper bearing handwriting
Three sheets of paper containing telephone directory of numbers
One receipt for Big Boy Restaurant dated 02/23/2003 with
             handwritten telephone number
One book bearing handwritten pages
One brown scarf
One section of a napkin bearing handwritten telephone number
One travel sewing kit
Miscellaneous personal hygiene items

Passenger side of center console, floor, and pocket
Five maps (Middlesex County, NJ; University of South Florida Campus
             Map; State of Georgia; State of Michigan; Chicago City
             Map)
One atlas of the US
One brochure from the US Senate
Two brochures rom the Lobby Gallery, NY
Ann Arbor, Michigan classified ads dated 02/20/2003 with
             handwritten directions and description of a house
One magazine entitled "Trace"
One pair of socks

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of    **Vehicle Inventory**    , On 03/07/2003 , Page 3

One scrap piece of white material
One Michigan registration for GMC station wagon in the name "Bayo
        Arts & Design and Reena Patel"
One insurance form for GMC Van in the name "Ilelavoyo Olaniyi"
One dealer transaction form for Bayo and Patel for GMC station
        wagon VIN 1GDFG15R721231621 (two copies)
Miscellaneous auto papers
Purchase papers for van with same VIN as listed above
Pieces of paper depicting printed "Bayo" logo
One address book with handwritten information

Underneath the passenger seat
Map of NJ

Passenger Visor
Six photographs
One fare card

Behind the rear seat
One air pump
Owners manual and miscellaneous documents
Fuses
One jack
One allen wrench
Various tools
One carrying sack
One pair of black shoes
Miscellaneous clothing
Bubble-wrap
Videocassette box
One box with bubble-wrap and piece of black metal
Four photo albums
Photographic slides
One dolly
One car brush/scraper
One large portfolio containing art
One flattened yellow box
One Cinderella suitcase with clothing
Miscellaneous documents

Overhead of backseat
Toilet paper
Two pages from a magazine
One poster

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of ___Vehicle Inventory_____ , On 03/07/2003 , Page   4

Rear overhead console, driver side
Two VHS videocassettes
Four VHS videocassette boxes

Rear overhead console, passenger side
Three maps, one Michigan and two NJ

Rear seat
One suitcase with clothing
Miscellaneous clothing
Baby car seat
Elmo suitcase with clothing
Toy figurine

Front passenger dash
Miscellaneous stringed/wrapped packages on sticks
Star-shaped metal base with string

Floor area between front and rear seat
One box with styrofoam which contained the following:
        US Currency - one $10.00 bill
        Wire
        Miscellaneous paper
        One antennae
        One metal stand
Cloth with writing
One box containing bubble-wrap
Chess pieces, small piece of marble, and small piece of bone-like
        substance all contained in a cloth sack
Miscellaneous clothing
Yarn/string-wrapped stick
Two statuettes
One box with styrofoam
Clear tape
Four carved rocks
Two necklaces
One small piece of foam
$0.01
One crayon
One towel
One straw
Two remote controls
One blue jacket with red decorative shapes
Foam
One VHS videocassette

Case 1:06-cv-02165-RBW    Document 12-5    Filed 03/30/2007    Page 16 of 55

Decl. Ex. 3 - FBI Declarations
16 of 55

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of __Vehicle Inventory__ , On _03/07/2003_ , Page __5__

One VHS videocassette box
One taped rod
Miscellaneous clothing
One comforter
Two notebooks
Windshield wiper fluid
One white-knotted sack containing unknown material
One camera bag
One camera lens bearing serial #3044625
One taped square-like item
Two rolls of film (possibly exposed)
One Ramada key card
Film containers and packaging
One University of Iowa Student Identification Card bearing the name
          Olaniyi, Olabayo David
One large box containing foam and four pieces of art
One large box containing the following:
          Foam
          Two maps (Michigan and Atlanta, GA)
          Bubble-wrap
          Shower gel
          Shampoo
          Miscellaneous clothing
          One red statuette
          One black candle holder
          Eight canvas panels
          Two pieces of wooden art
          Six carved rocks
Five matted pictures
One mug with tape
One decorative, red rod
One plastic grocery bag
One wooden-constructed drum-like stand with white cloth and nails
White cloth
Print cloth
One beige jacket
One animal-like horn
One wooden rod

Passenger floorboard
One carved rock

Running board of side doors
$0.10

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of ___Vehicle Inventory_____ , On 03/07/2003 , Page  6

     The $10.20 in US currency was enclosed in a plastic bag and left in the vehicle.

     At approximately 12:00 PM, the inventory was completed and the items returned to the vehicle. At 12:15 PM, exit photographs were taken.

     All logs, worksheets, inventory records, and notes will be enclosed in a 1A envelope (FD-340) and submitted to the Case Agent. The photographs have been submitted to FBIHQ, Photo Processing Unit, and will also be forwarded to the Case Agent when they have been developed and returned to the writer.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DAVID OLABAYO OLANIYI | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 05 CV 455 (RBW) |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF CHRIS A. GINSBURG
## FEDERAL BUREAU OF INVESTIGATION

I, Chris A. Ginsburg, pursuant to 28 U.S.C. § 1746, do declare and state as follows:

1. I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI). As of March 2003, I was assigned to the Joint Terrorism Task Force/National Capitol Response Squad of the Washington Field Office of the FBI. The statements made herein are based upon my personal knowledge and my review of documents which were contained in official FBI files.

2. On March 6, 2003, FBI SA Kevin Finnerty and I interviewed plaintiff David Olaniyi and Ms. Reena Patel at the U.S. Capitol Police headquarters at 119 D Street, N.E., Washington, D.C.

3. I am aware that plaintiff claims that his artwork in his vehicle was damaged at some point in time. I did not damage plaintiff's artwork or any other property and I am not aware of any other person causing damage to his artwork or any other property.

4. I was not involved in the arrest of plaintiff or in any search of the vehicle.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this

__02__ day of __MARCH__ , 2007 at Washington, D.C.

Chris A. Ginsburg

-2-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID OLABAYO OLANIYI    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | CIVIL ACTION NO. 05 CV 455 (RBW) |
| v.    ) | |
| ) | |
| DISTRICT OF COLUMBIA, ET AL.    ) | |
| ) | |
| Defendants.    ) | |
| ) | |

## DECLARATION OF MELISSA R. GODBOLD
## FEDERAL BUREAU OF INVESTIGATION

I, Melissa R. Godbold, pursuant to 28 U.S.C. § 1746, do declare and state as follows:

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI). As of March 2003, I was assigned to the Washington Field Office (WFO) of the FBI and was a member of the WFO Hazardous Materials Response Team (HMRT). The statements made herein are based upon my personal knowledge and my review of documents which were contained in official FBI files.

2.      On March 7, 2003, HMRT member SA Paul A. Garten and I were called to conduct a field screening of three jars found during an inventory search earlier that same day of a 2002 GMC Savanna van at the WFO storage facility, in order to determine whether it was safe to store the jars in FBI space. As is reflected in the attached FD-302 dated March 7, 2003 (a true and correct copy of which is attached hereto as Exhibit A), one mason jar contained a yellow liquid; a second jar labeled "Wildflower Honey" contained a viscous yellow material; and a third jar also labeled "Wildflower Honey" contained a clear liquid. Tests were negative for hazardous materials.

3.    I am aware that plaintiff claims that his artwork in the vehicle was damaged at some

point in time. I did not damage plaintiff's artwork or any other property and I am not aware of any

other person causing damage to his artwork or any other property.

4.    I was not involved in the arrest of plaintiff, the inventory search or the search of the

vehicle that is alleged to have taken place on March 6, 2003 while it was parked several blocks from

the Capitol.

I declare under penalty of perjury that the foregoing is true and correct. Executed this

6th day of March , 2007 at Washington, D.C.

Melissa R. Godbold

-2-

FD-302 (Rev. 10-6-95)

·1·

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    03/10/2003

On 03/07/2003, HMRT members SAs Paul A. Garten and
Melissa R. Godbold conducted a field screen in accordance with FBI
policy of a yellow liquid in a mason jar (Item #1), a viscous
yellow material in a jar labeled "Wildflower Honey" (Item #2), and
a clear liquid in a Sunbeam jar also labeled "Wildflower Honey"
(Item #3) found in a 2002 GMC Savanna van, VIN 1GDFG15R72131621.

