## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,     )
                            )
         Plaintiff        )
                            )
        v.            )     Civil Action No. 06-2165(RBW)
                            )
UNITED STATES OF AMERICA,    )
                            )
        Defendant.    )
_____  )

### DEFENDANT UNITED STATES' MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

defendant, United States, by and through its undersigned counsel, moves to dismiss the above-

captioned case.  In support of the Motion, the Court is respectfully referred to the accompanying

Memorandum of Points and Authorities.  As required by Local Rule 7(c), a proposed Order

consistent with the relief requested in this Motion is also attached hereto.

Date: July 13, 2007

                     Respectfully Submitted,


                     /s/ Jeffrey A. Taylor /kvm
                     _____
                     JEFFREY A. TAYLOR, D.C. BAR #498610
                     United States Attorney


                     /s/ Rudolph Contreras
                     _____
                     RUDOLPH CONTRERAS, D.C. BAR #434122
                     Assistant United States Attorney

/s/ Beverly M. Russell
_____
BEVERLY M. RUSSELL, D.C. Bar #454257
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia,
 Civil Division
555 4th Street, N.W., Rm. E-4915
Washington, D.C. 20530
Ph:  (202) 307-0492

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DAVID OLABAYO OLANIYI, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-2165(RBW) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT UNITED STATES' MOTION TO DISMISS**

The United States, by and through its undersigned counsel, moves this Court, pursuant to

Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the above-

captioned case brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§

1346(b), 2671-2680.   The United States' factual and legal bases for bringing this Motion are set

forth below.

**I.     BACKGROUND**

Acknowledging a pervasive "atmosphere of heightened anxiety and concerns over safety

and security[,]" Plaintiff, on March 6, 2003,  nevertheless presented himself in the U.S. Capitol

with a duct-taped apparatus strapped to his person.  Compl. ¶¶ 11, 14 and 15.  The apparatus was

made from "various materials from the D.C. environment, including newspapers, shampoo

bottles, empty honey jars and [of course] duct tape."  Id.  ¶ 14. He wore this outfit in the U.S.

Capitol "in an effort to study people's interactions with him" and because he "wanted to spread a

message of tolerance and understanding during times of war . . ."  See Olaniyi v. District of

Columbia, et al., Civil Action No. 05-00455(RBW)(Second Am. Compl. ¶ 66).  By wearing the

duct-taped apparatus (widely publicized as an unfortunate and deadly weapon of choice of

suicide bombers), Plaintiff also hoped "to promote acceptance of those who looked different."
Id.

Just after 1:00 p.m. on March 6, 2003, Plaintiff alleges that he was approached by U.S.
Capitol Police ("USCP") Officer Preston Nutwell who asked Plaintiff what he was holding.[1] Id.
¶ 19.  Officer Nutwell allegedly asked Plaintiff to drop the item.  Id.  The piece, a sculpture,
subsequently shattered on the ground.  Id.  ¶ 20.  Plaintiff claims that he was then handcuffed
and asked if he had any wires or explosives in his outfit.  Id. ¶¶ 23-24.   He purportedly
responded in the negative.  Id.  The Capitol Crypt area was evacuated although the full House of
Representatives was not.  Id. ¶ 25.  USCP agents x-rayed the empty jars from Plaintiff's outfit
which came back negative.  Id. ¶ 25.  Plaintiff was also questioned by both USCP and FBI agents
for approximately two to three hours.  Id. ¶ 26.  Plaintiff's vehicle, parked within close proximity
to the U.S. Capitol, was searched.  Id. ¶ 27.  Plaintiff alleges that, during the search, pieces of
original artwork were destroyed.  Id.

Plaintiff was detained overnight, id. ¶ 28, and subsequently charged with violations of 40
U.S.C. § 844(e) for false bomb threat, 40 U.S.C. § 193f(b)(7) for disorderly conduct on Capitol
grounds, 18 U.S.C. § 2 for aiding and abetting, and a District of Columbia code provision for
assault or threatened assault, id. ¶ 31. On March 10, 2003, Plaintiff was released from
confinement following the entry of criminal charges and his posting of bail.  Id. ¶ 32.  On or
around April 1, 2003, Plaintiff was indicted on all three counts.  Id. ¶ 32.  The charges were later
dropped.  Id. ¶ 33.

---

[1]Reena Patel, Plaintiff's companion, was present.  Compl. ¶ 21.

Plaintiff apparently had an on-going "custody battle" with his ex-wife. <u>Id.</u> ¶ 34. In January 2004, Plaintiff returned to Washington, D.C. accompanied by his children and Ms. Patel, and was stopped by a USCP officer. <u>Id.</u> USCP Detective Joseph DePalma, who did not initiate the stop, subsequently arrived on the scene and questioned Plaintiff regarding whether he had custody of his children and whether he had authority to remove the children from Michigan. <u>Id.</u> ¶ 36.

Soon after this incident, Secret Service Agent Charles J. Hull and Deputy Mike Sheetz appeared at Plaintiff's residence in Iowa City. <u>Id.</u> ¶ 39. Plaintiff's ex-wife had reported to Michigan authorities that Plaintiff said he wanted to kill the President. <u>Id.</u> ¶ 40. The agents interviewed Plaintiff about this allegation. <u>Id.</u> ¶ 40.

On December 26, 2006, Plaintiff brought this suit alleging false arrest resulting from the March 2003 incident; false arrest and false imprisonment resulting from the January 2004 stop; malicious prosecution resulting from his detention and arrest; intentional infliction of emotional distress; conversion of property resulting from the alleged destruction of Plaintiff's artwork; and loss of earnings, humiliation and damage to reputation. <u>Id.</u> ¶¶ 45, 48, 52, 63, and 69-71.

## II.     STANDARD OF REVIEW

### A.     Dismissal for Lack of Subject Matter Jurisdiction (Fed.R.Civ.P. 12(b)(1))

"A motion under 12(b)(1) 'presents a threshold challenge to the court's jurisdiction.'" <u>Gardner v. U.S.</u>, No. CIV. A. 96-1467EGS, 1999 WL 164412, *2 (D.D.C. Jan. 29, 1999), <u>aff'd</u>, 213 F.3d 735 (D.C. Cir. 2000) and <u>cert. denied</u>, 531 U.S. 1153 (2001), <u>quoting, Haase v. Sessions</u>, 835 F.2d 902, 906 (D.C. Cir.1987); <u>see also</u> 4 Wright & Miller: Federal Prac. & Proc. § 1350 (R12)(2002 Supplement)("...subject matter jurisdiction deals with the power of the court

3

to hear the plaintiff's claims in the first place, and therefore imposes upon courts an affirmative obligation to ensure that they are acting within the scope of their jurisdictional power.")

A court may resolve a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(1) in two ways.  First, the court may determine the motion based solely on the complaint.  Herbert v. National Academy of Science, 974 F.2d 192, 197 (D.C. Cir. 1992).  Alternatively, to determine the existence of jurisdiction, a court may look beyond the allegations of the complaint, consider affidavits and  other extrinsic information, and ultimately weigh the conflicting evidence.  See id.; see also Cureton v. United States Marshal Service, 322 F.Supp.2d 23, 2004 WL 1435124, *2 (D.D.C. June 28, 2004).

### B.    Motion for Failure to State a Claim (Fed.R.Civ.P. 12(b)(6))

In making determinations on a motion to dismiss under Rule 12(b)(6), the Court must view facts alleged in the complaint in the light most favorable to the plaintiff.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Nix v. Hoke, 139 F. Supp. 2d 125 (D.D.C. 2001), citing Weyrich v. The New Republic, Inc., 235 F.3d 617, 623 (D.C. Cir. 2001); see also Slaby v. Fairbridge, 3 F. Supp. 2d 22, 27 (D.D.C. 1998).  A complaint should be dismissed if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley, 355 U.S. at 46.  Although the plaintiff is given the benefit of all inferences that reasonably can be derived from the facts alleged in the complaint, the court need not accept inferences that are not supported by such facts, nor must the court accept plaintiff's legal conclusions cast in the form of factual allegations.  Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## III.    ARGUMENT

### A.    Certain Claims Are Barred on Immunity Grounds.

Sovereign immunity bars all suits against the United States except in accordance with the explicit terms of a statutory waiver of such immunity.  Hercules v. United States, 516 U.S. 417, 422-423 (1996); Cox v. Secretary of Labor, 739 F. Supp. 28, 30 (D.D.C. 1990); see also, United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Mitchell, 445 U.S. 535, 538 (1980); Kline v. Republic of El Salvador, 603 F. Supp. 1313, 1316 (D.D.C. 1985); Pullen v. United States, No.CIV.A. 96-1211 (RCL), 1997 WL 350003, *2 (D.D.C. June 11, 1997).  Because a waiver of sovereign immunity must be strictly construed in favor of the sovereign, a waiver of sovereign immunity "is to be read no more broadly than its terms require." Masonry Masters, Inc. v. Nelson, 105 F.3d 708, 712 (D.C.Cir. 1997).  Additionally, "any ambiguities in the statutory text must be resolved in favor of immunity." United States v. Williams, 514 U.S. 527, 531 (1995). For example, to sustain a claim for monetary damages against the United States, the waiver of sovereign immunity "must extend unambiguously to such monetary claims."  Flatow v. Islamic Republic of Iran, 74 F.Supp.2d 18, 20-21 (D.D.C. 1999), quoting United States v. Nordic Village, Inc., 503 U.S. 30, 34 (1992); see also Bienvenuti v. Dep't of Defense, 587 F.Supp. 348, 351-352 (1984).  In short, sovereign immunity operates as a jurisdictional bar to suit without an otherwise explicit waiver of such immunity by the United States.  See Flatow, 74 F.Supp.2d at 21.

The FTCA operates as a limited waiver of sovereign immunity allowing, at least for certain claims and under specific circumstances, the United States to be sued for torts "in the

same manner and to the same extent as a private individual under like circumstances." 28 U.S.C.

§ 2674; see also Eagle-Picher Industries, Inc. v. U.S., 937 F.2d 625, 627-628 (D.C. Cir. 1991).

However, the FTCA has certain conditions which must be met in order for a party to

bring suit against the United States.  Absent full compliance with these conditions, the Court

lacks jurisdiction to entertain tort claims against the United States.  GAF Corp. v. United States,

818 F.2d 901, 904 and n.86 (D.C. Cir. 1987). One such condition is contained in 28 U.S.C. §

2675(a) which states:

> An action shall not be instituted upon a claim against the United States for
> damages for injury or loss of property or personal injury ... caused by the
> negligent or wrongful act or omission of any employee of the Government while
> acting within the scope of his office or employment, unless the claimant shall
> have first presented the claim to the appropriate Federal agency and his claim
> shall have been finally denied by the agency ....

The courts have uniformly held that the filing of a claim pursuant to 28 U.S.C. § 2675(a)

is a jurisdictional prerequisite to filing an action pursuant to the FTCA.  See McNeil v. U.S., 508

U.S. 106, 111 (1993)("The command that an 'action shall not be instituted ... unless the claimant

shall have first presented the claim to the appropriate Federal agency and his claim shall have

been finally denied by the agency in writing and sent by certified or registered mail' is

unambiguous."); GAF Corp., 818 F.2d at 919; Bowden v. U.S., 106 F.3d 433 (D.C.Cir. 1997);

Buss v. United States, No. 96-5138, 1997 WL 195522, at *1 (D.C. Cir. March 5, 1997);

Simpkins v. District of Columbia Gov't, 108 F.3d 366, 370 (D.C. Cir. 1997); Brug v. National

Coalition for Homeless, 45 F.Supp.2d 33, 44 (D.D.C. 1999); Johnson v. DiMario, 14 F.Supp.2d

107, 111 (D.D.C. 1998); Williams v. District of Columbia, No.CIV.A. 95CV0936 (RMU), 1996

WL 422328 (D.D.C. July 19, 1996).