Tests were negative for radiation and oxygen above
background, pH (vapor), flammable liquids, carbon monoxide,
hydrogen sulfide, volatile organic compounds, oxidizers, fluorines,
petroleum products, organic solvents, iodine, bromine, chlorine,
nitrates, nitrites, GA, GB, and VX.  Item #1 had a liquid pH of ~5
and was positive for the presence of water.  Item #2 had a liquid
pH of ~7 and was negative for the presence of water.  Item #3 had
liquid pH of ~6 and was also positive for the presence of water.

Upon completion of the field screen, the three items were
placed beside the vehicle in their overpacks for storage.





Investigation on    03/07/2003    at   Washington, DC

File #   174C-WF-226342

Date dictated

SA Paul A. Garten
by   SA Melissa R. Godbold

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DAVID OLABAYO OLANIYI | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 05 CV 455 (RBW) |
| DISTRICT OF COLUMBIA, ET AL. | ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION OF RONALD E. MENOLD II
## FEDERAL BUREAU OF INVESTIGATION

I, Ronald E. Menold II, pursuant to 28 U.S.C. § 1746, do declare and state as follows:

1.    I am a Special Agent of the Federal Bureau of Investigation (FBI). As of March 2003, I was assigned to the Washington Field Office of the FBI. The statements made herein are based upon my personal knowledge and my review of documents which were contained in official FBI files.

2.    I was part of a group of FBI personnel who on March 7, 2003, photographed and inventoried items found in a black GMC Savana 1500 van, bearing Michigan license plate WAH896 (hereafter "the vehicle"), related to FBI case no. 174C-WF-226342. As is reflected in the March 7, 2003 FD-302 regarding this inventory search (a true and correct copy of which is attached hereto as Exhibit A), I took photographs of the vehicle and its contents. I cannot recall if I helped remove any items from the vehicle, but I likely helped put everything back into the vehicle when we were done.

3.    The photographing and inventorying of property in the vehicle was carried out in accordance with FBI policy. Specifically, sections 5-8, 5-8.1 and 5-8.2 of the Legal Handbook

for Special Agents require that FBI personnel conduct an inventory search of seized personal property, and they describe the scope of the inventory search and particular procedures when vehicles have been seized.

4.    The inventory search of the vehicle was carried out in a careful manner so as to not cause damage to any property in the vehicle.  I am aware that plaintiff claims that his artwork in the vehicle was damaged at some point in time.  I did not damage plaintiff's artwork or any other property and I am not aware of any other person causing damage to his artwork or any other property.

5.    I was not involved in the arrest of plaintiff or the search of the vehicle that is alleged to have taken place on March 6, 2003 while it was parked several blocks from the Capitol.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _01_ day of _MARCH_, 2007 at Washington, D.C.

Ronald E. Menold II

-2-

Def. Ex. 3 - FBI Declarations
25 of 55

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    03/10/2003

On 03/07/2003, at approximately 9:15 AM, Special Agents (SA) Kara D. Sidener, Ronald E. Menold II, Michelle L. Rankin, and Sandra I. Chinchilla arrived at the FBI Washington Field Office's V Street Facility, in order to photograph and inventory items found in a vehicle related to the below captioned investigation. SAs Mary B. Collins-Morton and Jennifer Cejpek arrived at approximately 10:30 AM and also participated in the inventory.

The vehicle to be photographed and inventoried was a black GMC Savana 1500 Van, bearing Michigan license plate WAH896 and VIN 1GDFG15R721231621.

At approximately 9:25 AM, SA Menold began taking photographs of the vehicle. SAs Rankin and Sidener assisted in the preparation of photograph logs. SA Sidener also documented vehicle information on an FD-653 (Motor Vehicle Inspection Inventory Record) and prepared administrative worksheets.

Beginning at approximately 9:35 AM, items in the vehicle were removed for the purpose of being photographed and inventoried. The following is a list of items in the vehicle and the location where they were found:

Driver's side dash
Seller's Disclosure Statement for 12750 Scully Manchester, Michigan, Lenawee County
University of Michigan class roster
One piece of paper bearing handwriting "story of my life..." and graphs

Driver's side floorboard
Metropolitan Map of Washington, DC
One business card, "Memories Past Antiques"
Two Michigan lottery ticket stubs dated 02/26/2003

Dash/console
Two compact discs (CD)
One New York lottery ticket
Two pens
One pom-pom

---

Investigation on    03/07/2003    at   Washington, DC

File #  174C-WF-226342-12    Date dictated  N/A

by  SA Kara D. Sidener:kds, SA Ronald E. Menold II, SA Michelle L. Rankin, SA Sandra I. Chinchilla, SA Mary B. Collins-Morton, SA Jennifer Cejpek

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

174C-WF-226342-12

## EXHIBIT A

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of    Vehicle Inventory                    On 03/07/2003 , Page    2

One Clinique tube
$0.09 in pennies
One tied piece of clear plastic containing unknown black substance
Miscellaneous trash (gum wrappers, etc.)

Floor next to console (driver's side)
Arlington County Parking Ticket, dated 03/06/2003
Three CDs and one CD holder
One package of sewing needles
One business card, "bedecidos"
Two Michigan lottery tickets, dated 02/18/2003 and 02/19/2003
One plastic bag
One large glass jar containing various rounds of ammunition
One black and white striped piece of material

Center console
Three jars filled with honey-colored substance
One cup
One partial loaf of bread
One white washcloth

Center floor in front of console
One book entitled, "Beyond Indigo" (Address Book)
One business card, "Douglas Ginsberg...Des Moines, IA"
Six scraps of paper bearing handwriting
Three sheets of paper containing telephone directory of numbers
One receipt for Big Boy Restaurant dated 02/23/2003 with
        handwritten telephone number
One book bearing handwritten pages
One brown scarf
One section of a napkin bearing handwritten telephone number
One travel sewing kit
Miscellaneous personal hygiene items

Passenger side of center console, floor, and pocket
Five maps (Middlesex County, NJ; University of South Florida Campus
        Map; State of Georgia; State of Michigan; Chicago City
        Map)
One atlas of the US
One brochure from the US Senate
Two brochures rom the Lobby Gallery, NY
Ann Arbor, Michigan classified ads dated 02/20/2003 with
        handwritten directions and description of a house
One magazine entitled "Trace"
One pair of socks

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of    Vehicle Inventory    , On 03/07/2003    , Page   3

One scrap piece of white material
One Michigan registration for GMC station wagon in the name "Bayo
        Arts & Design and Reena Patel"
One insurance form for GMC Van in the name "Ilelavoyo Olaniyi"
One dealer transaction form for Bayo and Patel for GMC station
        wagon VIN 1GDFG15R721231621 (two copies)
Miscellaneous auto papers
Purchase papers for van with same VIN as listed above
Pieces of paper depicting printed "Bayo" logo
One address book with handwritten information

Underneath the passenger seat
Map of NJ

Passenger Visor
Six photographs
One fare card

Behind the rear seat
One air pump
Owners manual and miscellaneous documents
Fuses
One jack
One allen wrench
Various tools
One carrying sack
One pair of black shoes
Miscellaneous clothing
Bubble-wrap
Videocassette box
One box with bubble-wrap and piece of black metal
Four photo albums
Photographic slides
One dolly
One car brush/scraper
One large portfolio containing art
One flattened yellow box
One Cinderella suitcase with clothing
Miscellaneous documents

Overhead of backseat
Toilet paper
Two pages from a magazine
One poster

Def.'s Ex. 3 - FBI Declarations
28 of 55

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of ___ Vehicle Inventory _____ , On 03/07/2003 , Page ___ 4 ___

Rear overhead console, driver side
Two VHS videocassettes
Four VHS videocassette boxes

Rear overhead console, passenger side
Three maps, one Michigan and two NJ

Rear seat
One suitcase with clothing
Miscellaneous clothing
Baby car seat
Elmo suitcase with clothing
Toy figurine