6

Moreover a claim is "forever barred" unless it is presented in writing to the appropriate agency within two years after the claim accrues or within six months of an agency's denial of the administrative claim.  See 28 U.S.C. § 2401(b)("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.").  The general rule under the FTCA is that "a tort claim accrues at the time of the plaintiff's injury."  United States v. Kubrick, 444 U.S. 111, 120 (1979); see also Attallah v. United States, 955 F.2d 776, 779 (1st Cir.1992).

Plaintiff alleges false arrest and imprisonment and intentional infliction of emotional distress resulting from the five nights he spent in jail from March 6, 2003 to March 11, 2003. Compl. ¶ 45 and 57.  He also claims that he suffered humiliation and damage to reputation because of the March 6, 2003 arrest.  Id. ¶¶ 26, 70-71.  Plaintiff additionally brings a claim for conversion of property (based on the alleged destruction of Plaintiff's artwork) resulting form the incident at the Capitol Building on March 6, 2003 and the search of his van that same day. Id. ¶ 64.  However, all of these claims are time-barred.

For purposes of 28 U.S.C. § 2401(b), "a claim shall be deemed to have been presented *when a Federal agency receives from a claimant*, his duly authorized agent or legal representative, an executed Standard Form 95 or other written notification of an incident accompanied by a claim for money damages in a sum certain for [an] injury."  28 C.F.R. § 14.2(a)(emphasis added); see also 28 C.F.R. § 14.2(b)(1)("A claim shall be presented as required by 28 U.S.C. 2401(b) as of the date it is received by the appropriate agency."); Barkowski v.

7

<u>Kurimai</u>, No. 3:98CV2287DJS, 2000 WL 565230, *3 (D.Conn. 2000).  Further, the mailing of

the administrative claim is not "presenting; there must be receipt [by the agency.]" <u>Drazen v.</u>

<u>U.S.</u>, 762 F.2d 56, 58 (7th Cir. 1985), citing, 28 C.F.R. § 14.2(b)(1); <u>see also</u> <u>Murray v. U.S.</u>,

604 F.Supp. 444, 445 (D.C.Pa. 1985)( "Mailing of an administrative claim is insufficient to

satisfy the presentment requirement[.]"); <u>Arias v. U.S.</u>, Civil Action No. 05-4775 (JLL), 2007

WL 608375, *3 (D.N.J. Feb. 23, 2007)(For purposes of establishing presentment of an

administrative tort claim, "a plaintiff must demonstrate that the appropriate federal agency

*received* the claim. . .mere proof of mailing is insufficient to establish proper

presentment.")(emphasis in original)(internal citations omitted)(unpub.).  Here, records

demonstrate that the USCP received Plaintiff's administrative claim on March 17, 2005.  Ex. 1,

Declaration of Cecelia E. Barrios, March 29, 2007.  Accordingly, Plaintiff's claims for actions

involving the USCP occurring between March 6, 2003 and March 11, 2003 are all time-barred

and should be dismissed with prejudice.

        Further, all of Plaintiff's claims for actions involving the FBI should be dismissed.  As

indicated above, a tort claim against the United States is also barred where a claimant fails to

institute action within six months "after the date of mailing, by certified or registered mail, of

notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b).

The FBI denied Plaintiff's administrative claim on October 25, 2005.  Ex. 2, Declaration of

Sophia Marta Ivashkiv, ¶ 2 (July 13, 2007).  Plaintiff was required to bring this action in April

2006 to maintain a timely claim but filed in December 2006 well after the limitations period.

Accordingly, all of Plaintiff's claims as they relate to the FBI are time-barred.

### B.    Probable Cause Bars Plaintiff's Suit.

As indicated above, in evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, "the court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." Government Relations Inc. v. Howe, No. Civ. A. 05-1081 CKK, 2007 WL 201264, *7 (D.D.C. Jan. 24, 2007).  Further, in reviewing such motions, "[t]he court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record."  Wiggins v. Powell, No. Civ. A. 02-1774(CKK), 2005 WL 555417, *9 (D.D.C. March 7, 2005)(citations omitted); accord Hudert v. Alion Science & Tech Corp., Civil Action No. 05-545(RBW), 2007 WL 666567, *2 (March 2, 2007); Raymen v. United Senior Ass'n, Inc., 409 F.Supp.2d 15, 20 (D.D.C. 2006).

Pertinent here, the FTCA's waiver of immunity for the United States to be sued for torts "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, is determined by the law of the state in which the wrongful act occurred. See, e.g., Eagle-Picher Industries v. GAF Corp., 937 F.2d 625, 635 (D.C. Cir. 1991); Raflo v. United States, 157 F.Supp.2d 1, 7 (D.D.C. 2001).  Here, the laws of the District of Columbia would apply since the incident at issue here occurred within this jurisdiction.

Plaintiff alleges the following.  He created an outfit "out of the most popular materials he found from the D.C. environment. . .including newspapers, shampoo bottles, empty glass jars, and duct tape."  Compl. ¶ 14; see also Olaniyi v. District of Columbia, et al., Civil Action No. 05-00455(RBW)(Second Am. Compl. ¶ 66).  By wearing the duct-taped apparatus (widely publicized as a deadly weapon of choice of suicide bombers) in the U.S. Capitol on March 6,

2003, Plaintiff hoped "to promote acceptance of those who looked different." See Olaniyi v. District of Columbia, et al., Civil Action No. 05-00455(RBW)(Second Am. Compl. ¶ 66). Plaintiff was subsequently charged with violations of 18 U.S.C. § 844(e) for false bomb threat, 40 U.S.C. § 193f(b)(7) for disorderly conduct on Capitol grounds, 18 U.S.C. § 2 for aiding and abetting, and a District of Columbia code provision for assault or threatened assault, Compl. ¶ 31.

      Plaintiff also alleges that he was in a "custody battle" with his ex-wife. Id. ¶ 3. While in Washington, D.C. in January 2004, he was stopped by a USCP officer. Id. ¶ 34. USCP Detective DePalma arrived on the scene thereafter and inquired about whether Plaintiff had authority to remove the children from Michigan. Id. ¶ 36. Plaintiff subsequently sued for false arrest and imprisonment based on the March 2003 incident and the January 2004 traffic stop. Id. ¶¶ 43 to 49.

      In the District of Columbia, "[f]alse imprisonment is the same as false arrest." Saidi v. Washington Metropolitan Area Transit Authority, 928 F.Supp. 21, 26 (D.D.C. 1996), citing to Gabrou v. May Department Stores Co., 462 A.2d 1102, 1103 (D.C. 1983)(per curiam). "Depriving someone of the ability to freely move for any amount of time, either by real force or the threat of force, will be sufficient to bring a claim for false arrest or false imprisonment." Lyles v. Micenko, 468 F.Supp.2d 68, 74 (D.D.C. 2006), citing, Marshall v. Dist. of Columbia, 391 A.2d 1374, 1380 (D.C. 1978). However, "probable cause for the arrest or imprisonment is a valid defense" to such a claim. Lyles, 468 F.Supp.2d at 74. The test for "probable cause" is whether the "officer had a reasonable good faith belief that the suspect ha[d] committed or [was] committing a crime, based on the facts and circumstances known to him." Id., quoting Gueory v.

10

District of Columbia, 408 A.2d 967, 969 (D.C. 1979); see also Gabrou, 462 A.2d at 1104

("Probable cause for an arrest and detention constitutes a valid defense to a claim of false arrest

or imprisonment. . .[The] defendant need not show probable cause in a constitutional sense; it is

sufficient that the arresting officer have a good faith, reasonable belief in the validity of the

arrest and detention.")  The question of whether an officer had probable cause is a legal one to be

resolved by the Court.  Lyles, 468 F.Supp.2d at 74.  The Courts view "the evidence of probable

cause from the perspective of the arresting officer" when determining whether a detention is

supported by probable cause.  Dent v. May Department Stores Co., 459 A.2d 1042 (D.C. 1982).

　　　Probable cause is clearly evident here.  As to the March 2003 incident (which as

indicated above is subject to dismissal on the separate ground of being time-barred), Plaintiff

wore an outfit in the U.S. Capitol consisting of duct tape to which various items were attached

not unreasonably raising concerns for a possible violation of 18 U.S.C. § 844(e)[2].  Plaintiff did

so with the intention of expressing his point of view which reasonably could be viewed as a

violation of 40 U.S.C. § 193f (now 40 U.S.C. § 5104).  The statutory provision states, in part,

"[a]n individual or group of individuals may not willfully and knowingly...parade, demonstrate

or picket in any of the Capitol Buildings."

---

[2]18 U.S.C. § 844(e) states

　　　Whoever, through the use of the mail, telephone, telegraph, or other instrument of
　　　interstate or foreign commerce, or in or affecting interstate or foreign commerce,
　　　willfully makes any threat, or maliciously conveys false information knowing the
　　　same to be false, concerning an attempt or alleged attempt being made, or to be
　　　made, to kill, injure, or intimidate any individual or unlawfully to damage or
　　　destroy any building, vehicle, or other real or personal property by means of fire
　　　or an explosive shall be imprisoned for not more than 10 years or fined under this
　　　title, or both.

As to the January 2004 incident, Plaintiff, by his own admission was engaged in a custody battle with his ex-wife, a matter of which Detective DePalma was aware (Pl.'s Compl. ¶ 36).  Thus, it was not entirely unreasonable, and perhaps eminently prudent, for Detective DePalma to question Plaintiff about the status of that custody during the traffic stop.  Accordingly, given the facts known to the officers during these events, probable cause existed for the actions taken.  Thus, Plaintiff's claims for false imprisonment and arrest should be dismissed with prejudice.  Pl.'s Compl. ¶¶ 42 and 48-49.

Plaintiff's claim for malicious prosecution as related to the March 2003 events in the U.S. Capitol  must fail on similar grounds, i.e., the officers had probable cause for undertaking the actions alleged.  To sustain a claim of malicious prosecution, "a plaintiff must plead and 'prove: (1) that the underlying suit terminated in plaintiff's favor; (2) malice on the part of the defendant; (3) *lack of probable cause for the underlying suit*; and (4) special injury occasioned by plaintiff as the result of the original action."  Lyles, 468 F.Supp.2d at 75, citing Tyler v. Centr. Charge Serv., Inc., 444 A.2d 965, 968 (D.C. 1982)(emphasis added).

Additionally, this Court has held that "[t]here is no reasonable distinction between reasonable grounds for detention in false imprisonment and probable cause in malicious prosecution."  Saidi, 928 F.Supp. at 26.  "Therefore the existence of probable cause for false arrest will 'likewise defeat a claim for malicious prosecution."  Id., citing Gabrou, 462 A.2d at 1103.  As indicated above, given that Plaintiff's claims for false arrest and imprisonment fail as they relate to the actions within the U.S. Capitol, his claim for malicious prosecution must fail as well.  See Joyce v. United States, 795 F.Supp. 1, 5 (D.D.C. 1992)(A plaintiff cannot establish an

"essential element of a malicious prosecution claim" if a determination is made that defendant

had probable cause to arrest the plaintiff.)

> ### C.     Plaintiff's Claim for Intentional Infliction of Emotional Distress Fails as a Matter of Law.

To establish a claim of intentional infliction of emotional distress, a "plaintiff must show

that the defendant acted in an (1) extreme and outrageous manner (2) which was intentionally or

recklessly calculated to cause plaintiff (3) severe emotional distress." Joyce, 795  F.Supp. at 5

(citations omitted); see also Lyles, 468 F.Supp.2d at 75.  Further, a plaintiff must prove all three

elements to prevail.  Joyce, 795 F.Supp. at 5.  With regard to the first element, the District of

Columbia Court of Appeals has stated that liability will only be found where the conduct is "so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Sere

v. Group Hospitalization, Inc., 443 A.2d 33, 37 (D.C. 1982), quoting, Restatement (Second) of

Torts § 46 (1965).

Additionally, this Court has stated that "recovery is not permitted merely because

conduct causes mental distress."  Lyles, 468 F.Supp.2d at 75.  There must be some element of

physical harm to support a claim for intentional infliction of emotional distress.  Joyce, 795

F.Supp. at 5 (citation and quotation marks omitted); see also Green v. American Broadcasting

Companies, Inc., 947 F.Supp. 1359, 1363 (D.D.C. 1986)("Even if [a] plaintiff's emotional

difficulties could be tied to [the defendant, the plaintiff] could not recover damages unless [the

defendant] caused some physical harm.")