Front passenger dash
Miscellaneous stringed/wrapped packages on sticks
Star-shaped metal base with string

Floor area between front and rear seat
One box with styrofoam which contained the following:
          US Currency - one $10.00 bill
          Wire
          Miscellaneous paper
          One antennae
          One metal stand
Cloth with writing
One box containing bubble-wrap
Chess pieces, small piece of marble, and small piece of bone-like
          substance all contained in a cloth sack
Miscellaneous clothing
Yarn/string-wrapped stick
Two statuettes
One box with styrofoam
Clear tape
Four carved rocks
Two necklaces
One small piece of foam
$0.01
One crayon
One towel
One straw
Two remote controls
One blue jacket with red decorative shapes
Foam
One VHS videocassette

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of  __Vehicle Inventory_____  , On 03/07/2003  , Page  5

        One VHS videocassette box
        One taped rod
        Miscellaneous clothing
        One comforter
        Two notebooks
        Windshield wiper fluid
        One white-knotted sack containing unknown material
        One camera bag
        One camera lens bearing serial #3044625
        One taped square-like item
        Two rolls of film (possibly exposed)
        One Ramada key card
        Film containers and packaging
        One University of Iowa Student Identification Card bearing the name
                Olaniyi, Olabayo David
        One large box containing foam and four pieces of art
        One large box containing the following:
                Foam
                Two maps (Michigan and Atlanta, GA)
                Bubble-wrap
                Shower gel
                Shampoo
                Miscellaneous clothing
                One red statuette
                One black candle holder
                Eight canvas panels
                Two pieces of wooden art
                Six carved rocks
        Five matted pictures
        One mug with tape
        One decorative, red rod
        One plastic grocery bag
        One wooden-constructed drum-like stand with white cloth and nails
        White cloth
        Print cloth
        One beige jacket
        One animal-like horn
        One wooden rod

        Passenger floorboard
        One carved rock

        Running board of side doors
        $0.10

Docs Ex. 3 - FBI Declarations
30 of 55

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of ___Vehicle Inventory___ , On 03/07/2003 , Page 6

    The $10.20 in US currency was enclosed in a plastic bag and left in the vehicle.

    At approximately 12:00 PM, the inventory was completed and the items returned to the vehicle. At 12:15 PM, exit photographs were taken.

    All logs, worksheets, inventory records, and notes will be enclosed in a 1A envelope (FD-340) and submitted to the Case Agent. The photographs have been submitted to FBIHQ, Photo Processing Unit, and will also be forwarded to the Case Agent when they have been developed and returned to the writer.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID OLABAYO OLANIYI | ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION NO. 05 CV 455 (RBW) |
| DISTRICT OF COLUMBIA, ET AL. | ) |
| Defendants. | ) |

## DECLARATION OF MICHELLE L. RANKIN
## FEDERAL BUREAU OF INVESTIGATION

I, Michelle L. Rankin, pursuant to 28 U.S.C. § 1746, do declare and state as follows:

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI). As of March 2003, I was assigned to the Washington Field Office of the FBI. The statements made herein are based upon my personal knowledge and my review of documents which were contained in official FBI files.

2.      I was part of a group of FBI personnel who on March 7, 2003, photographed and inventoried items found in a black GMC Savana 1500 van, bearing Michigan license plate WAH896 (hereafter "the vehicle"), related to FBI case no. 174C-WF-226342. As is reflected in the March 7, 2003 FD-302 regarding this inventory search (a true and correct copy of which is attached hereto as Exhibit A), I assisted in removing items from the vehicle for purposes of preparing them for photographic documentation and inventory, assisting in the preparing of the photograph logs, and returning the items to the vehicle upon conclusion.

3.      The photographing and inventorying of property in the vehicle was carried out in

accordance with FBI policy.   Specifically, sections 5-8, 5-8.1 and 5-8.2 of the Legal Handbook for

Special Agents require that FBI personnel conduct an inventory search of seized personal property,

and they describe the scope of the inventory search and particular procedures when vehicles have been

seized.

4.      The inventory search of the vehicle was carried out in a careful manner so as to not

cause damage to any property in the vehicle.  I am aware that plaintiff claims that his artwork in the

vehicle was damaged at some point in time.  I did not damage plaintiff's artwork or any other property

and I am not aware of any other person causing damage to his artwork or any other property.

5.      I was not involved in the arrest of plaintiff or the search of the vehicle that is alleged to

have taken place on March 6, 2003, while it was parked several blocks from the United States Capitol.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this

7th day of MARCH  , 2007 at Washington, D.C.


Michelle L. Rankin
Michelle L. Rankin

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    03/10/2003

On 03/07/2003, at approximately 9:15 AM, Special Agents
(SA) Kara D. Sidener, Ronald E. Menold II, Michelle L. Rankin, and
Sandra I. Chinchilla arrived at the FBI Washington Field Office's V
Street Facility, in order to photograph and inventory items found
in a vehicle related to the below captioned investigation.  SAs
Mary B. Collins-Morton and Jennifer Cejpek arrived at approximately
10:30 AM and also participated in the inventory.

The vehicle to be photographed and inventoried was a
black GMC Savana 1500 Van, bearing Michigan license plate WAH896
and VIN 1GDFG15R721231621.

At approximately 9:25 AM, SA Menold began taking
photographs of the vehicle.  SAs Rankin and Sidener assisted in the
preparation of photograph logs.  SA Sidener also documented vehicle
information on an FD-653 (Motor Vehicle Inspection Inventory
Record) and prepared administrative worksheets.

Beginning at approximately 9:35 AM, items in the vehicle
were removed for the purpose of being photographed and inventoried.
The following is a list of items in the vehicle and the location
where they were found:

Driver's side dash
Seller's Disclosure Statement for 12750 Scully Manchester,
      Michigan, Lenawee County
University of Michigan class roster
One piece of paper bearing handwriting "story of my life..." and
      graphs

Driver's side floorboard
Metropolitan Map of Washington, DC
One business card, "Memories Past Antiques"
Two Michigan lottery ticket stubs dated 02/26/2003

Dash/console
Two compact discs (CD)
One New York lottery ticket
Two pens
One pom-pom

Investigation on    03/07/2003    at Washington, DC

File #   174C-WF-226342-12                           Date dictated   N/A

by   SA Kara D. Sidener:kds, SA Ronald E. Menold II, SA Michelle L. Rankin
     SA Sandra I. Chinchilla, SA Mary B. Collins-Morton, SA Jennifer Cejpek

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency

174C-WF-226342-12

# EXHIBIT A

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of    Vehicle Inventory    On 03/07/2003 , Page    2

One Clinique tube
$0.09 in pennies
One tied piece of clear plastic containing unknown black substance
Miscellaneous trash (gum wrappers, etc.)

Floor next to console (driver's side)
Arlington County Parking Ticket, dated 03/06/2003
Three CDs and one CD holder
One package of sewing needles
One business card, "bedecidos"
Two Michigan lottery tickets, dated 02/18/2003 and 02/19/2003
One plastic bag
One large glass jar containing various rounds of ammunition
One black and white striped piece of material

Center console
Three jars filled with honey-colored substance
One cup
One partial loaf of bread
One white washcloth

Center floor in front of console
One book entitled, "Beyond Indigo" (Address Book)
One business card, "Douglas Ginsberg...Des Moines, IA"
Six scraps of paper bearing handwriting
Three sheets of paper containing telephone directory of numbers
One receipt for Big Boy Restaurant dated 02/23/2003 with
        handwritten telephone number
One book bearing handwritten pages
One brown scarf
One section of a napkin bearing handwritten telephone number
One travel sewing kit
Miscellaneous personal hygiene items

Passenger side of center console, floor, and pocket
Five maps (Middlesex County, NJ; University of South Florida Campus
        Map; State of Georgia; State of Michigan; Chicago City
        Map)
One atlas of the US
One brochure from the US Senate
Two brochures rom the Lobby Gallery, NY
Ann Arbor, Michigan classified ads dated 02/20/2003 with
        handwritten directions and description of a house
One magazine entitled "Trace"
One pair of socks

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of ___ Vehicle Inventory ___ , On 03/07/2003 , Page 3