None of the allegations here as pled by Plaintiff rises to the level of actionable conduct.

See Compl. ¶¶ 57-61.  Given that Plaintiff showed up in the U.S. Capitol wearing an apparatus

looking very much like a device used by terrorists, his subsequent questioning and detention was eminently reasonable, and thus, the actions of the law enforcement officers certainly do not rise to the level of outrageous conduct that is beyond all bounds of decency, atrocious, and flat-out intolerable to a civilized community.  Compl. ¶¶ 11 and 15.  Additionally, Detective DePalma's questioning of Plaintiff, during the January 2004 traffic stop, simply does not shock the conscience given DePalma's awareness of the "custody battle" between Plaintiff and his ex-wife. Compl. ¶ 36.  According to the Complaint, it was Plaintiff's ex-wife who apparently contacted "authorities in Michigan and said [Plaintiff] was going to kill the President."  Compl. ¶ 40. Given the gravity of this allegation, the subsequent questioning of Plaintiff by Secret Service officers was also reasonable, and thus, not rising to the level of outrageous conduct sufficient to sustain a claim for emotional distress.  Further, the decision to charge Plaintiff with, inter alia, a false bomb threat and disorderly conduct on Capitol grounds, and the subsequent decision to drop those charges also do not come close to the outrageous conduct sufficient to establish a claim for intentional infliction of emotional distress.  Compl. ¶ 59-60.  The facts as pled demonstrate that the course of action undertaken by the federal officers was reasonable given Plaintiff's actions within the U.S. Capitol.

Finally, Plaintiff states only that Defendant's actions caused "severe emotional distress," id. ¶ 57, which is, by itself, insufficient to establish a claim for intentional infliction of emotional distress.  Lyles, 468 F.Supp.2d at 75.  For this reason as well, the claim should be dismissed.

14

IV.     **CONCLUSION**

For reasons stated herein, Defendant United States respectfully requests that the Court

dismiss this suit with prejudice.

Date: July 13, 2007

Respectfully Submitted,

/s/ Jeffrey A. Taylor /kvm
_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney

/s/ Rudolph Contreras
_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

/s/ Beverly M. Russell
_____
BEVERLY M. RUSSELL, D.C. Bar #454257
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia,
  Civil Division
555 4th Street, N.W., Rm. E-4915
Washington, D.C. 20530
Ph:  (202) 307-0492
Fax: (202) 514-8780
E-Mail: beverly.russell@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the ***Defendant United States' Motion to Dismiss***

was made by the Court's Electronic Case Filing System this <u>13th</u> day of July, 2007 to:

        David Finley Williams
        Keith Wesolowski
        Jennafer P. Neufeld
        Cadwalader, Wickersham & Taft LLP
        1201 F Street, N.W.
        Washington, DC 20004

        Melvin W. Bolden, Jr.
        Office of the Attorney General for the
         District of Columbia
        441 4th Street, N.W.
        Washington, D.C.  20001

                    /s/ Beverly M. Russell

                    _____

                    BEVERLY M. RUSSELL
                    Assistant United States Attorney

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID OLABAYO OLANIYI,                    )
                                           )
      Plaintiff                         )
                                           )
v.                                         )          Civil Action No. 05-00455(RBW)
                                           )
DISTRICT OF COLUMBIA, et al.               )
                                           )
      Defendant.                        )

## <u>DECLARATION OF CECELIA E. BARRIOS</u>

Cecelia E. Barrios declares as follows:

1. I am a paralegal in the United States Capitol Police (USCP) Office of the General Counsel (OGC) located at 499 South Capitol Street, S.W., Washington, D.C. 20003.
2. In this position I am responsible for the administration and processing of administrative claims presented to the USCP under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2401(b), and 2671-2680. The OGC is also responsible for the supervision and monitoring, on behalf of the USCP, of all litigation in federal district courts associated with such claims.
3. I have searched records within the USCP OGC to determine whether the plaintiff in this action, David Olabayo Olaniyi, has properly presented an administrative claim to this office prior to commencing this action, as required by 28 U.S.C. § 2675(a).
4. Review of OGC records reveals that the USCP received the Plaintiff's administrative claim on March 17, 2005. This is supported by the USCP OGC time stamp on the back of Plaintiff's Standard Form 95. In order to be timely filed, the plaintiff's claim in this instance must have been received by the OGC by March 6, 2005. Plaintiff did not timely file his administrative claim.

I, Cecelia E. Barrios, declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct based upon my knowledge, information and belief.

_____Cecelia E. Barrios_____
Cecelia E. Barrios


_____3-29-07_____
Date

Def.'s Ex. 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DAVID OBAYO OLANIYI | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL ACTION No. 05-00455 (RBW) |
| | ) | |
| DISTRICT OF COLUMBIA, et al. | ) | |
| | ) | |
| Defendants | ) | |

**DECLARATION OF SOPHIA MARTA IVASHKIV**

In accordance with Title 28, United States code, Section 1746, I , Sophia Marta Ivashkiv,
do hereby declare as follows:

1.    I am an Assistant General Counsel employed by the Federal Bureau of Investigation
("FBI"), Office of the General Counsel (OGC), Civil Litigation Unit.  I am assigned to FBI
Headquarters, but I work out of the Buffalo field office.  Since admission to the State Bar of
California in 1991, I have always been a member in good standing.  I was assigned within FBI
OGC to respond to the administrative claim submitted by David Obayo Olaniyi.  The
administrative claim was dated February 25, 2005. This claim was submitted with an affidavit
from David F. Williams, Esq., a partner in the law firm of Cadwalader, Wickersham and Taft
dated February 25, 2005.  Also attached to the administrative claim were affidavits from Dr.
Frederick Woodard, David Olabayo Olaniyi, Reena Patel Olaniyi, Victoria L. Rovine, Thomas R.
Aprile, and a letter from Cannon Hersey.  A true and correct copy of the administrative claim and
enclosures submitted with the administrative claim are attached hereto as Exhibit A.

Def.'s Ex. 2

2. The FBI denied the administrative claim on October 25, 20005. A true and correct copy of the FBI file copy of the denial letter is attached hereto as Exhibit B. This letter advised that plaintiff had six months from the date of the notification of denial to file suit against the United States in an appropriate United States District Court. I placed the denial letter, per FBI office protocol, in the 'outgoing mail' slot in the mail room of the FBI's Buffalo field office.

3. The FBI's Buffalo field office mail room sent the denial letter via registered mail. A true and correct copy of the green return receipt requested card is attached hereto as Exhibit C. The date of delivery to Cadwalader, Wickersham and Taft, and the signature for the denial letter is dated October 31, 2005. See Exhibit C.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ____13th____ day of July 2007.

Sophia Marta Ivashkiv
Assistant General Counsel
Office of the General Counsel
FBI

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 EXPIRES 5-31-05 |
|---|---|---|

| 1. Submit To Appropriate Federal Agency: | 2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, street, city, State and Zip Code) |
|---|---|
| FEDERAL BUREAU OF INVESTIGATION<br>J. Edgar Hoover Building<br>935 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20535 | David Olaniyi<br>2985 Prairie Du Chien Rd<br>Iowa City, IA 52240 | David Williams & Lory Stone<br>Cadwalader, Wickersham & Taft<br>1201 F Street, NW Suite 1100<br>Washington, DC 20004 |

| 3. TYPE OF EMPLOYMENT MILITARY (CIVILIAN) | 4. DATE OF BIRTH 04-02-70 | 5. MARITAL STATUS Married | 6. DATE AND DAY OF ACCIDENT 03-06-03 | 7. TIME (A.M. OR P.M) P.M. |
|---|---|---|---|---|

**8. Basis of Claim** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof) (Use additional pages if necessary.)

See Affidavit of David F. Williams, attached hereto.
See Affidavit of Dr. Fredrick Woodard, attached hereto.
See Letter from Cannon Hersey, attached hereto.
See Affidavit of David Olabayo Olaniyi, attached hereto.
See Affidavit of Reena Patel Olaniyi, attached hereto.
See Affidavit of Victoria L. Rovine, Ph.D, attached hereto.
See Affidavit of Thomas R. Aprile, attached hereto.

**9. PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, street, city, State, and Zip Code)
Same as claimant.

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side)
See appraisals from Dr.Fredrick Woodard & Cannon Hersey, attached hereto.
See Affidavit of David Olaniyi, attached hereto.

**10. PERSONAL INJURY/WRONGFUL DEATH**

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT

See Affidavit of Reena Patel Olaniyi, attached hereto.
See Affidavit of David Williams & Lory Stone, attached hereto.

**11. WITNESSES**

| NAME | ADDRESS (Number, street, city, State, and Zip Code) |
|---|---|
| Reena Patel Olaniyi | 2985 Prairie Du Chien Rd<br>Iowa City, IA 52240 |

**12. (See instructions on reverse)    AMOUNT OF CLAIM (In dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) |
|---|---|---|---|
| 102,318.56 | 2,215,000.00 | | |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT. (See instructions on reverse side.)<br>*David Stone, Esq. on behalf of D.Olaniyi* | 13b. Phone number of signatory 202-862-2331 | 14. DATE OF CLAIM 2/15/05 |
|---|---|---|
| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM<br>The claimant shall forfeit and pay to the United States the sum of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the United States. (See 31 U.S.C. 3729.) | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS<br>Imprisonment for not more than five years and shall be subject to a fine of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the United States. (See 18 U.S.C.A. 287.) |

| 95-108<br>Previous editions not usable | NSN 7540-00-634-4046 | STANDARD FORM 95 (Rev. 7-85)<br>PRESCRIBED BY DEPT. OF JUSTICE<br>28 CFR 14.2 |



NEW CASE

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.

A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.

C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.

D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

## INSTRUCTIONS

**Complete all items – Insert the word NONE where applicable**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A <u>SUM CERTAIN</u> FOR INJURY TO OR LOSS OF

PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT, THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN <u>TWO YEARS</u> AFTER THE CLAIM ACCRUES.

Any instructions or information necessary in the preparation of your claim will be furnished, upon request, by the office indicated in item #1 on the reverse side. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplemental regulations also. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with said claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file claim for both personal injury and property damage, claim for both must be shown in item #12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to completely execute this form or to supply the requested material within two years from the date the allegations accrued may render your claim "invalid". A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

**Failure to specify a sum certain will result in invalid presentation of your claim And may result in forfeiture of your rights.**

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or other aspect of this collection of information, including suggestions for reducing this burden,

to  Director, Torts Branch
  Civil Division
  U.S. Department of Justice
  Washington, DC  20530

and to the
Office of Management and Budget
Paperwork Reduction Project (1105-0008)
Washington, DC  20503

## INSURANCE COVERAGE

In order that subrogation claims be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance?  Yes, if yes give name and address of insurance company (*Number, street, city, State, and Zip Code*) and policy number.  No

No.  N/A

16. Have you filed claim on your insurance carrier in this instance, and if so, is it full coverage or deductible?

N/A

17. If deductible, state amount

N/A

18. If claim has been filed with your carrier, what action has your insurer taken or proposes to take with reference to your claim? (*It is necessary that you ascertain these facts*)

N/A

19. Do you carry public liability and property damage insurance?  Yes, If yes, give name and address of insurance carrier (*Number, street, city, State, and Zip Code*)  No

No.  N/A

SF 95 (Rev. 7-85) BACK

**\* U.S. GOVERNMENT PRINTING OFFICE: 1989--241-175**

CADWALADER, WICKERSHAM & TAFT LLP
David F. Williams
Lory Stone
1201 F Street, N.W.
Washington, D.C. 20004
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

**ADMINISTRATIVE CLAIM**

**DAVID OLABAYO OLANIYI,**

**Plaintiff,**

**-against-**

**THE UNITED STATES OF AMERICA,**

**Defendant.**

**AFFIDAVIT OF DAVID F. WILLIAMS, ESQ., ON BEHALF OF
DAVID OLABAYO OLANIYI**

David F. Williams, being duly sworn, hereby states under oath:

1.      I am a partner in the law firm Cadwalader, Wickersham & Taft, LLP, and a

member of the District of Columbia Bar. I make this Affidavit in my capacity as an

attorney representing David Olabayo Olaniyi ("Olaniyi"), and based on my knowledge of

the facts described herein as they have been relayed to attorneys in my firm by Olaniyi

and by this firm's review of records and other factual investigation.