One scrap piece of white material
One Michigan registration for GMC station wagon in the name "Bayo
     Arts & Design and Reena Patel"
One insurance form for GMC Van in the name "Ilelavoyo Olaniyi"
One dealer transaction form for Bayo and Patel for GMC station
     wagon VIN 1GDFG15R721231621 (two copies)
Miscellaneous auto papers
Purchase papers for van with same VIN as listed above
Pieces of paper depicting printed "Bayo" logo
One address book with handwritten information

Underneath the passenger seat
Map of NJ

Passenger Visor
Six photographs
One fare card

Behind the rear seat
One air pump
Owners manual and miscellaneous documents
Fuses
One jack
One allen wrench
Various tools
One carrying sack
One pair of black shoes
Miscellaneous clothing
Bubble-wrap
Videocassette box
One box with bubble-wrap and piece of black metal
Four photo albums
Photographic slides
One dolly
One car brush/scraper
One large portfolio containing art
One flattened yellow box
One Cinderella suitcase with clothing
Miscellaneous documents

Overhead of backseat
Toilet paper
Two pages from a magazine
One poster

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of ___Vehicle Inventory___ , On _03/07/2003_ , Page ___4___

Rear overhead console, driver side
Two VHS videocassettes
Four VHS videocassette boxes

Rear overhead console, passenger side
Three maps, one Michigan and two NJ

Rear seat
One suitcase with clothing
Miscellaneous clothing
Baby car seat
Elmo suitcase with clothing
Toy figurine

Front passenger dash
Miscellaneous stringed/wrapped packages on sticks
Star-shaped metal base with string

Floor area between front and rear seat
One box with styrofoam which contained the following:
          US Currency - one $10.00 bill
          Wire
          Miscellaneous paper
          One antennae
          One metal stand
Cloth with writing
One box containing bubble-wrap
Chess pieces, small piece of marble, and small piece of bone-like
          substance all contained in a cloth sack
Miscellaneous clothing
Yarn/string-wrapped stick
Two statuettes
One box with styrofoam
Clear tape
Four carved rocks
Two necklaces
One small piece of foam
$0.01
One crayon
One towel
One straw
Two remote controls
One blue jacket with red decorative shapes
Foam
One VHS videocassette

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of    __Vehicle Inventory__    , On 03/07/2003 , Page   5

One VHS videocassette box
One taped rod
Miscellaneous clothing
One comforter
Two notebooks
Windshield wiper fluid
One white-knotted sack containing unknown material
One camera bag
One camera lens bearing serial #3044625
One taped square-like item
Two rolls of film (possibly exposed)
One Ramada key card
Film containers and packaging
One University of Iowa Student Identification Card bearing the name
     Olaniyi, Olabayo David
One large box containing foam and four pieces of art
One large box containing the following:
     Foam
     Two maps (Michigan and Atlanta, GA)
     Bubble-wrap
     Shower gel
     Shampoo
     Miscellaneous clothing
     One red statuette
     One black candle holder
     Eight canvas panels
     Two pieces of wooden art
     Six carved rocks
Five matted pictures
One mug with tape
One decorative, red rod
One plastic grocery bag
One wooden-constructed drum-like stand with white cloth and nails
White cloth
Print cloth
One beige jacket
One animal-like horn
One wooden rod

__Passenger floorboard__
One carved rock

__Running board of side doors__
$0.10

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of ___Vehicle Inventory_____ , On 03/07/2003 , Page 6

    The $10.20 in US currency was enclosed in a plastic bag and left in the vehicle.

    At approximately 12:00 PM, the inventory was completed and the items returned to the vehicle. At 12:15 PM, exit photographs were taken.

    All logs, worksheets, inventory records, and notes will be enclosed in a 1A envelope (FD-340) and submitted to the Case Agent. The photographs have been submitted to FBIHQ, Photo Processing Unit, and will also be forwarded to the Case Agent when they have been developed and returned to the writer.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DAVID OLABAYO OLANIYI | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 05 CV 455 (RBW) |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF KARA D. SIDENER
## FEDERAL BUREAU OF INVESTIGATION

I, Kara D. Sidener, pursuant to 28 U.S.C. § 1746, do declare and state as follows:

1.     I am a Special Agent of the Federal Bureau of Investigation (FBI).  As of March 2003, I was assigned to the Washington Field Office of the FBI.   The statements made herein are based upon my personal knowledge and my review of documents which were contained in official FBI files.

2.     I was part of a group of FBI personnel who on March 7, 2003, photographed and inventoried items found in a black GMC Savana 1500 van, bearing Michigan license plate WAH896 (hereafter "the vehicle"), related to FBI case no. 174C-WF-226342. As is reflected in the March 7, 2003 FD-302 regarding this inventory search (a true and correct copy of which is attached hereto as Exhibit A), I assisted in the preparation of the photograph logs and I documented information on an FD-653 (Motor Vehicle Inspection Inventory Record) and prepared administrative worksheets.  True and correct copies of the FD-653 and the administrative worksheets are attached hereto as Exhibit B.

3.     The photographing and inventorying of property in the vehicle was carried out in

accordance with FBI policy. Specifically, sections 5-8, 5-8.1 and 5-8.2 of the Legal Handbook for

Special Agents require that FBI personnel conduct an inventory search of seized personal property,

and they describe the scope of the inventory search and particular procedures when vehicles have been

seized. True and correct copies of these provisions are attached hereto as Exhibit C.

    4.     The inventory search of the vehicle was carried out in a careful manner so as to not

cause damage to any property in the vehicle. I am aware that plaintiff claims that his artwork in the

vehicle was damaged at some point in time. I did not damage plaintiff's artwork or any other property

and I am not aware of any other person causing damage to his artwork or any other property.

    5.     I was not involved in the arrest of plaintiff or the search of the vehicle that is alleged to

have taken place on March 6, 2003 while it was parked several blocks from the Capitol.

    I declare under penalty of perjury that the foregoing is true and correct. Executed this

2nd day of March , 2007 at Quantico, VA .

Kara D. Sidener

-2-

Def. Ex. 3 - FBI Declarations
41 of 55

FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    03/10/2003

On 03/07/2003, at approximately 9:15 AM, Special Agents (SA) Kara D. Sidener, Ronald E. Menold II, Michelle L. Rankin, and Sandra I. Chinchilla arrived at the FBI Washington Field Office's V Street Facility, in order to photograph and inventory items found in a vehicle related to the below captioned investigation. SAs Mary B. Collins-Morton and Jennifer Cejpek arrived at approximately 10:30 AM and also participated in the inventory.

The vehicle to be photographed and inventoried was a black GMC Savana 1500 Van, bearing Michigan license plate WAH896 and VIN 1GDFG15R721231621.

At approximately 9:25 AM, SA Menold began taking photographs of the vehicle. SAs Rankin and Sidener assisted in the preparation of photograph logs. SA Sidener also documented vehicle information on an FD-653 (Motor Vehicle Inspection Inventory Record) and prepared administrative worksheets.

Beginning at approximately 9:35 AM, items in the vehicle were removed for the purpose of being photographed and inventoried. The following is a list of items in the vehicle and the location where they were found:

Driver's side dash
Seller's Disclosure Statement for 12750 Scully Manchester,
        Michigan, Lenawee County
University of Michigan class roster
One piece of paper bearing handwriting "story of my life..." and
        graphs

Driver's side floorboard
Metropolitan Map of Washington, DC
One business card, "Memories Past Antiques"
Two Michigan lottery ticket stubs dated 02/26/2003

Dash/console
Two compact discs (CD)
One New York lottery ticket
Two pens
One pom-pom

---

Investigation on    03/07/2003    at    Washington, DC

File #    174C-WF-226342 -12                                        Date dictated    N/A

by    SA Kara D. Sidener:kss, SA Ronald E. Menold II, SA Michelle L. Rankin,
      SA Sandra I. Chinchilla, SA Mary B. Collins-Morton, SA Jennifer Cejpek

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

174C-WF-226342-12

## EXHIBIT A

Def's Ex. 3 - FBI Declarations
42 of 55

FD-302a (Rev. 10-6-95)

174C-WP-226342

Continuation of FD-302 of    Vehicle Inventory    , On 03/07/2003 , Page   2

One Clinique tube
$0.09 in pennies
One tied piece of clear plastic containing unknown black substance
Miscellaneous trash (gum wrappers, etc.)