2.      I am one of the attorneys of record representing Olaniyi in his claims against

the U.S. Capitol Police ("USCP"), the Federal Bureau of Investigation ("FBI"), and the

United States Secret Service ("Secret Service"). Olaniyi is entitled to compensatory

damages because the USCP and the FBI violated the Federal Tort Claims Act ("FTCA").

As required by the FTCA, 28 U.S.C. § 2675(a), Olaniyi first seeks resolution of his

claims though the appropriate federal agencies: the USCP, the FBI, and the Secret

Service. Under the FTCA, the proper defendants in Olaniyi's case are not the individual

agencies, but the government itself. 28 U.S.C. §§ 1346, 2671 et seq.

     3.     Olaniyi seeks compensation for the following common law tort claims: false

imprisonment, false arrest, intentional infliction of emotional distress, and malicious

prosecution. The United States has consented to waiving immunity under the FTCA for

such suits. 28 U.S.C. § 2680(h). In addition, Olaniyi seeks compensation for the

destruction of his artwork and other monetary damages resulting from the unlawful arrest

and detention.

## BACKGROUND

     4.     In the wake of the September 11, 2001 terrorist attacks, an atmosphere of

heightened anxiety and concerns over safety and security has been pervasive in the

United States. Congress responded to the terrorist attacks by passing the USA Patriot

Act, which, among other things, permitted the government to detain suspected noncitizen

"terrorists" for up to seven days without charges and strengthened federal law

enforcement surveillance powers over citizens and noncitizens associated with

"terrorism." In addition, President Bush issued a military order allowing military

tribunals to try alleged noncitizen terrorists and, with Congress, created the Department

of Homeland Security. These measures have created a society filled with

overzealousness and suspicion, and have impeded civil liberties across America. It was

in this context that David Olabayo Olaniyi, a native of Nigeria, and his wife Reena Patel Olaniyi, of Indian decent, visited the U.S. Capitol.

5.     On March 6, 2003, Olaniyi visited the U.S. Capitol to tour and conduct research for his stage play.  While in D.C., Olaniyi created a costume out of various materials from the D.C. environment, including newspapers, shampoo bottles, empty honey jars and duct tape.  At the time, Homeland Security Advisor Thomas Ridge instructed people to purchase duct tape, among other items, to protect against chemical warfare.  The various goods were wrapped in duct tape which was formed into a harness shape over Olaniyi's chest.  USCP reports generated after the events described in this Complaint described his outfit as loose fitting "African type" clothing, and stated it "looked like a Halloween costume a young kid would create."  Olaniyi wore this costume into the U.S. Capitol in an effort to study people's interactions with him.  He wanted to spread a message of tolerance and understanding during times of war and hoped to use his costume to promote acceptance of those who looked different.

6.     Olaniyi carried with him into the Capitol a small, hand-carved mask sculpture that he had created.

7.     To enter the Capitol, Olaniyi passed through four layers of security.  The first layer consisted of a magnetometer, x-ray machines, explosive detectors, and security dogs.  Olaniyi explained to the guards that he was an artist doing research for an upcoming performance and was allowed through.  At the second layer, Olaniyi passed through a metal detector, and, at the third layer, a guard used a hand held metal detector to examine Olaniyi.  He was allowed through both checks.  At the last layer of security, a

3

guard asked for his Capitol passes to enter and he was allowed through. The USCP interacted with Olayini at every security check.

8.      Once inside the Capitol, Olaniyi took pictures of presidential bust sculptures. He also performed for tourists by dancing and singing. Tourists approached Olaniyi and took pictures with him. Olaniyi described "David/Dafidi" and his philosophy "Life is a Performance" to them.

9.      Just after 1:00 p.m., Officer Nutwell of the USCP approached Olaniyi in the Crypt area of the Capitol and asked Olaniyi what he was holding. Olaniyi, who was carrying his sculpture for entertainment purposes, explained that it was a hand-carved mask sculpture. Officer Nutwell instructed Olaniyi to "drop it." As Olaniyi was explaining that if he dropped the sculpture it would break, Officer Nutwell grabbed the piece and shattered it on the ground. Patel, who was with Olaniyi at the time, took pictures of the incident. Officer Nutwell demanded that she put down the camera, and its film was later confiscated. In an affidavit later provided by Officer Nutwell for Olaniyi's criminal proceedings, Officer Nutwell alleged that at this time he heard Olaniyi say "were [sic] all children of 'Allah.' " Olaniyi was raised Catholic, is not Islamic, and never said the word "Allah."

10.      Officer Nutwell told Olaniyi to put his hands behind his head and handcuffed him. Within minutes, several more police officers arrived. One officer pointed a gun at Olaniyi's head. Olaniyi heard someone say, "this is a good arrest, this will make you Sergeant." Thirty to forty more officers, including the Capitol Police Hazardous Device Unit and the Joint Terrorism Task Force, soon arrived on the scene. Among those to

4

arrive was Detective Joseph DePalma. When Olaniyi was asked if there were any wires or explosives in his outfit, he replied in the negative, explaining that it was an artistic costume. Olaniyi's costume was cut from his body and x-rayed, and the honey jars were tested for hazardous materials. According to Detective DePalma's affidavit, all tests came back negative and the Hazardous Device Unit determined that "there were no explosives in either the harness or waist band that the defendants were wearing." Clearly the USCP did not perceive any real threat of explosives, as they did not evacuate the House of Representative (the Senate was not in session).

11.        Despite the determination that Olaniyi had no explosives on his person, police reports indicate that Olaniyi was initially detained around 1:17 p.m. and was not arrested until 2:45 p.m. It was dark outside by the time he was transported to the Capitol Hill Police Prisoner Processing Center, at which time he was interrogated without an attorney, despite his request for one, and was denied a phone call. Numerous agents – including FBI agents, psychologists, and the USCP – questioned him for two or three hours, after which he was transported to another station. While waiting to be transferred, Olaniyi spent nearly one hour outside in the winter cold with no shoes or jacket.

12.        Olayini and Patel's costumes, as well as their personal items, were confiscated by the USCP and the FBI. The USCP and FBI found car keys, and asked Olaniyi if he had a car. Olaniyi stated that he had a black 2002 GMC Savanna van. The USCP and FBI located the vehicle approximately four blocks from the Capitol and, despite the fact that neither Olaniyi nor Patel consented to a search of the van, two canine technicians searched the exterior of the vehicle with negative results. Despite those

5

negative results and the fact that no explosives were found on their persons, the USCP and FBI nevertheless conducted a search of the interior of the van during which numerous pieces of original artwork were destroyed. The van was registered in the business name of Bayo Arts & Design, and in the name of Reena Patel.

13.     That evening, Olaniyi was placed in a holding cell where he remained overnight. The following day, March 7, 2003, Olaniyi appeared before Magistrate Judge John Facciola in the United States District Court of the District of Columbia and a preliminary hearing was set for March 10, 2003.

14.     Olaniyi was then transferred from the regular ward of the D.C. Jail to the psych ward of the D.C. Jail after a clinician assessment indicated he had "delusions of grandeur." While in the psych ward, Olaniyi was informed by clinicians that tests indicated he had diabetes and he would therefore be administered medication for the diabetes. Olaniyi, who does not have diabetes, refused the medication and informed clinicians that he did not have diabetes. However, he was told "you can either cooperate or be physically restrained while we inject you." Under duress, Olaniyi cooperated. Olaniyi was then forcibly administered a medication which caused him to lose consciousness until the following morning. On information and belief, the medication was an antipsychotic drug because it caused Olaniyi to lose consciousness for several hours and it was administered through a shot into Olaniyi's upper arm rather than a typical finger prick for diabetes testing. All written reports later gathered from the psych ward indicate that Olaniyi was "cooperative" and "consistent," and that he had no history of diabetes.

6

15.   Olaniyi remained in the psych ward of the D.C. Jail until his return to the United States District Court of the District of Columbia on March 10, 2003, at which time he and Patel were charged with violations of 19 U.S.C. § 844(e) for False Bomb Threat; 40 U.S.C. § 193f(b)(7) for Disorderly Conduct on Capitol Grounds; 18 U.S.C. § 2 for Aiding and Abetting; and 22 D.C. Code § 404 for Assault or Threatened Assault. During his imprisonment in the holding cell and the psych ward, Olaniyi was unable to speak with his two young children from his previous marriage.

16.   Olaniyi was released from confinement following the entry of the criminal charges against him on March 10 and his posting of a bond. After his release, Olaniyi returned to his home in Michigan. Judge Facciola ordered that Olaniyi could not travel for six weeks upon returning home to Michigan unless clearance with the court was obtained beforehand. On April 1, 2003, the case was assigned to Judge Richard J. Leon of this Court and Olaniyi was indicted on all three counts. On April 10, 2003, Judge Leon modified the conditions of Olaniyi's release so he could travel outside of Michigan to Pennsylvania, New Mexico and Colorado from April 21, 2003 to May 3, 2003. Olaniyi requested this modification to allow for continued research for his stage play "David/Dafidi," and to otherwise promote and exhibit his artwork. Judge Leon again modified the conditions of Olaniyi's release on May 17, 2004, so that he could travel outside of Michigan to New York and the District of Columbia from May 23, 2003 to May 31, 2001, for purposes of attending exhibitions of his artwork, performing, and meeting with counsel in preparation of his case. On May 29, 2003, Olaniyi was arraigned before Judge Leon and plead not guilty to all three counts against him. Judge Leon then granted an oral motion by Olaniyi to travel out of Michigan from June 15, 2003 to June

7

29, 2003. On June 13, 2004, Judge Leon modified the condition of Olaniyi's release to allow him to travel out of Michigan to Santa Fe, New Mexico and Iowa City, Iowa, again for purposes of promoting "David/Dafidi" and his artwork. On July 3, 2003, Judge Leon granted Olaniyi's request to move from his residence in Michigan to Iowa City, Iowa. Judge Leon also ruled that Olaniyi report to Pretrial Services for the Southern District of Iowa to request travel outside of the state for work-related purposes.

17.    On August 4, 2003, without any prior notification to Olaniyi or explanation, the government filed a motion with Judge Leon to dismiss all three counts pending against Olaniyi. On August 13, 2003, the court granted the Government's motion to dismiss all charges. The government's abrupt and unexplained abandonment of its criminal case against Olaniyi came after nearly five months of court-restricted movement for Olaniyi, which hindered both his career and reputation as a traveling performer and his ability to see his children from his previous marriage. In addition, his custody battle against his ex-wife, Laurie Christine Olaniyi ("Christine"), was seriously jeopardized.

18.    In January 2004, Olaniyi returned to D.C. with his children and Patel to retrieve several pieces of artwork and other belongings confiscated by the USCP and the FBI during the arrest and during the search of his van in March of 2003. While driving near the Capitol in the same black GMC van, Olaniyi was pulled over by the USCP. Detective Joseph DePalma, one of the officers at the scene of Olaniyi's arrest in the Capitol the previous year, explained that the police pulled them over because snow on the van and Michigan tags made them "suspicious." Detective DePalma was aware of the ongoing custody battle between Olaniyi and Christine from conversations with Olaniyi

8

after he was arrested. Detective DePalma made several inappropriate comments and questions about why Olaniyi and his family were back in D.C., why they had the children with them, whether Olaniyi had custody of the children, whether he had the authority to remove them from Michigan, whether he had papers on his person authorizing their transportation, and other intimidating remarks. He then threatened to call child services in Michigan to retrieve the details of the custody settlement.