Floor next to console (driver's side)
Arlington County Parking Ticket, dated 03/06/2003
Three CDs and one CD holder
One package of sewing needles
One business card, "bedecidos"
Two Michigan lottery tickets, dated 02/18/2003 and 02/19/2003
One plastic bag
One large glass jar containing various rounds of ammunition
One black and white striped piece of material

Center console
Three jars filled with honey-colored substance
One cup
One partial loaf of bread
One white washcloth

Center floor in front of console
One book entitled, "Beyond Indigo" (Address Book)
One business card, "Douglas Ginsberg...Des Moines, IA"
Six scraps of paper bearing handwriting
Three sheets of paper containing telephone directory of numbers
One receipt for Big Boy Restaurant dated 02/23/2003 with
        handwritten telephone number
One book bearing handwritten pages
One brown scarf
One section of a napkin bearing handwritten telephone number
One travel sewing kit
Miscellaneous personal hygiene items

Passenger side of center console, floor, and pocket
Five maps (Middlesex County, NJ; University of South Florida Campus
        Map; State of Georgia; State of Michigan; Chicago City
        Map)
One atlas of the US
One brochure from the US Senate
Two brochures rom the Lobby Gallery, NY
Ann Arbor, Michigan classified ads dated 02/20/2003 with
        handwritten directions and description of a house
One magazine entitled "Trace"
One pair of socks

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of ___Vehicle Inventory_____ , On 03/07/2003 , Page 3

One scrap piece of white material
One Michigan registration for GMC station wagon in the name "Bayo
    Arts & Design and Reena Patel"
One insurance form for GMC Van in the name "Ilelavoyo Olaniyi"
One dealer transaction form for Bayo and Patel for GMC station
    wagon VIN 1GDFG15R721231621 (two copies)
Miscellaneous auto papers
Purchase papers for van with same VIN as listed above
Pieces of paper depicting printed "Bayo" logo
One address book with handwritten information

Underneath the passenger seat
Map of NJ

Passenger Visor
Six photographs
One fare card

Behind the rear seat
One air pump
Owners manual and miscellaneous documents
Fuses
One jack
One allen wrench
Various tools
One carrying sack
One pair of black shoes
Miscellaneous clothing
Bubble-wrap
Videocassette box
One box with bubble-wrap and piece of black metal
Four photo albums
Photographic slides
One dolly
One car brush/scraper
One large portfolio containing art
One flattened yellow box
One Cinderella suitcase with clothing
Miscellaneous documents

Overhead of backseat
Toilet paper
Two pages from a magazine
One poster

Def.'s Ex. 3 - FBI Declarations
44 of 55

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of    __Vehicle Inventory__    , On 03/07/2003 , Page    4

Rear overhead console, driver side
Two VHS videocassettes
Four VHS videocassette boxes

Rear overhead console, passenger side
Three maps, one Michigan and two NJ

Rear seat
One suitcase with clothing
Miscellaneous clothing
Baby car seat
Elmo suitcase with clothing
Toy figurine

Front passenger dash
Miscellaneous stringed/wrapped packages on sticks
Star-shaped metal base with string

Floor area between front and rear seat
One box with styrofoam which contained the following:
        US Currency - one $10.00 bill
        Wire
        Miscellaneous paper
        One antennae
        One metal stand
Cloth with writing
One box containing bubble-wrap
Chess pieces, small piece of marble, and small piece of bone-like
        substance all contained in a cloth sack
Miscellaneous clothing
Yarn/string-wrapped stick
Two statuettes
One box with styrofoam
Clear tape
Four carved rocks
Two necklaces
One small piece of foam
$0.01
One crayon
One towel
One straw
Two remote controls
One blue jacket with red decorative shapes
Foam
One VHS videocassette

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of __Vehicle Inventory__ , On __03/07/2003__ , Page __5__

    One VHS videocassette box
    One taped rod
    Miscellaneous clothing
    One comforter
    Two notebooks
    Windshield wiper fluid
    One white-knotted sack containing unknown material
    One camera bag
    One camera lens bearing serial #3044625
    One taped square-like item
    Two rolls of film (possibly exposed)
    One Ramada key card
    Film containers and packaging
    One University of Iowa Student Identification Card bearing the name
            Olaniyi, Olabayo David
    One large box containing foam and four pieces of art
    One large box containing the following:
            Foam
            Two maps (Michigan and Atlanta, GA)
            Bubble-wrap
            Shower gel
            Shampoo
            Miscellaneous clothing
            One red statuette
            One black candle holder
            Eight canvas panels
            Two pieces of wooden art
            Six carved rocks
    Five matted pictures
    One mug with tape
    One decorative, red rod
    One plastic grocery bag
    One wooden-constructed drum-like stand with white cloth and nails
    White cloth
    Print cloth
    One beige jacket
    One animal-like horn
    One wooden rod

    Passenger floorboard
    One carved rock

    Running board of side doors
    $0.10

Davis Ex. 3 - FBI Declarations
46 of 55

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of ___Vehicle Inventory_____ , On 03/07/2003 , Page  6

     The $10.20 in US currency was enclosed in a plastic bag and left in the vehicle.

     At approximately 12:00 PM, the inventory was completed and the items returned to the vehicle. At 12:15 PM, exit photographs were taken.

     All logs, worksheets, inventory records, and notes will be enclosed in a 1A envelope (FD-340) and submitted to the Case Agent. The photographs have been submitted to FBIHQ, Photo Processing Unit, and will also be forwarded to the Case Agent when they have been developed and returned to the writer.

FD-653 (Rev. 8-14-92)

## Motor Vehicle Inspection Inventory Record

Def.'s Ex. 3 - FBI Declarations

Agents Conducting Examination __Ronald E Menuld II, Michelle L. Rankin, Sandra Chindemi(?) of Sara D. Sidener__

File Number __174 NEW__    Place and Date of Examination __Wash, DC. 03/07/03__    Time Begun __9.15 AM__

Seizure Number _____    Location of Examination __ERT Space /V St. Facility__    Stored At _____

Year ____    Make __GMC Van__    Style __1500__    Model __Savana__    Color __BLACK__    Top _____

NADA Book Value _____    License No __WAH 896__    State __MICHIGAN__    Year ____    Bottom _____

Odometer Reading _____

True VIN __1GDFG615R721231621__
*(After Examination)*

**Lifts**
- [ ] True
- [ ] Replaced
- [ ] Salvage
- [ ] Homemade

**NCIC**
- [ ] Positive
- [ ] Negative

VIN on Unit _____

CVIN _____

Engine _____    Size _____    Cylinders _____

Serial Number of Engine _____

Serial Number of Transmission _____

Transmission
- [ ] Automatic
- [ ] Standard
- [ ] Console

**Fuel**
- [ ] Gasoline
- [ ] Diesel
- [ ] Propane

Fed. Safety Cert. _____
- [ ] Altered
- [ ] Unaltered
- [ ] Removed

| Vehicle Condition | Fair | Good | Excellent |
|---|---|---|---|
| Paint | [ ] | [X] | [ ] |
| Transmission | [ ] | [X] Used | [ ] |
| Engine | [ ] | [ ] | [ ] |
| Body | [ ] | [ ] | [ ] |
| Tires | [ ] | [ ] | [ ] |
| Interior | [X] | [ ] | [ ] |

Marks of Identification _____

- [ ] Power Steering
- [ ] Power Brakes
- [ ] Power Windows
- [ ] Power Seats
- [ ] Vinyl Roof
- [ ] Power Locks

- [ ] Air Conditioning
- [ ] Remote Mirror
- [ ] Tint Glass-all
- [ ] Tint/Windshield
- [ ] Cruse Control