19.     Detective DePalma had dogs search the van while the children were in it. Police asked Olaniyi to come into the station for questioning, but Olaniyi refused to do so without an attorney present.

20.     Detective DePalma's harassment of Olaniyi persisted. He contacted Christine and instructed her to call the Secret Service to say that Olaniyi wanted to kill the President. Prosecutor Frederick Yvette also called Christine and advised her to write to Customs and Immigration in order to have Olaniyi deported. Christine testified as to these conversations in their divorce and custody proceedings.

21.     Soon after Detective DePalma's instructions to Christine, Secret Service Agent Hull and Deputy Mike Sheetz appeared at Olaniyi's residence in Iowa City. Olaniyi answered the door and, after introducing themselves, the officers accused Olaniyi with the following: "we understand you want to kill the President." Olaniyi denied the accusation, but invited them into his home and offered them something to eat. The men explained that Christine went to authorities in Michigan and said he was going to kill the President. They asked him personal questions about his life, his parents, his arrest, his travel destinations, and his immigration status. At one point, Agent Hull threatened, with

9

regard to Olaniyi's immigration papers, "what if I take these away?" They asked invasive questions about the children, and even asked if they could talk to them. They asked Oba-Santos, Olaniyi's son, if Olaniyi ever said he was going to kill the President. Oba-Santos replied "no." The officers stated that they did not want Olaniyi returning to D.C. The officers were at the house two to three hours.

22.    Olaniyi has endured severe emotional distress as the arrest, imprisonment and subsequent harassment has caused him to become abnormally fearful and paranoid, has hampered his ability to deal with authority, and has wreaked havoc on his personal life and professional reputation. Despite the passage of nearly two years' time, Olaniyi still thinks of the psych ward and hears the screaming of patients in his head. Today he has headaches, but is afraid to go to the hospital for treatment. Because of the severe emotional trauma that was a direct cause of being administered drugs against his will in the psych ward, he is not emotionally equipped at this time to consult with a physician about his condition. In addition, Olaniyi suffers from sleep disorder, depression, and paranoia, and he is unable to fully enjoy his life. Furthermore, Olaniyi has not spoken to anyone in the community about what has happened to him. He feels that because he is a black foreigner, people in the community would not be able to empathize with his fear and would ridicule him because of it.

23.    Olaniyi's emotional distress also stems from the destruction of his artwork. Several pieces of valuable and irreplaceable art, created by Olaniyi and his family members either to sell or to remain in the family's permanent collection, were

10

unnecessarily destroyed by the USCP and FBI at the time of the arrest and in the subsequent search of his van.

## FALSE IMPRISONMENT AND FALSE ARREST

24.     The FTCA establishes liability for false arrest or false imprisonment when such torts are committed by federal law enforcement officers. 28 U.S.C. § 2680(h). There is no practical distinction between the torts of false arrest and false imprisonment. Under the common law of the District of Columbia, Olaniyi was falsely arrested and imprisoned when he was arrested against his will by the USCP and the FBI and imprisoned for five nights. The arrest was unlawful since the USCP and the FBI possessed no arrest warrant and lacked probable cause. Olaniyi seeks damages for false arrest and imprisonment in the amount of $50,000.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

25.     The FTCA establishes liability for the intentional infliction of emotional distress when such torts are committed by federal law enforcement officers. 28 U.S.C. § 2679. The tort of intentional infliction of emotional distress does not require the plaintiff to prove that he sustained physical injury as the direct result of the defendant's conduct under District of Columbia law.

26.     The USCP and the FBI intentionally inflicted severe emotional distress on Olaniyi. The false arrest and imprisonment, and especially his time in the Psych Ward of the D.C. Jail, caused Olaniyi severe emotional distress, including sleep disorder, depression, paranoia, and impairment of his enjoyment of life. Additionally, Detective

11

DePalma continually harassed and intimidated Olaniyi for more than twelve months.
Agent Hull also intentionally inflicted emotional distress by threatening Olaniyi with
deportation. Olaniyi seeks damages for intentional infliction of emotional distress in the
amount of $550,000.

## MALICIOUS PROSECUTION

27.    The FTCA establishes liability for malicious prosecution when it is committed
by federal law enforcement officers. 28 U.S.C. § 2680(h). Olaniyi brings a claim against
the United States for malicious prosecution. Though in theory it is the prosecutor who
initiates criminal proceedings, the defendant in a malicious prosecution proceeding can
be anyone who "procures" them. The USCP and the FBI maliciously procured criminal
proceedings against Olaniyi by detaining and arresting him, and initiating proceedings
against him despite having determined on the scene that Olaniyi possessed no explosives.
Detective DePalma used the criminal proceedings to promote his agenda of harassing and
intimidating Olaniyi. The Government dropped all charges against Olaniyi on August 14,
2003.

28.    Olaniyi seeks damages for malicious prosecution in the amount of $350,000.

## DAMAGES FOR OUTSTANDING ISSUES

29.    The FTCA establishes liability for property damages when committed by
federal law enforcement officers. 28 U.S.C. §§ 1346(b) and 2675(a). Olaniyi brings a
property damages claim under the FTCA against the United States for the destruction of
his artwork. The general rule for measure of damages for the destruction of property is

12

the difference between the value of property before and after injury. Olaniyi had several pieces of artwork destroyed when the USCP and the FBI accosted him in the Capitol dome and later searched his van. In paragraphs thirty and thirty-one, independent appraisers set forth their professional opinions as to the value of Olaniyi's artwork. In paragraph thirty-two, Olaniyi gives his own estimation of the value of his art, factoring in subjective components such as the sentimental, familial, and spiritual value of the art.

30.    Dr. Fredrick Woodard owns and operates Arbor Gallery in Iowa, and has exhibited Olaniyi's work on several occasions. In his capacity of owner and operator of Arbor Gallery, Dr. Woodard is accustomed to appraising artwork. He appraised Olaniyi's artwork destroyed by the USCP and FBI at $36,200.

31.    Cannon Hersey is a curator who runs CrossPathCulture, a nonprofit organization which sponsors art exhibitions, shows and performances. CrossPathCulture is based in New York City and has several international offices. Mr. Hersey is very familiar with Olaniyi's work, and has purchased Olaniyi's work in the past. Mr. Hersey appraised Olaniyi's artwork destroyed by the USCP and FBI at $66,550.

32.    Olaniyi also places a monetary value on his artwork. Unlike the appraisers who objectively appraised Olaniyi's art at its estimated fair market value, Olaniyi has a sentimental, spiritual, and familial attachment to several of the pieces. Accordingly, those pieces, including the "Axe of Shango," "Ten Million Dollar Sculpture," "Small Beaded Bell," and "Red Beaded Object," were not for sale but were instead part of his personal permanent collection. The destruction of these original pieces by the USCP and FBI has caused Olaniyi a great amount of grief, sorrow, and mental anguish, as many of

13

the pieces were family heirlooms, as such, are irreplaceable. Olaniyi seeks damages at
$1.2 million for the destruction of his art, both those pieces created for sale and those
pieces in his permanent collection.

33.    Olaniyi also seeks damages for loss of future earnings, humiliation, and
damage to reputation. Under District of Columbia law, "loss of future earnings" is the
difference between the present value of plaintiff's demonstrated earning capacity and the
present value of actual earning capacity. Prior to the arrest, "David/Dafidi" was
performed at the Lensic Performing Arts Center with ticket profits of $880.00. Because
of the arrest, Olaniyi's supporters withdrew all funding and all future productions of his
stage play, "David/Dafidi," were cancelled. As a result, "David/Dafidi" could not be
staged at the following venues: Hancher Auditorium, Iowa City, Iowa; Hill Auditorium,
Ann Arbor, Michigan; Fox Theatre, Detroit, Michigan; Miller Auditorium, Kalamazoo,
Michigan; Paramount Theatre, Seattle, Washington; East County Performing Arts Center,
San Diego, California; The Orpheum Theatre, Los Angeles, California; The Golden Gate
Theatre, San Francisco, California; The Chicago Theatre, Chicago, Illinois; Sanders
Theatre, Harvard University, Boston, Massachusetts; Carnegie Hall, New York, New
York; The National Black Theatre, Harlem, New York; Alliance Theatre at the Woodruff
Arts Center, Atlanta, Georgia; Lincoln Theatre, Washington D.C.; and Saenger Theatre,
New Orleans, Louisiana.

34.    Furthermore, Olaniyi suffered humiliation and damage to his reputation as a
result of the arrest. The D.C. Circuit allows compensatory damages for humiliation and
damage to reputation. Numerous newspapers and magazines ran articles covering the

14

arrest. As a result, as stated in paragraph thirty-three, many of Olaniyi's supporters

withdrew their support for "David/Dafidi" after the arrest because they did not want to be

associated with a "terrorist." Additionally, some of Olaniyi's best patrons stopped

contacting him about purchasing artwork. Olaniyi seeks damages for loss of future

earnings, humiliation, and damage to reputation in the amount of $65,000.

35.    Olaniyi seeks compensation for the value of his vehicle, a GMC Savanna Van,

which was repossessed by GMC soon after the arrest based on the company's statement

to Olaniyi that it did not want to be associated with terrorists. The van was repossessed,

and GMC stated that Olaniyi could obtain possession only by paying the full amount

owed on the vehicle upfront, which was $35,768.56. Accordingly, Olaniyi seeks

damages for this amount, $35,768.56.

February 25, 2005

DAVID F. WILLIAMS

DISTRICT OF COLUMBIA
CITY OF WASHINGTON              :ss:

        Subscribed and sworn to before me
this 25th day of February 2005.

KATHY HILL TABARES
NOTARY PUBLIC

My commission expires November 30, 2009

15

CADWALADER, WICKERSHAM & TAFT LLP
Lory Stone
1201 F Street, N.W.
Washington, D.C. 20004
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

**ADMINISTRATIVE CLAIM**

**DAVID OLABAYO OLANIYI,**

                                    **Plaintiff,**

              **-against-**

**THE UNITED STATES OF AMERICA,**

                                    **Defendant.**

**AFFIDAVIT OF DR. FREDRICK WOODARD IN SUPPORT OF
CLAIM FOR MONETARY DAMAGES FOR DESTRUCTION OF
ARTWORK**

Dr. Fredrick Woodard, being duly sworn, hereby states under oath:

1.      I am an Associate Professor of English and African American World Studies at

the University of Iowa, and in that capacity have served as both Chairman of the African

American World Studies program and as Director of the Museum of Art. My research

interests encompass African American life and literature as they demonstrate influences

of intellectual ideas from the Colonial periods to the present. In recent years, I have been

researching a comparative study of slavery of Africans in the Western world and slavery

of Africans in the Eastern world. The results of my comparative study will be published

in conjunction with the work of colleagues in East Africa and India.

2.      I am also a poet and a visual artist. In this capacity, I recently published a book entitled <u>Reasons to Dream</u>.

3.      As both a scholar and artist, I have produced two documentary videos: "Chole Island: From Slavery to Freedom," and "Reasons to Dream." I also produced and directed ten video productions for civic development in Tanzania, under the auspices of the United States Information Agency.

4.      For fifteen years, I have operated a nonprofit gallery, Arbor Gallery, from my home. It is a venue for local artists to sell their work. I first met David Olabayo Olaniyi ("Olaniyi") as a mature artist when he was a student at the University of Iowa. While at the university, Olaniyi was one of only two students to have an exhibition at Arbor Gallery.

5.      Olaniyi has had two subsequent exhibitions at Arbor Gallery, and I have sold his work to various collectors in and around Iowa City.

6.      I have known of Olaniyi and his family for many years. Both his mother and father are world renown artists. That, in part, contributes to the real value of Olaniyi's art. Olaniyi was creating art from the time he could walk, and some collectors have been collecting his work from that time to the present. Anything that Olaniyi creates is in high demand. Olaniyi is also an artist in his own right, and his artwork incorporates a wide range of African and Western – both European and American – influence. Additionally, the works attributed to his performance are extremely valuable. His work has a transient, activist component which makes it unusual. This information all needs to be explained, as it adds value to his work.