Radio:
- [ ] AM
- [ ] Stereo
- [ ] Cassette
- [ ] Interior
- [ ] Leather

- [ ] AM/FM
- [ ] Tape
- [ ] CB
- [ ] Vinyl
- [ ] Cloth

Color: _____

Tires
- [ ] Radial
- [ ] Standard
- [ ] Snow
- [ ] All Terrain
- [ ] Special

Hubcaps
- [ ] Factory
- [ ] Spoke
- [ ] Aluminum
- [ ] Chrome

Tire Size:  Front _____
            Rear _____

Note if vehicle equipped with:

| | No | Yes | Unknown |
|---|---|---|---|
| CD Player | [ ] | [X] | [ ] |
| Spare Tire | [ ] | [ ] | [ ] |
| Tools in Vehicle | [ ] | [ ] | [ ] |
| Radio | [ ] | [X] | [ ] |
| Tape Player | [ ] | [X] | [ ] |
| CB Radio | [ ] | [ ] | [ ] |

Cellular Phone    No [ ]    Yes [ ]    Unknown [ ]

Items or components damaged or missing (include engine compartment): _____

_____

_____

*(See Reverse Side of Form)*

FBI/DOJ

# EXHIBIT B

Other distinguishing features:  (Dents, decals, trailer hitch, rust, interior) _____  _____

_____  _____

Location of seizure _____  _____

Vehicle in possession of _____  _____ Owner _____  _____

Address _____  _____ Address _____  ____

Purchased from _____ Date _____  Amount _____  ___

Vehicle stolen from _____ Address _____  _____

Originating Agency (ORI) _____

Date of Theft _____  ____ Location _____  Complaint # _____  ___

Insurance  Co.  __  _____  Policy # _____  _____

Claim # _____  ___

Insurance Co. Notified:  By Agent _____ By Police _____ Other _____ Date: _____

Accompanying Officers at time of inspection _____  _____

Note any area of vehicle not inventoried and reason therefore _____  _____

_____

Items removed from vehicle for safeguarding or as evidence:

**Item**                                   **Location Found**                              **Located By**

Signed:    _____

_____

Time Completed:    _____

## INSTRUCTIONS FOR VEHICLE INVENTORY

1. Two persons should conduct inventory.

2. Remove items of significant value from vehicle for safekeeping.   A receipt should be given for all items removed from vehicle.

3. Unless compelling reason exists, do not force open locked doors, trunk, or glove compartment.

4. Photograph interior and exterior of vehicle where practicable.

Def.'s Ex. 3 - FBI Declarations
49 of 55

# ADMINISTRATIVE WORKSHEET

PAGE ___ 2
DATE 2/7/03

| | |
|---|---|
| ...ER | 172 New St / SE facility |
| ...STANTS | SA Lopez D. Sidener |
| OF ARRIVAL | 03/01/2003  3 12 AM |
| SENT AT SCENE / RIVAL | arrived at his scene at M St facility |

**PERSONNEL INVOLVED IN SEARCH AND THEIR RESPECTIVE DUTIES**

SA Ronald E. Renault
SA Michele L. Rankin
SA Sandra Chinchilla
SA Tara D. Sipples
SA Mary Olsen-Morton

**PRELIMINARY SURVEY/EVIDENCE EVALUATION (NOTES/OBSERVATIONS)**

**SPECIAL SITUATIONS OR CONDITIONS (NOTES/OBSERVATIONS)**

| | |
|---|---|
| ...RGE OF SCENE / RIVAL | N/A |
| ...CENE OBTAINED | N/A |
| ...E OF CONTROL | N/A |
| SCENE | secured |
| ...ECURED | |
| ...DITIONS | inside lighting (temp/cold) |
| ...TS OF | |
| ...CRIPTION(S) | |

Def.'s Ex. 3 - FBI Declarations
50 of 55

# ADMINISTRATIVE WORKSHEET continued

PAGE 2 OF 2
DATE 2/7/03

CRIME SCENE CONFERENCE (NOTES/OBSERVATIONS)

CRIME SCENE INVESTIGATION COMPLETED and RELEASE OF SCENE AUTHORIZED

NAME
TITLE
DATE
TIME
SIGNATURE

CRIME SCENE RELEASED TO

NAME
TITLE
DATE
TIME

(ADDITIONAL NOTES/OBSERVATIONS)

FINAL SURVEY (NOTES/OBSERVATIONS)

## ADMINISTRATIVE LOG:

| TIME | PERTINENT DESCRIPTION / INFORMATION |
|---|---|
| 9:15 AM | Arrival of ERT CSS at V.A. facility |
| 9:26 AM | Photos started |
| 9:35 AM | Sketching started |
| | Processing completed |
| | begin processing in |
| 12:10 PM | EXIT photos |
| 12:20 PM | Scene departed V.A. |

Def.'s Ex. 3 - FBI Declarations
51 of 55

}

**SENSITIVE**

MANUAL: LHBSAP1 LEGAL HANDBOOK FOR SPECIAL AGENTS PART 1

---

5-8       | INVENTORY SEARCHES

            In certain situations, Agents may have reason to seize
personal property but have no investigatory reason for searching the
property.  As part of an administrative caretaking function, Agents
seizing such property must be concerned about its custody, storage and
inventorying the contents of the property.  The inventory is a search
made reasonable by the lawful possession of the property and adherence
to the FBI's policy on conducting inventory searches.  This caretaking
function is based on the need to protect the property owner's
interests while the property is in the custody of the FBI, to protect
the FBI and its employees against claims or disputes over lost, stolen
or vandalized property and to protect employees from potential danger.
An inventory search may not be a ruse for a search for evidence of
criminal activity. |

**EffDte: 07/26/1999 MCRT#: 915  Div: D9          Cav:          SecCls:

*****************************  End of Report  *****************************
                                **SENSITIVE**


# EXHIBIT C

SENSITIVE

MANUAL: LHBSAP1 LEGAL HANDBOOK FOR SPECIAL AGENTS PART 1

---

|5-8.1        Scope of the Inventory Search (Formerly 5-7.2)

Upon seizing personal property, a prompt thorough search of the contents of the property, whether locked or unlocked, including any containers located therein whether locked or unlocked, should be conducted and an FD-302 prepared showing the results of the inventory. The FD-302 should include, but not be limited to, a description of the property and a description of the valuables secured for safekeeping. In order to facilitate the preparation of the FD-302, form FD-653 (Motor Vehicle Inspection Inventory Record) may be used in connection with seizure of motor vehicles. The FD-302 may simply refer to the FD-653 and be attached thereto. Where practicable, the inventory should be conducted by two persons. Nonevidentiary items of significant value should be removed for safekeeping and afforded adequate security. Contraband or evidence found should be immediately seized and preserved in accordance with existing procedures governing the seizure of physical evidence. A receipt should be given for all items retrieved during the search. (See 5-8.2 below and MIOG, Part 1, Sections 26-2.5, 26-2.7, and 149-3, and MAOP, Part 2, Section 2, re evidence retention.)|

**EffDte: 07/26/1999 MCRT#: 915  Div: D9        Cav:        SecCls:

*****************************  End of Report  *****************************
SENSITIVE

Def.'s Ex. 3 - FBI Declarations
53 of 55

}

SENSITIVE

MANUAL: LHBSAP1 LEGAL HANDBOOK FOR SPECIAL AGENTS PART 1

---

| 5-8.2          Impoundment Inventories (Formerly 5-7.2)

        Vehicles are often seized with no investigatory reason for searching the vehicle and its contents. In such situations, Agents have a routine administrative caretaking responsibility regarding the custody, storage, and inventorying of the contents of the vehicle. The following procedures should be used whenever Agents impound vehicles:

        (1)  The U.S. Marshal should be contacted to arrange for storage if no adequate Bureau facilities are available.

        (2)  A receipt for the vehicle should be prepared at the time of the seizure or as soon thereafter as practicable.

        (3)  A prompt, thorough inventory of the interior (including trunk and glove box) and any containers therein, whether locked or unlocked, should be conducted and an FD-302 prepared showing the results of the inventory. The FD-302 should include, but not be limited to, the following:

                (a)  Description of the car (year, color, VIN, license number)

                (b)  Description of all valuables secured from the vehicle for safekeeping

                (c)  Listing of all accessories, tools, and unattached parts left in the vehicle

                (d)  Notation describing the condition of the body and upholstery (specifically naming the damage or deteriorated areas and briefly stating the damage)

                (e)  Listing of all missing items such as keys, motor, radio, battery, spare tire, etc.