7.     To the art historian, the mention of Chief Twin 77, Olaniyi's father, is instantly

recognizable. For instance, he is in such high demand that he fetches at least $25,000 to

leave his Nigerian compound to travel to speaking engagements. His mother, Neke

Davies, is world renown for her production of textiles. She has entertained for many

American diplomats in Nigeria, including Bill Clinton.

8.     Olaniyi is a serious and intellectual artist. The combination of family

acclamation, cutting edge technique, and fusions of various influences makes Olaniyi's

artwork both unique and desirable. This is reflected in the monetary amount obtained

upon the sale of his work.

DR. FREDRICK WOODARD

Sworn to me before this 15 day of February 2005.

NOTARY PUBLIC



CHRISTOPHER W KNAPP
Commission Number 120625
My Commission Expires
September 23, 2006

# C A D W A L A D E R

February 7, 2005

| ARTWORK | PHOTO | MONETARY VALUE |
|---|---|---|
| **Stone Alabaster Mask** Orange/red alabaster hand-carved mask made of alabaster stone from Colorado. It has two figures attached, both with red and blue beads. It was designed as a major object character for "David/Dafidi," and was first used in performance at the "Oju Aye (The Eyes of the World)" symposium at the University of South Florida in February 2003. It was also used during the "Life is a Performance" tour from Michigan to Milbrook, NY and Washington, D.C. in March 2003. |  | *$2,500.00* |
| **Costume – "Washington Experience"** The "Washington Experience" costume was designed to capture "David's" experience in Washington, D.C. for use in "David/Dafidi." The costume was made from objects accumulated and collected from the journey to, in, and around Washington, D.C. It was made of duct tape, newspaper, Washington art gallery brochures, Twin 77's autobiography, empty honey bottles, and other objects. |   | *$1,500* |

# C A D W A L A D E R

February 7, 2005

**Baby Ganesh Sculpture**
Small marble stone carving of a half-man,
half-elephant figure.  Adorned with beads,
strings, and family objects from India.  It
was carved in 2001 and used in traveling
performances of "Life is a Performance"
across America, Europe and Nigeria.





$700.^{00}$

# CADWALADER

February 7, 2005



| | | |
|---|---|---|
| **Red Alabaster Stone Hand-Carved Mask – "Healing Mask"**<br>Delicate and thin alabaster mask. Designed for African Studies Conference in Washington, D.C. in 2002 and for the "Life is a Performance" tour. | | $3500.00 |
| **"Axe of Shango" Stone Sculpture**<br>The "Axe of Shango" is Olabayo's most valuable and acclaimed sculpture. It has been used to entertain thousands of people across the nation. It is a family object designed to teach Olabayo's children and others the wisdom that an "elephant" possesses, the wisdom of the old. | | $16,000.00 |

CADWALADER

February 7, 2005



| | | |
|---|---|---|
| **Small Beaded Bell**<br>Brass bell adorned with white beads. The bell was Olabayo's Grandmother's Christian praying bell that was redesigned and adorned with beads as a gift to Aluna-Aro Olaniyi, Olabayo's daughter. | | $500.00 |
| **Drawing by Chief Twin 77**<br>This drawing was given to Olabayo by his father – Chief Twin 77 – who is a world renown Nigerian artist. It was part of Chief Twin 77's new series. | | $450.00 – $600.00 |

# C A D W A L A D E R

February 7, 2005



**"Ten Million Dollar" Sculpture**
Designed as Olabayo's contract for
$10,000,000 with a group of scholars and
art dealers who were interested in
Olabayo's work. "Ten Million Dollars"
was also designed to play a major role in
"David/Dafidi." It consisted of a stone and
metal sculpture with wrapped contents.

$10,000

**"Ifa – Circle of Life" Beaded Painting**
"Ifa" was a colorful, beautiful bead mosaic
tapestry designed for "David/Dafidi" and
used in the "Oju Aye" symposium at the
University of South Florida.

$3,000.00

# C A D W A L A D E R

February 7, 2005



| | | |
|---|---|---|
| **Peacock Woman Sculpture**<br>Small soapstone carving of woman with shells, peacock feathers, and an intricate weaving of turquoise beads gathered from different destinations of the traveling "Life is a Performance" tour in the southwest of America. | | $300.00 |
| **Eyes Beaded Object**<br>"Eyes" was created at the University of Michigan during "The House of Obatala" multi-media art exhibition. It is a small rectangular white and black beaded object with mirrors. It has been used in several "Life is a Performance" tours. | | $150.00 |
| **Small Stone Sculpture**<br>Small marble stone sculpture of a woman's head covered with spiritual materials and beaded. | | $300.00 |

C A D W A L A D E R

February 7, 2005

| | | |
|---|---|---|
| **Red Beaded Object**<br>Representing the core principle of "Life is a Performance," this object was one of the first objects made to teach people/students the philosophy. It is made mostly of red coral beads gathered from every journey of "Life is a Performance." |  | $2,000 |
| | | $36,200.00<br>TOTAL: |

With your signature below, you are certifying that the property values for Olaniyi's artwork are just and correct as estimated to the best of your ability. You are also indicating that you are a "disinterested competent person," as required under the Federal Tort Claims Act to prove damages. Below your signature, please list the date, your contact information, and your credentials, including whether you are a art dealer and whether you have ever bid for and/or purchased a piece of Olaniyi's artwork.

Please submit this completed document to Lory Stone at Cadwalader, Wickersham & Taft by facsimile or Fed Ex as soon as possible, but no later than February 15, 2005, to 202.862.2400 or 1201 F Street, N.W., Suite 1100, Washington, D.C. 20004. Again, thank you for your cooperation.

Name (printed): FREDRICK WOODARD

Signature: Fredrick Woodard

Date: 2/15/05

Contact Information:
Office: 319-335-0318
Home: 319-354-1498

Credentials:
See Affidavit

CADWALADER, WICKERSHAM & TAFT LLP
Lory Stone
1201 F Street, N.W.
Washington, D.C. 20004
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

**ADMINISTRATIVE CLAIM**

**DAVID OLABAYO OLANIYI,**

**Plaintiff,**

**-against-**

**THE UNITED STATES OF AMERICA,**

**Defendant.**

## AFFIDAVIT OF DAVID OLABAYO OLANIYI IN SUPPORT OF CLAIM FOR MONETARY DAMAGES FOR DESTRUCTION OF ARTWORK

David Olabayo Olaniyi, being duly sworn, hereby states under oath:

1.      I am an artist, philosopher, scholar, performer, and director who was born in Nigeria and traveled to the U.S. to pursue a higher education. I received my Bachelor of Fine Arts from the College of Santa Fe in 1993, and my Master of Arts and Master of Fine Arts from the University of Iowa. I was an artist-in-resident at the University of Michigan, and while teaching at there, I developed a philosophy which I entitled "Life is a Performance." This philosophy attempts to understand the role of objects in defining daily life experiences and cultural identity. Grounded in this philosophy were my plans to create a stage play called "David/Dafidi" in which I would illustrate to audiences

across the United States the way in which objects in one's physical space tend to shade

one's views of different experiences. As part of my philosophy and to research

"David/Dafidi," I traveled to Washington, D.C. in 2003. On March 6, 2003, I was

arrested in the U.S. Capitol. In the search of my personal items and effects that ensued,

several pieces of personally and professionally valuable artwork were severely damaged

and/or destroyed by the U.S. Capitol Police and the FBI.

2.      The pieces of damaged artwork include the following: two hand-carved stone

alabaster masks; two duct tape costumes; "Baby Ganesh" marble sculpture; "Peacock

Woman" soapstone sculpture; "Eyes" beaded object; small stone marble sculpture of a

woman's head; red beaded object used in international performances; small beaded brass

bell; a drawing by Chief Twin 77; Ten-Million Dollar" sculpture designed for scholars at

the University of Florida; beaded painting "Ifa – Circle of Life"; and "Axe of Shango"

marble sculpture.

3.      The purpose of this affidavit is to explain the importance of each piece of artwork

in more detail.

4.      The stone alabaster mask was entitled "Seeing and Sight." Made of alabaster

stone from Colorado, it had two figures attached to it with red and blue beads.  It was

designed as a major object character for "David/Dafidi" and was performed first at the

"Oju Aye (The Eyes of the World)" symposium at the University of South Florida in

February 2003.  It was also used in performance during the "Life is a Performance" tour

which spanned from Michigan to Milbrook, NY and Washington, D.C. in March 2003.  It

was present at the time of my arrest in the Capitol and broken by Officer Nutwell in my

presence.

2

5.    My costume was entitled "Washington Experience," and was designed to capture

"David's" experience in Washington D.C. It was to be used as a shield of empowerment

in "David/Dafidi." The costume was made from objects accumulated and collected from

the journey to, in, and around Washington D.C. It was made of duct tape, newspaper,

Washington art gallery brochures, Twin 77's autobiography, empty honey bottles, and

other objects. I created the costume on March 6, 2003 and wore it in Washington D.C. as

I conversed with people around town. The Capitol Hill Police Bomb Squad hacked the

"Washington Experience" from my body into pieces with a pocket knife at the place of

the arrest, the Capitol Crypt.

6.    "Baby Ganesh" is a small marble stone carving of a half man, half elephant

sculpture. It was adorned with beads, strings, and family objects from India. Carved in

2001, it was used while traveling during "Life is a Performance" across America, Europe

and Nigeria. All the adornments were gone and the stone was scratched, scored, and

bruised when returned from Government possession.

7.    "The Peacock Woman" is a small soapstone carving of a woman with shells,

peacock feathers, and turquoise beads gathered from different journeys of "Life is a

Performance" in the southwest of America. The beads were intricately woven around the

sculpture. It was returned from Government possession with the head broken off, beads

scattered, and shells removed.

8.    "Eyes" Beaded Sculpture was created at the University of Michigan during "The

House of Obatala" multi-media art exhibition. "Eyes" was a "third eye" spiritual

companion that accompanied me in every performance, journey, and every day life. My

3

wife carried it in her purse at all times. It was returned from Government possession with many of the beads cut off, exposing the core of the sculpture.

9.      The red beaded object, entitled "Object of Love that Loves," represents the core principle of "Life is a Performance." It was one of the first objects made to teach people, especially students, the philosophy. It symbolized growth and represented all that people seek and their desires of love and being loved. Many hands – young and old, rich and poor, black and white – around the world have held, blessed, and prayed upon it. It is made mostly of red coral beads gathered from every journey "Life is a Performance" led me. It was full of beads of loving memory until its destruction by the Capitol Hill Police and FBI. It was returned missing layers of beads. Since its return, I have tied down the strings to keep it from losing more precious beads.

10.     The small beaded bell was my Grandmother's Christian praying bell that was redesigned and adorned with beads as a gift to Aluna-Aro Olaniyi, my daughter. It brought Aluna joy to ring the bell. The bell was badly damaged while in Government possession; most of the beads were torn off to the core of the handle.

11.     The drawing by Chief Twin 77 was given to me by my father, a renown Nigerian artist. The drawing was part of a new series he was creating. I found it severely damaged after the government authorities unlawfully searched my GMC Savanna Van for incriminating evidence.

12.     The "Ten Million dollar" sculpture was designed as my contract for $10,000,000 with a group of scholars and art dealers who were interested in my work. "Ten Million Dollars" was also designed to play a major role in "David/Dafidi." It was broken in the GMC Savanna Van by the government authorities. The antennae to the sculpture top was

4

missing, the top cover was shattered in two. Furthermore, the sculpture was disconnected and the "Ten Million Dollar" contract was broken physically.

13.    "Ifa – Circle of Life" beaded painting was a very colorful, beautiful bead mosaic painting designed for "David/Dafidi" and used in the "Oju Aye" symposium at the University of South Florida. It was in the GMC Savanna Van during the unlawful search by the government authorities. I found the painting severely scratched and damaged beyond repair. Since then, I tried painting it blue to cover the damage done to it, but it will never be the same.