(See 5-8.1 re use of FD-653.)|

**EffDte: 07/26/1999 MCRT#: 915  Div: D9        Cav:        SecCls:

*****************************  End of Report  *****************************
SENSITIVE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DAVID OLABAYO OLANIYI | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. 05 CV 455 (RBW) |
| DISTRICT OF COLUMBIA, ET AL. | ) | |
| Defendants. | ) | |

## DECLARATION OF GERHARD S. VIENNA

I, Gerhard S. Vienna, pursuant to 28 U.S.C. § 1746, do declare and state as follows:

1.    I am presently a Special Agent (SA) of the U.S. Food and Drug Administration, U.S. Department of Health and Human Services. As of March 2003, I was a Special Agent of the U.S. Capitol Police, assigned full time to the Joint Terrorism Task Force of the Washington Field Office of the Federal Bureau of Investigation (FBI). The statements made herein are based upon my personal knowledge and my review of documents which were contained in official FBI files.

2.    On March 6, 2003, I was notified of an incident on Capitol Hill wherein someone wearing what appeared to be a suicide bomber vest had been apprehended by the U.S. Capitol Police (USCP). I responded to the Capitol building but when I arrived I was told that the subject had been transported to USCP Headquarters. I then went to USCP Headquarters and saw Mr. Olaniyi in the prisoner processing area, but I did not speak with him. At USCP Headquarters, I was advised that Mr. Olaniyi's vehicle had been located on a street a few blocks from the Capitol, and I tried to respond to that location. However, I was stopped approximately a block away and was told that USCP bomb technicians were clearing the van for explosives. To my knowledge,

no FBI or FBI Joint Terrorism Task Force personnel were involved in the search of the van while it was parked on Capitol Hill, as is claimed by plaintiff.

3.       On March 11, 2003, FBI SA John Gardner, Jr. and I met with Reena Patel and SA Gardner released custody of a black 2002 GMC Savanna van, with miscellaneous items in the van, to her.

4.       I am aware that plaintiff claims that his artwork in the vehicle was damaged at some point in time. I did not damage plaintiff's artwork or any other property and I am not aware of any other person causing damage to his artwork or any other property.

5.       I was not involved in the arrest of plaintiff or the inventory search of the vehicle.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _5th_ day of _March_ , 2007 at Washington, D.C.

Gerhard S. Vienna

-2-

Def.'s Ex. 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DAVID OLABAYO OLANIYI | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. 05 CV 455 (RBW) |
| DISTRICT OF COLUMBIA, ET AL. | ) | |
| Defendants. | ) | |

## DECLARATION OF KEVIN D. FINNERTY
## FEDERAL BUREAU OF INVESTIGATION

I, Kevin D. Finnerty, pursuant to 28 U.S.C. § 1746, do declare and state as follows:

1.      I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI).  As of March 2003, I was assigned as a Special Agent Bomb Technician to the Joint Terrorism Task Force (JTTF)/National Capitol Response Squad (NCRS) of the Washington Field Office of the FBI.  The statements made herein are based upon my personal knowledge and my review of documents which were contained in official FBI files.

2.      On March 6, 2003, I responded to the Capitol Rotunda after being advised that someone wearing what appeared to be a suicide bomber vest had been apprehended by the U.S. Capitol Police (USCP).  When I arrived, there were various items on the floor of the Rotunda, such as duct-taped cylinders and bottles, clothing and other items.  These items are depicted in the photographs attached hereto as Exhibit A.  I was advised by USCP officers that these items had been on the persons of plaintiff David Olaniyi and Ms. Reena Patel.  In particular, I was advised that Mr. Olaniyi

had been wearing what appeared to be a harness made of duct tape strapped to his body and that attached to and covered by the harness were cylinders and bottles, which gave the appearance of a suicide bomber explosive belt. I was also advised that Mr. Olaniyi had been wearing a long white robe (depicted in some the photographs in Exhibit A) and then, while singing, removed the robe in the Rotunda area to reveal the duct tape harness. I was advised that Ms. Patel also had been wearing a duct tape harness which attached and covered round containers, which gave the appearance of a suicide bomber explosive belt. The harnesses and clothing are depicted in the photographs attached hereto as Exhibit B, which came from a camera recovered at the scene.

3.     At the time, I was aware that the U.S. Capitol was considered to be a target for terrorists. I was also aware that terrorists planning suicide bombings have been known to probe security conditions at their target before actually carrying out the attack. Based on that knowledge, my observation of the duct-tape belts and other items on the floor of the Rotunda, and the information I received from the USCP concerning the actions of and the duct tape belts worn by Mr. Olaniyi and Ms. Patel, I believed that the incident was a bomb hoax and may have been a probing of security conditions in advance of an actual attack. Because the FBI would have jurisdiction over such matters, I gathered the items on the floor of the Rotunda and took custody of them.

4.     The USCP had advised me that they had field inspected the harnesses and containers for possible explosive materials and had found none. However, I was also aware that such field inspections are not considered by the FBI to be definitive, as the field testing equipment does not detect all types of explosive residue, or explosive residue may exist at low levels not detected by the equipment. Therefore, at my direction, on March 7, 2003, the harnesses, containers and certain other

-2-

items from the floor of the Rotunda were sent to the FBI Laboratory Division for explosive residue testing.

5.     I learned from the USCP that Mr. Olaniyi and Ms. Patel had parked a vehicle a few blocks from the Capitol building. I notified the JTTF/NCRS and headed towards the location. I was stopped about a block away from the vehicle and was advised that USCP bomb technicians were already at the vehicle. I was subsequently advised that the USCP bomb technicians had completed their search of the van for chemical and explosive devices and/or hazards and that based on their preliminary inspection they suspected that a fluid found in containers in the van was urine.

6.     After the USCP bomb technicians completed the search of the van, SA Douglas Edmonson and I discussed the incident with USCP personnel, and we all expressed concern that Mr. Olaniyi and Ms. Patel might have been intentionally probing security at the Capitol in advance of an actual attack, or may have been unwitting "patsies" being used by terrorists to probe security at the Capitol. I believed the van would likely contain evidence regarding their actions and intentions, and SA Edmonson and I discussed the possibility of having the van swabbed for explosive residue, if the van was taken into FBI custody. We also knew that Mr. Olaniyi and Ms. Patel had been arrested, so we did not want to leave their van on the street and run the risk that it would be vandalized, stolen, towed because of a parking violation, or perhaps driven away by an unknown third party involved in the incident. Therefore, after consultation with a supervisor at the Washington Field Office, the van was towed back to an FBI storage facility. As the case agent assigned to this matter, I requested that an inventory search be conducted, as required by FBI policy.

7.     After the USCP bomb technicians completed the search of the van, FBI SA Chris

-3-

Ginsburg and I interviewed Mr. Olaniyi and Ms. Patel at USCP Headquarters.  Copies of our interview reports are attached hereto as Exhibit C.

8.     I am aware that plaintiff claims that his artwork in the vehicle was damaged at some point in time.  I did not damage plaintiff's artwork or any other property.  Some of the items that I gathered from the floor of the Capitol Rotunda on March 6, 2003 were damaged, but I am not aware of any other damage to his artwork or any other property in his vehicle or elsewhere.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 20 day of MARCH , 2007 at Washington, D.C.

Kevin D. Finnerty






**Exhibit A**
































Exhibit B





FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    03/07/2003

        ILELABAYO D. OLANIYI, home address 1233 Eshter Court,
Iowa City, Iowa, zip code 52240, date of birth April 20, 1970,
social security account number 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, was interviewed at the
United States Capitol Police Headquarters, 119 D Street, Northeast,
Washington, District of Columbia.  After being advised of the
identity of the interviewing agents and the purpose of the
interview, OLANIYI provided the following information.

        OLANIYI was born in Nigeria and has been living in
Michigan for the past three (3) years.  He attended the College of
Santa Fe where he received a Bachelor of Fine Arts degree.  He
attended the University of Iowa where he received a Master of Fine
Arts degree.  OLANIYI taught a course at the University of Michigan
titled "Life as a Performance."