14.    The Red Alabaster stone hand carved mask entitled "Healing Memory" was designed for African Studies Conference in Washington, D.C. in 2002 and the "Life is a Performance" tour. "Healing Memory" was carved thinly and therefore was quite delicate. It was damaged in the GMC Savanna Van during the unlawful search. It was cracked into three pieces. I attempted to glue it back together because of what it represents, but the damage is still highly visible. It is not the same as the beautifully carved thin red alabaster mask from a healing trip to Colorado.

15.    The "Axe of Shango" (Shango Frankie) stone sculpture is one of my most known sculptures across the world, and it has been blessed by both the powerful and the weak. It represents the proverb that the head of an elephant is not a load for a young child. This proverb rides "Shango Frankie," and entertains thousands of people across the nation. It is a family object designed to teach my children and others the wisdom that an "elephant" possesses, the wisdom of the old. My son Oba-Santos will inherit it with its load and its responsibility when he becomes a man. This object representing living wisdom, knowledge, and power was shattered by the Government. Those that searched my van

shattered the ear of the head and tip of the axe. "Shango Frankie" played one of the most

important roles in the life of "David" in "David/Dafidi" onstage and offstage.

16.    There was also damage to the van, and the roll of film confiscated at the scene of

the arrest with pictures of the officers destroying my artwork was never returned.


17.    All of these objects are not designed for retail value for galleries or museums, but

for my spiritual growth and understanding to better my family, my community, my

people, my humanity, and myself. I neither harmed nor scared anyone. Rather, I have

spent my life beautifying and enriching every community in which I've lived and

experienced. In words and performance, these objects have enriched many worlds: art

and plastic, spiritual and physical, old and new, white collar and blue collar, young and

old, male and female, government and civilians alike. Although I've tried to fix many of

these objects, physically and sacredly I am unable to bring them back to the same state

and condition.

18.    Given the emotional distress associated with my unlawful detainment, arrest and

destruction of art, I can never be fully compensated for the damage done by the Capitol

Hill Police, FBI, and other Government officials. However, I am seeking monetary

compensation for both the objective and sentimental value of the destroyed artwork.

DAVID OLABAYO OLANIYI


Sworn to me before this ᴴᴴ day of February 2005.

NOTARY PUBLIC



TODD BECKER
Commission Number 730489
My Commission Expires
9/07

7

CADWALADER, WICKERSHAM & TAFT LLP
Lory Stone
1201 F Street, N.W.
Washington, D.C. 20004
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

**ADMINISTRATIVE CLAIM**

---

**DAVID OLABAYO OLANIYI,**

                        **Plaintiff,**

          **-against-**

**THE UNITED STATES OF AMERICA,**

                        **Defendant.**

---

**AFFIDAVIT OF REENA PATEL OLANIYI IN SUPPORT OF
CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL
DISTRESS**

Reena Patel Olaniyi, being duly sworn, hereby states under oath:

1.     I currently serve as the Executive Manager of Bayo Arts & Design, which I co-founded with David Olabayo Olaniyi ("Olaniyi"). In my capacity as Executive Manager, I have done research over the past four years for "Life as a Performance," a philosophy which attempts to understand the role of objects in defining daily life experiences and cultural identity. I have organized, managed, and participated in hundreds of performances and exhibitions nationwide with Olaniyi that have led to the development and debut of the stage play "David/Dafidi."

2.      I received my Bachelor of Fine Arts from the University of Michigan School of Art & Design in 2002. In addition to my work as Executive Manager of Bayo Arts & Design, I am a sculptor, designer, poet and performer.

3.      I first met Olaniyi when I was a student at the University of Michigan. I married Olaniyi on January 22, 2004. We currently live in Iowa together, and our first child was born on June 28, 2004.

4.      The arrest that occurred on March 6, 2003, constituted a tragedy in the story of our lives. The problems that we continue to have nearly two years later can be traced to the events of that day. We were detained by the U.S. Capitol Police and FBI in the Capitol Crypt in violation of our constitutional rights for an unreasonable length of time. During that time, we were unable to speak to an attorney. Officer Preston Nutwell, of the U.S. Capitol Police, grabbed and shattered Olaniyi's hand-carved mask sculpture. Moreover, Olaniyi was detained in the Crypt for nearly an hour, handcuffed and helpless, as his clothing and personal belongings were searched and confiscated. He was then taken to the Capitol Hill Police station and interrogated without an attorney, despite his request for one. He was also denied a phone call, as police continuously told him he would be released momentarily, though he was not. He was put in a holding cell were he remained overnight.

5.      The following day, for unknown reasons, Olaniyi was transferred to the D.C. Psych Ward where he was administered a drug against his will. The drug was allegedly for diabetes, but Olaniyi does not have diabetes and the injection caused him to fall into a deep sleep until the next morning. Olaniyi believes he was administered morphine.

6.      We were jailed for five days.  During that time Olaniyi was unable to speak with his two young children from his previous marriage.  Consequently, his custody battle against his ex-wife was seriously jeopardized.

7.      In January 2004, we returned to D.C. with Olaniyi's children to retrieve our confiscated belongings and to meet with our attorneys.  While driving near the Capitol, we were pulled over by U.S. Capitol Police.  Detective Joseph DePalma arrived on the scene, and explained that the Police pulled us over because we had snow on our van as well as Michigan tags, and, therefore, we were deemed "suspicious."  Detective DePalma made a lot of inappropriate comments.  He asked why we were back in D.C., why we had the children with us, if Olaniyi had custody of the children, if he had the authority to remove them from Michigan, if he had papers on his person authorizing their transportation, and other intimidating remarks.  He then threatened to call child services in Michigan to get the details of the custody settlement.

8.      Detective DePalma had dogs search the van while the children were in it.

9.      Police wanted us to come into the station for questioning, but having learned the hard way after our previous five day incarceration, we refused to do so without our attorney present.  Also, I began taping the scene with my video camera, causing police to back off a bit.

10.     Detective DePalma continued to harass us from afar.  He later contacted Olaniyi's ex-wife and instructed her to call the Secret Service to say that Olaniyi wanted to kill the President.  Prosecutor Yvette also called his ex-wife and advised her to write to Customs and Immigration in order to have Olaniyi deported.  Olaniyi's ex-wife testified as to these conversations in their divorce and custody proceedings.

11.    Not too long after Detective DePalma's instructions to Olaniyi's ex-wife, Secret

Service Agent Charlie Hull and Deputy Mike Sheetz arrived at our home in Iowa City.

Olaniyi answered the door and, after introducing themselves, they accused: "we

understand you want to kill the President." Striving to be cooperative despite our

previous negative encounters with the police, Olaniyi invited them into our house and

offered them something to eat.  The men explained that Olaniyi's ex-wife went to

authorities in Michigan and said he was going to kill the President.  They asked him

personal questions about his life, his parents, the arrest, his travel destinations, and his

immigration status.  At one point, Agent Hull threatened, with regard to Olaniyi's

immigration papers, "what if I take these away?"  They asked invasive questions about

the children, and even asked if they could talk to them.  I prepared the children, who were

taking a bath at the time, and brought them to talk to the officers.  They asked Oba-

Santos, Olaniyi's son, if Olaniyi ever said he was going to kill the President.  Oba-Santos

replied "no."  The officers stated that they did not want Olaniyi returning to D.C.  The

officers were at our home two to three hours, and after they finally left, Olaniyi said he

felt threatened by their presence.

12.    Because of the arrest, imprisonment and subsequent harassment, Olaniyi has

become abnormally fearful and paranoid.  Though he is a grown man, he is a minority

with imperfect English skills and he feels incapable of protecting himself from injustice.

He is extremely fearful of government officers, of jail, and especially of the Psych Ward.

When he sees a police officer on the street, he becomes very fearful.  He believes that

police officers do not see the way he sees, or think the way he thinks.  He believes they

are always there watching him – as evidenced by the stop in D.C. and the Secret Service

4

interview at our home – and he is threatened by their presence. He maintains these feelings in spite of the fact that he has opened our home to investigators, that he has attempted to show them he has nothing to hide.

13.     Despite the passage of nearly two years' time, Olaniyi still thinks of the Psych Ward and hears the screaming of patients in his head. During his time there, Olaniyi considered himself "captured." Today he has headaches, but refuses to go to the hospital for treatment. Because of the severe emotional trauma that was a direct cause of being administered drugs against his will in the Psych Ward, he is not emotionally equipped at this time to consult with a physician about his condition. Furthermore, Olaniyi has not spoken to anyone in the community about what has happened to him. He feels that because he is a black foreigner, people in the community would not be able to empathize with his fear and would ridicule him because of it.

14.     Olaniyi is paranoid that our phone has been tapped.

15.     Olaniyi feels safest when he is with his children. As such, he has started taking his children with him when he travels. He has found that their presence in the car is beneficial in the event that he is pulled over by police. On his way to Santa Fe once, he was pulled over with his daughter in the car. He said that he was not harassed as much as usual because she was there. Olaniyi has also begun to sleep in his children's bedroom because he only feels safe when he is near them.

16.     Despite his legal status in the U.S., Olaniyi feels he cannot go to Nigeria for fear of not being able to return to his family here in Michigan. After the threats made by Agent Hull regarding his immigration status, he feels his U.S. citizenship, which was pending before his arrest, may now be in jeopardy.

5

17.    Additionally, Olaniyi's work and reputation have suffered immensely since the arrest. Everywhere we go to promote "David/Dafidi," a local newspaper will run an article about our arrest. Olaniyi was once a recognized figure in the African art world, but today he does not have the support he once had. Now, instead of concentrating on his art, David must worry about his finances. Numerous benefactors who agreed to financially support "David/Dafidi" have withdrawn support. Though he would like to continue to perform, we just don't have enough funding for the show right now.

_____        *[signature]*    2-14-05
REENA PATEL OLANIYI

Sworn to me before this ___ day of February 2005.

*[signature]*    2/14/05
NOTARY PUBLIC

> ★NOTARIAL SEAL★ IOWA
> ANGELA ROUTH
> Commission Number 732402
> My Commission Expires
> 1-14-08

6

CADWALADER, WICKERSHAM & TAFT LLP
Lory Stone
1201 F Street, N.W.
Washington, D.C. 20004
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

**ADMINISTRATIVE CLAIM**

---

**DAVID OLABAYO OLANIYI,**

                                        **Plaintiff,**

                 **-against-**

**UNITED STATES CAPITOL POLICE,**
**FEDERAL BUREAU OF INVESTIGATION,**

                                        **Defendants.**

---

**AFFIDAVIT OF VICTORIA L. ROVINE, PH.D., IN SUPPORT OF**
**DAVID OLABAYO OLANIYI'S CREDENTIALS AS AN ARTIST**

Victoria L. Rovine, Ph.D., being duly sworn, hereby states under oath:

1.      I am writing to provide information about David Olabayo Olaniyi's credentials as

an artist.  I am on the faculties of Art History and African Studies at the University of

Florida, and until last December I was the curator of the African art collection at the

University of Iowa.  While at the University of Iowa, I came to know and work with

Olaniyi in a curatorial capacity.  We have maintained contact since we worked together

on a solo exhibition at the University of Iowa Museum of Art.  That exhibition, titled

*African In America: An Installation by Olabayo Olaniyi* (November 16, 2001–January

13, 2002) was well received, and the Museum purchased two pieces from Olaniyi immediately after the exhibition.

2.      Olaniyi is a committed artist who has studied a variety of art forms both in the United States (where he received an MFA in Sculpture at the University of Iowa) and in his native Nigeria, where he was apprenticed to a sculptor. He brings his Yoruba heritage to his work, and he innovates and invents new forms and styles that draw on his experiences across cultures. He creates with great intensity, working through profound ideas that are both deeply personal and universal. I have many times discussed Olaniyi's work with him, and seen him present his work at conferences and other venues. He is articulate and passionate about his work, and can communicate at both lofty, academic and popular levels—unusual skills that have enabled him to have a great impact on audiences in many contexts.

3.      In sum, I can enthusiastically vouch for the seriousness and the high quality of Olaniyi's work. He and his wife, Reena Patel, surround themselves and their family with art, dedicating themselves to the creation of powerful and often beautiful forms. Few artists have their level of commitment to artistic production. Olaniyi's success in selling and exhibiting his work is a testament to that commitment.