        OLANIYI left Michigan on Wednesday, February 26, 2003 and
traveled to New York to visit friends.  He left New York on
Wednesday March 5, 2003 and traveled to Washington, District of
Columbia.

        On March 6, 2003, OLANIYI arrived at the Capitol with his
friend REENA PATEL.  OLANIYI was inside the Capitol taking pictures
with other visitors that had come to tour the Capitol.  OLANIYI
showed some of the visitors a stone mask that he made.  A police
officer approached OLANIYI and asked what he was doing with the
mask.  The police officer proceeded to knock the mask out of
OLANIYI's hand causing the mask to break into pieces on the ground.
OLANIYI asked the officer why he knock the mask out of his hand.
The officer handcuffed OLANIYI and detained him.

        OLANIYI described his actions at the Capitol as a
"spontaneous performance."  OLANIYI was responding to the audience
with his "art."  OLANIYI used clothing, carved stone, and dance to
create his "art."  The aforementioned materials are part of a
costume that he used to perform.

        OLANIYI was asked to describe the "art" that he was
wearing which consisted of duct tape and canisters.  OLANIYI
described this clothing as a "sculpture vest."  This vest was made

Investigation on    03/06/2003    at    Washington, D.C.

File #    174C-WF-226342 -16                          Date dictated
        SA CHRIS A. GINSBURG
by      SA KEVIN D. FINNERTY

This document contains neither recommendations nor conclusions of the FBI  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency

## Exhibit C

FD-302a (Rev. 10-6-95)

174C-WF-226342

Continuation of FD-302 of ___ILELABYO D. OLANIYI___ , On 03/06/2003 , Page ___2___

from art that he collected over time and had pieced together. Part of the costume required OLANIYI to use duct tape. OLANIYI further described his costume and stone mask as a "composite costume."

OLANIYI advised that he is not a terrorist and has no ties to any terrorist organizations. OLANIYI described his purpose for being in the world: "My life is to beautify not to destroy. I am not a terrorist."

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    03/07/2003

REENA PATEL, home address ~~315 Redfern Circle~~, Portage, Michigan, ~~zip code 49024~~, date of birth ~~June 6, 1980~~ was interviewed at the United States Capitol Police Headquarters, 119 D Street, Northeast, Washington, District of Columbia. After being advised of the identity of the interviewing agents and the purpose of the interview, PATEL provided the following information.

PATEL was born in Norristown, New Jersey and currently lives in Michigan at the aforementioned address. PATEL is a graduate of the University of Michigan.

At approximately 2:00 P.M. on March 6, 2003, PATEL entered the United States Capitol at the visitors entrance and proceeded through security. PATEL was joined by her friend, ILELABAYO OLANIYI. PATEL has known OLANIYI FOR approximately one (1) year. PATEL and OLANIYI entered the Rotunda wearing various articles of clothing that PATEL described as "artwork." This "artwork" included clothes, and an African mask that was hand carved from stone. They were met by visitors to the Rotunda who were interested in their various articles of clothing and "artwork." By visitors, PATEL meant the general public that were inside the Rotunda. The visitors asked to take pictures with PATEL and OLANIYI. OLANIYI proceeded to show some of the visitors a stone mask that he had created. A Capitol police officer walked over to OLANIYI and told him to put the mask down. According to PATEL, the police officer "swatted" at the mask, causing it to fall to the ground and break into pieces. They both were told to get on the ground and were they were handcuffed.

PATEL described herself and OLANIYI as "artists." The clothing they were wearing and the mask that OLANIYI displayed were described as "an art form." PATEL and OLANIYI travel all over the United States and perform their "art" at exhibitions. The art that they created is shown to different exhibitors in the hopes that the exhibitors will buy their art so PATEL can support herself.

PATEL gets her art supplies from various stores. The hand carved mask came from stone quarries in Colorado. The duct tape was purchased at a Home Depot and her clothing was bought from

CG03661. 302 3/7/03 CH

| | | |
|---|---|---|
| Investigation on | 03/06/2003 | at Washington, D.C. |

File # 174C-WF-226342 -9

Date dictated _____

by SA CHRIS A. GINSBURG
   SA KEVIN D. FINNERTY

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency

FD-302a (Rev 10-6-95)

174C-WF-226342

Continuation of FD-302 of    REENA PATEL                              , On 03/06/2003 , Page    2

      various JOANNE FABRICS stores. PATEL could not recall the exact
locations of the various stores.

          PATEL had plans to meet with a perspective buyer in the
evening (March 6, 2003) and was suppose to travel back to Michigan
in the morning (March 7, 2003).  The perspective buyer was named
MIMI WOLFORD (Phonetic).

          PATEL advised that there are no political or religious
causes to her art form and that she is not a terrorist or has any
affiliation with any terrorist organization.

Def.'s Ex. 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID OLABAYO OLANIYI )<br><br>Plaintiff, )<br><br>v. )<br><br>DISTRICT OF COLUMBIA, ET AL. )<br><br>Defendants. ) | CIVIL ACTION NO. 05 CV 455 (RBW) |

## DECLARATION OF JOHN GARDNER, JR.
## FEDERAL BUREAU OF INVESTIGATION

I, John Gardner, Jr, pursuant to 28 U.S.C. § 1746, do declare and state as follows:

1.     I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI).  As of March

2003, I was assigned as to the Washington Field Office of the FBI.   The statements made herein are

based upon my personal knowledge and my review of documents which were contained in official FBI

files.

2.     On March 6, 2003, I responded to the Capitol Rotunda after being advised that

someone wearing what appeared to be a suicide bomber vest had been apprehended by the U.S.

Capitol Police (USCP).  When I arrived, Mr. Olaniyi and Ms. Patel were not in the Rotunda, and I did

not speak with them.  I assisted FBI SA Kevin D. Finnerty and other personnel with gathering various

items, such as duct-taped jars and round containers, clothing and artwork, from the floor of the Capitol

Rotunda.  I was advised that these items had been on the persons of Mr. Olaniyi and Ms. Patel. These

items are depicted in the photographs attached hereto as Exhibit A.

3.    On March 11, 2003, I met with Reena Patel and released custody of a black 2002 GMC Savanna van, with miscellaneous items in the van, to her. SA Gerhard Vienna of the U.S. Capitol Police, who was assigned to the FBI's Joint Terrorism Task Force at the time, was present as well.

4.    I am aware that plaintiff claims that his artwork in the vehicle was damaged at some point in time. I did not damage plaintiff's artwork or any other property. Some of the artwork that SA Finnerty and I gathered from the floor of the Capitol Rotunda on March 6, 2003 appeared damaged, but I am not aware of any other damage to his artwork or any other property.

5.    I was not involved in the arrest of plaintiff or in any search of the vehicle.

I declare under penalty of perjury that the foregoing is true and correct. Executed this

01    day of  MARCH   , 2007 at Washington, D.C.

_____

John Gardner, Jr.






**Exhibit A**






























# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,       )
                          )
        Plaintiff       )
                          )
    v.                 )    Civil Action No. 05-00455(RBW)
                          )
DISTRICT OF COLUMBIA, et al.    )
                          )
        Defendant.    )
_____ )

## ORDER

UPON CONSIDERATION of the Federal Defendants' Motion To Dismiss

Plaintiff's Second Amended Complaint, Or Alternatively, for Summary Judgment, any

opposition thereto, any replies, and the entire record herein, it is hereby

ORDERED that federal defendants' motion is granted, and it is further

ORDERED that this case is dismissed with prejudice.


_____
 DATE                                UNITED STATES DISTRICT JUDGE

Copies to:
Counsel for Plaintiff       David F. Williams/
                          Keith Wesolowski/
                          Jennafer P. Neufeld
                          Cadwalader, Wickersham & Taft LLP
                          1201 F Street, N.W., Suite 1100
                          Washington, D.C.  20004

Counsel for District of     Melvin W. Bolden, Jr.
 Columbia              Office of Corporation Counsel
                          441 4th Street, N.W.
                          Washington, D.C.  20001

Counsel for Federal       Beverly M. Russell
Defendants             U.S. Attorney's Office for the District of Columbia
                          555 Fourth Street, N.W., Suite E-4915
                          Washington, D.C.  20530