VICTORIA L. ROVINE

Sworn to me before this **23** day of February 2005.

NOTARY PUBLIC

Laurie L. Hoopaugh
Commission # DD323231
Expires June 12, 2008
Bonded Troy Fain - Insurance, Inc. 800-385-7019

2

CADWALADER, WICKERSHAM & TAFT LLP
Lory Stone
1201 F Street, N.W.
Washington, D.C. 20004
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

**ADMINISTRATIVE CLAIM**

**DAVID OLABAYO OLANIYI,**

                         **Plaintiff,**

              **-against-**

**THE UNITED STATES OF AMERICA,**

                      **Defendant.**

## AFFIDAVIT OF THOMAS R. APRILE IN SUPPORT OF
## DAVID OLABAYO OLANIYI'S CREDENTIALS AS AN ARTIST

Thomas R. Aprile, being duly sworn, hereby states under oath:

1.      I am an Associate Professor at the University of Iowa, and serve as Head of the

Sculpture Department. I am writing to provide some background history on the work of

the performance artist/sculptor Olabayo Olaniyi. I was his professor and advisor at the

University of Iowa, in the Sculpture Area, from 1997-1999.

2.      Mr. Olaniyi is a very accomplished Nigerian-American artist in the United States

and his own country, Nigeria. He has shown his paintings and sculptures throughout the

U.S. and the Virgin Islands and has given lecture and performance demonstrations at

many universities and art institutions across the country and Europe.

3.      Mr. Olaniyi brings a rich cultural heritage from Nigeria to the field of American and European sculpture and performance art, in that he weaves the two contexts together in a provocative fashion. Performance art in Europe started in the 1930's with the DADA artists. Their work was in reaction to the atrocities of World War I. These artists were upset and horrified by the politics of the time and were no longer satisfied with the static art forms of painting and sculpture and wanted to create something more vital and engaging.

4.      This tradition continued into the 1960s with the Happenings of Allan Kaprow and currently with the work of Laurie Anderson and Jeanine Antoni. Mr. Olaniyi continues in this tradition. Like his predecessors, he is upset and appalled by what is going on in the government today. As a Nigerian national, he grew up with the idea that the United States of America was a free country where anything was possible. Imagine his horror when he was arrested in front of the White House for freely expressing his views in a harmless performance.

5.      In his Capitol Hill performance, he used the materials suggested by the Homeland Securities office, duct tape and plastic sheeting and created a Nigerian Hunter's Vest. Nigerian hunters wear vests made of cloth covered with small pouches of traditional medicines, bits of animal tooth and claw and other precious materials to give him spiritual strength for a successful hunt. Mr. Olaniyi was using the form of this traditional jacket as a forum for his protest of the war. He was equating the hunter's use of protective medicines with the protective materials of duct tape and plastic. He was only expressing his political and artistic sensibility and vision.

THOMAS APRILE

State of Iowa

County of Johnson

Sworn to me before this 16th day of February 2005.

NOTARY PUBLIC

HOLLY FALLGATTER
Commission Number 713716
My Commission Expires
Nov 20, 200?

DCLIB2 37282.1

CADWALADER

February 7, 2005

With your signature below, you are certifying that the property values for Olaniyi's artwork are just and correct as estimated to the best of your ability. You are also indicating that you are a "disinterested competent person," as required under the Federal Tort Claims Act to prove damages. Below your signature, please list the date, your contact information, and your credentials, including whether you are a art dealer and whether you have ever bid for and/or purchased a piece of Olaniyi's artwork.

Please submit this completed document to Lory Stone at Cadwalader, Wickersham & Taft by facsimile or Fed Ex as soon as possible, but no later than <u>February 15, 2005</u>, to 202.862.2400 or 1201 F Street, N.W., Suite 1100, Washington, D.C. 20004. Again, thank you for your cooperation.

Name (printed):  Cannon Hersey

Signature:

Date:  2/21/05

Contact Information:  Cannon_hersey@earthlink.net
917 684 1276

Credentials:  I have worked with Olabayo in multiple environments and witnessed him make sales in different markets. I've personally paid Olabayo $3000 for a small sculpture, $10,000 for a major drum and $10,000 for an object not yet specified. I was formerly the executive director of CrossPath Culture, a non-profit focused on "Global Community Building Through the Arts." I have tried to be as realistic to the current prices as possible, but would stress that Olabayo's career has suffered greatly due to this incident and many deals and connections were lost at the hands of those that imprisoned him.

# CADWALADER

February 7, 2005

| ARTWORK | PHOTO | MONETARY VALUE |
|---|---|---|
| **Stone Alabaster Mask**<br>Orange/red alabaster hand-carved mask made of alabaster stone from Colorado. It has two figures attached, both with red and blue beads. It was designed as a major object character for "David/Dafidi," and was first used in performance at the "Oju Aye (The Eyes of the World)" symposium at the University of South Florida in February 2003. It was also used during the "Life is a Performance" tour from Michigan to Milbrook, NY and Washington, D.C. in March 2003. |  | 8,500.00 |
| **Costume – "Washington Experience"**<br>The "Washington Experience" costume was designed to capture "David's" experience in Washington, D.C. for use in "David/Dafidi." The costume was made from objects accumulated and collected from the journey to, in, and around Washington, D.C. It was made of duct tape, newspaper, Washington art gallery brochures, Twin 77's autobiography, empty honey bottles, and other objects. |  | 4,750.00 |

# CADWALADER

February 7, 2005



**Baby Ganesh Sculpture**
Small marble stone carving of a half-man, half-elephant figure. Adorned with beads, strings, and family objects from India. It was carved in 2001 and used in traveling performances of "Life is a Performance" across America, Europe and Nigeria.

2,800

# C A D W A L A D E R

February 7, 2005

| | | |
|---|---|---|
| **Peacock Woman Sculpture**<br>Small soapstone carving of woman with shells, peacock feathers, and an intricate weaving of turquoise beads gathered from different destinations of the traveling "Life is a Performance" tour in the southwest of America. |  | 2,800 |
| **Eyes Beaded Object**<br>"Eyes" was created at the University of Michigan during "The House of Obatala" multi-media art exhibition.  It is a small rectangular white and black beaded object with mirrors.  It has been used in several "Life is a Performance" tours. | <br> | 2,400.00 |
| **Small Stone Sculpture**<br>Small marble stone sculpture of a woman's head covered with spiritual materials and beaded. |  | 4,800 |

# CADWALADER

February 7, 2005



**Small Beaded Bell**
Brass bell adorned with white beads.  The bell was Olabayo's Grandmother's Christian praying bell that was redesigned and adorned with beads as a gift to Aluna-Aro Olaniyi, Olabayo's daughter.

3, 800.00

**Drawing by Chief ɪ ʏ.**
This drawing was given to Oɪ. father – Chief Twin 77 – who is a w. renown Nigerian artist.  It was part of Chief Twin 77's new series.

8, 500.00

# CADWALADER

February 7, 2005

| | | |
|---|---|---|
| **"Ten Million Dollar" Sculpture**<br>Designed as Olabayo's contract for $10,000,000 with a group of scholars and art dealers who were interested in Olabayo's work. "Ten Million Dollars" was also designed to play a major role in "David/Dafidi." It consisted of a stone and metal sculpture with wrapped contents. |  | 3,600 |
| **"Ifa – Circle of Life" Beaded Painting**<br>"Ifa" was a colorful, beautiful bead mosaic tapestry designed for "David/Dafidi" and used in the "Oju Aye" symposium at the University of South Florida. |  | 3,800 |

# CADWALADER

February 7, 2005

| | | |
|---|---|---|
| **Red Alabaster Stone Hand-Carved Mask – "Healing Mask"**<br>Delicate and thin alabaster mask. Designed for African Studies Conference in Washington, D.C. in 2002 and for the "Life is a Performance" tour. |  | 5,800 |
| **"Axe of Shango" Stone Sculpture**<br>The "Axe of Shango" is Olabayo's most valuable and acclaimed sculpture. It has been used to entertain thousands of people across the nation. It is a family object designed to teach Olabayo's children and others the wisdom that an "elephant" possesses, the wisdom of the old. |  | 15,000.00 |
| | | **TOTAL:** |

October 25, 2005

CERTIFIED - RETURN
RECEIPT REQUESTED

David Williams & Lory Stone
Cadwalader, Wickersham & Taft
1201 F Street, N.W. Suite 1100
Washington, DC 20004

   RE: ADMINISTRATIVE CLAIM OF DAVID OLANIYI

Dear Attorneys:

   This office received the administrative claim filed by
your office on behalf of David Olaniyi, dated February 25, 2005,
against the Federal Bureau of Investigation (FBI).

   The claim you presented seeks damages under the Federal
Tort Claims Act (FTCA), Title 28, United States Code, Sections
2671-2680.  A claimant, to recover damages under the FTCA, must
show a negligent or a wrongful act or omission on the part of a
federal employee acting within the scope of his or her
employment.  This office has reviewed the claim.  There is
insufficient evidence of negligent or wrongful acts attributable
to any employee; therefore, the claim must be, and hereby is,
denied.

   Please be advised that the law (Title 28, Code of
Federal Regulations, Section 14.9(a)) requires me to inform you
that if you are dissatisfied with this decision, you may file

1 - Ms. Bessee
1 - Ms. Ivashkiv
1 - CLU I

SMI:smi (5)



suit against the United States in an appropriate United States
District Court not later than six months from the date of this
notification of denial.


                              Sincerely yours,



                              Marta Ivashkiv
                              Civil Litigation Unit


NOTE:   Claimant, an artist, was arrested by the US Capitol
Police on March 6, 2003 when he wore a costume in the Capitol to
generate discussion about the US war of terror.  He was wrapped
in material simulating a bomb/weapons.  Claimant alleges that the
FBI destroyed his artwork, questioned him for two hours, and
searched the interior of his van.  He filed a civil action
against several Us Capitol Policemen and John Does.

                         - 2 -

UNITED STATES POSTAL SERVICE

SOUTHERN MD 207

31 OCT 2005 PM 3 1

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

U.S. Department of Justice
Federal Bureau of Investigation
One FBI Plaza
Buffalo, New York 14202-2698

Attn: S. Moeta *(signature)*

14202+2698    *(barcode)*

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|

■ Complete items 1, 2, and 3. Also complete
  item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

A. Signature
X *(signature)*
☐ Agent
☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery
R. HFRIM    10 3 15

1. Article Addressed to:

Cadwalader, Wickersham +
Taft
1201 F. St., N.W. 8-1100
Washington, DC 20004

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below:    ☐ No

3. Service Type
☐ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    RA 039429201

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540



**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DAVID OLABAYO OLANIYI,                )
                                      )
                        Plaintiff     )
                                      )
            v.                        )        Civil Action No. 06-2165(RBW)
                                      )
UNITED STATES OF AMERICA,             )
                                      )
                        Defendant.    )
_____     )

ORDER

UPON CONSIDERATION of the United States' Motion to Dismiss, any opposition

thereto, any replies, and the entire record herein, it is hereby

ORDERED that the United States' Motion is granted, and it is further

ORDERED that this case is dismissed with prejudice.


‾‾‾‾‾‾‾‾‾                              ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
 DATE                                 UNITED STATES DISTRICT JUDGE

Copies to:
Counsel for Plaintiff            David F. Williams/
                                 Keith Wesolowski/
                                 Jennafer P. Neufeld
                                 Cadwalader, Wickersham & Taft LLP
                                 1201 F Street, N.W., Suite 1100
                                 Washington, D.C. 20004

Counsel for District of          Melvin W. Bolden, Jr.
 Columbia                        Office of Corporation Counsel
                                 441 4th Street, N.W.
                                 Washington, D.C. 20001

Counsel for Federal              Beverly M. Russell
Defendants                       U.S. Attorney's Office for the District of Columbia
                                 555 Fourth Street, N.W., Suite E-4915
                                 Washington, D.C. 20530