# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
DAVID OLABAYO OLANIYI,         )
          )
     Plaintiff,      )
          )     Civil Action No. 05-455 (RBW)
    v.         )
          )     Consolidated with:
          )
          )     Civil Action No. 06-2165 (RBW)
DISTRICT OF COLUMBIA, et al.,  )
          )
     Defendants.   )
_____)

## MEMORANDUM OPINION

Plaintiff David Olabayo Olaniyi brings this action against the District of Columbia

("District") and the United States, asserting constitutional and common law claims arising from

his detention in March of 2003, and a separate incident involving a traffic stop in January of

2004.  See generally Second Amended Complaint ("2d Am. Compl."); Complaint ("United

States Compl.").[1]  Currently before the Court are motions for summary judgment filed by the

District and the United States.  Upon careful consideration of the parties' submissions,[2] the Court

concludes for the following reasons that the defendants' motions must be granted.

---

[1] Olaniyi instituted two lawsuits that were subsequently consolidated by the Court.  The complaint in Civil Action No. 05-455 asserts claims against the District as well as several federal and District employees, and will be referred to in this Memorandum Opinion as the Second Amended Complaint.  The complaint in Civil Action No. 06-2165 asserts claims solely against the United States government, and will be referred to as the United States Complaint.

[2] In addition to the filings identified, the Court considered the following documents and their supporting exhibits in rendering its decision: (1) the District's Memorandum of Points and Authorities ("District's Mem."); (2) the District of Columbia's Statement of Undisputed Facts ("District's Facts"); (3) the Memorandum of Points and Authorities in Support of United States' Motion for Summary Judgment ("United States's Mem."); (4) the United States's Statement of Undisputed Material Facts ("United States's Facts"); (5) the Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant District of Columbia's Motion for Summary Judgment ("Pl.'s District Opp'n"); (6) Plaintiff David Olabayo Olaniyi's Statement  of Genuine Issues of Material Fact in Dispute ("Pl.'s Response to District's Facts"); (7) the Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant United States' Motion for Summary Judgment ("Pl.'s United States Opp'n"); (8) the Plaintiff's Statement of

(continued . . .)

# I. BACKGROUND

**A.      Facts**

Many of Olaniyi's claims have already been dismissed by the Court.  See Olaniyi v.

District of Columbia, 416 F. Supp. 2d 43, 59-60 (D.D.C. 2006); Olaniyi v. District of Columbia,

763 F. Supp. 2d 70, 78 (D.D.C. 2011).  Olaniyi's remaining claims in this case arise from the

following two events: the alleged forcible injection of Olaniyi by District personnel with an

unknown drug in March of 2003, and a traffic stop conducted by the United States Capitol Police

("Capitol Police") in January of 2004.  The following facts recounting these two events are

undisputed unless otherwise noted, and are presented in the light most favorable to Olaniyi.

**1.      The March 2003 Forcible Injection**

Olaniyi, a native of Nigeria, describes himself as "an artist, philosopher, scholar,

performer, and director."  2d Am. Compl. ¶ 3.  On March 6, 2003, Olaniyi and his now-wife,

Reena Patel Olaniyi ("Patel"), visited the United States Capitol Building "to tour and conduct

research for his stage play."  Id. ¶¶ 65-66.  Olaniyi was wearing "an artistic garment that he made

out of cardboard, empty bottles, newspaper, a book, and other common materials secured with

duct tape."  Pl.'s Response to District's Facts ¶ 1.  "He also carried a stone sculpture."  Id.  Upon

entering the Capitol Building with this paraphernalia, Olaniyi "began to sing and dance," which

"attracted the attention of the Capitol Police."  District's Facts ¶¶ 2-3.  The Capitol Police

"detained and thereafter arrested [Olaniyi] and searched his car on suspicion that he was going to

---

(. . . continued)
Material Facts in Dispute ("Pl.'s Response to United States's Facts"); (9) Defendant District of Columbia's Reply to
the Plaintiff's Opposition to the District's Motion for Summary Judgment ("District's Reply"); and (10) the Reply to
Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant United States' Motion for Summary
Judgment ("United States's Reply").

bomb the Capitol." <u>Id.</u> ¶ 3.  "Olaniyi appeared before a Federal Magistrate Judge on the morning of March 7, 2003, who held him over until March 10, 2003." <u>Id.</u> ¶ 4.

Olaniyi was detained at the Mental Health Unit of the District of Columbia Jail ("D.C. Jail") during the period of his detention under the Magistrate Judge's order. <u>Id.</u> ¶ 5; Pl's Response to District's Facts ¶ 5.  According to Olaniyi, at some point during his detention at the D.C. Jail, he was forcibly injected with a drug that caused him to lose consciousness. <u>See</u> Pl.'s District Opp'n, Exhibit ("Ex.") D (Deposition of Olabayo David Olaniyi ("Olaniyi Dep.")) at 187:4-190:25, 196:1-3.  Specifically, he claims that a D.C. Jail employee gave him an injection in his left arm while a guard restrained him, despite his verbal objections to receiving the injection. <u>See id.</u>  Olaniyi maintains that prior to giving him the injection "[t]hey told [him] they were treating [him] for diabetes," which they claimed had been detected by testing conducted during his detention. <u>Id.</u> at 194:10-13.  Olaniyi explained that he did not have diabetes, but they nonetheless administered the injection. <u>See id.</u> at 194:13-16.  The medical personnel did not tell Olaniyi what drug they used, and Olaniyi does not know what it was. <u>See id.</u> at 190:10-17.  Olaniyi claims that "when the injection was given, things calm[ed] down, and . . . everything just whitewashed out." <u>Id.</u> at 190:24-25.  He then "lost consciousness." <u>Id.</u> at 198:20-23.  Olaniyi's next memory is waking up in his jail cell "the following morning." <u>Id.</u> at 196:3.  Olaniyi acknowledges that no medical record exists documenting the injection, attributing the lack of documentation to deficient record-keeping practices at the D.C. Jail. <u>See</u> Pl.'s Response to District's Facts ¶ 34.  The District denies that this incident occurred, asserting that "Olaniyi was tested, but not treated[,] for diabetes."  District's Facts ¶ 25.

On March 10, 2003, federal prosecutors charged Olaniyi and Patel with "False Bomb Threats, Disorderly Conduct on Capitol Grounds, Aiding and Abetting, and Assault or

Threatened Assault." Id. ¶ 6. Olaniyi was then released from the D.C. Jail on March 11, 2003.

District's Facts ¶ 31. The government dismissed all charges against Olaniyi and Patel in August

of 2003. 2d Am. Compl. ¶ 78.

### 2.    The January 2004 Traffic Stop

On January 20, 2004, Olaniyi, his two minor children, and Patel traveled to the District

from Michigan. United States's Facts ¶¶ 1-2. The purpose of the trip was to retrieve several

pieces of artwork that had been confiscated by the Capitol Police as a result of the March 2003

event at the Capitol Building. United States Compl. ¶ 34. During their cross-country trip,

Olaniyi's vehicle, a white van, "accumulated dirt and grime from driving through snow." United

States's Facts ¶ 3. The van's license plate had "accumulated dirt and grime as well." Id. ¶ 4. In

addition to "the dirt covering the windows, the windows themselves were tinted a dark shade."

Id. ¶ 5.

Olaniyi's trip to the District coincided with former President George W. Bush's State of

Union Address. Id. ¶ 6. The Capitol Police were accordingly "on high alert and fully staffed" on

that date. Id.

Olaniyi claims that while he and his family were riding in his van in the District, a

Capitol Police officer, Sergeant Jessica Gissubel,[3] signaled him to stop the van in front of

Capitol Police headquarters.[4] See Pl.'s Response to United States's Facts ¶ 7; Pl.'s United States

Opp'n, Ex. 1 (Olaniyi Dep.) at 70:6-16. Capitol Police headquarters "is located directly adjacent

to the United States Capitol, where the President planned to deliver his State of the Union

---

[3] Sergeant Jessica Gissubel has since married and changed her name to Jessica Baboulis. United States's Facts ¶ 9.

[4] The United States maintains that Olaniyi's van was already parked illegally in front of Capitol Police headquarters when Sergeant Gissubel arrived on the scene, and that Sergeant Gissubel did not pull over the van. See United States's Facts ¶ 7; United States's Mem. at 3 n.3. However, in moving for summary judgment, the United States correctly assumes Olaniyi's version of events as true (i.e., that Sergeant Gissubel pulled him over), and analyzes his claims accordingly. See United States's Reply at 2-3. The Court, as it must, will do the same.

address."  United States's Facts ¶ 8.  Sergeant Gissubel does not recall "being able to read the

license plate on [Olaniyi's] van when she initially saw it."  Id. ¶ 10.  After pulling the van over,

she "radioed headquarters and requested a canine unit and the hazardous device unit to 'check

out [the] vehicle.'"  Id. ¶ 11.

      "When [Sergeant] Gissubel approached the vehicle, [Olaniyi] asked [for] Detective

Joseph DePalma," id. ¶ 12, one of the officers who had "arrested and jailed" Olaniyi in

connection with the March 2003 incident at the Capitol Building, Pl.'s District Opp'n at 7.  In

response to Olaniyi's request, Sergeant "Gissubel called [Detective] DePalma, advising him of

the vehicle in front of [Capitol Police] headquarters and requested his presence on the scene."

United States's Facts ¶ 12.  Detective "DePalma arrived on the scene shortly thereafter."  Id. ¶

13.  "He spoke to [Olaniyi] and requested that [he] exit the vehicle."  Id.  Olaniyi "obliged and

began to converse with [Detective] DePalma."  Id.

      Olaniyi's van was then searched by the Capitol Police's canine unit.  Id. ¶ 14.  "Olaniyi's

two minor children remained in the van while it was searched by police officers and two

canines."  Pl.'s Response to United States's Facts ¶ 13; Pl.'s United States Opp'n, Ex. 1 (Olaniyi

Dep.) at 67:13-19.  "[N]o [p]olice dog growled at or bit any member of [Olaniyi's] family, and

the children were not heard crying or screaming in any way during the canine sweep of the van,

which last no more than 5 minutes."  United States's Facts ¶ 14.  And "the dog[] search did not

damage [Olaniyi's] vehicle."  Id.  The "canine sweep" took only "a few minutes . . . because it

was the day of the State of the Union Address and the canine officers were extremely busy, given

the large number of vehicles they were called upon to sweep."  Id. ¶ 29.

      Following the canine sweep, Patel "began recording a video of the events that transpired

in front of [Capitol Police] headquarters."  Id. ¶ 15.  "On the video recording, [Detective]

DePalma audibly tells [Olaniyi] that his license plate was dirty, obscuring an officer's ability to read it." Id. ¶ 16; see United States's Mem., Ex. 7 (Video of January 20, 2004 Traffic Stop). Detective "DePalma then advised [Olaniyi] that he was likely to be pulled over again if his vehicle remained in the same condition." United States's Facts ¶ 16. Heeding this advice, Olaniyi "cleaned the partially obscured license plate with a rag while [Detective] DePalma observed." Id. ¶ 17. Detective DePalma also questioned Olaniyi about his presence in the District, noting that the President's State of the Union Address was scheduled for that evening and asking Olaniyi "are you going to pull a stunt?" Pl.'s United States Opp'n, Ex. 2 (Deposition of Reena Patel Olaniyi ("Patel Dep.")) at 44:13-45:7. Detective DePalma then asked Olaniyi a series of questions concerning the custody of his children. Id. at 45:21-23. During the encounter, Olaniyi explained that he requested Detective DePalma's presence so that his son could "'see the man who tried to make me lose my children,' referring to [Detective] DePalma's . . . involvement in [Olaniyi's] arrest in 2003 for false bomb threats." United States's Facts ¶ 18; see United States's Mem., Ex. 7 (Video of January 20, 2004 Traffic Stop).

After completing "a routine background check for outstanding warrants," Sergeant Gissubel returned Olaniyi's driver's license "and sent him on his way." United States's Facts ¶ 19. The Capitol Police did not "issue [Olaniyi] a citation for the incident, nor did they seize any of [Olaniyi's] property." Id. However, "as [Olaniyi] was leaving the scene of the incident, [Sergeant] Gissubel issued [him] a verbal warning that he was parked illegally." Id. ¶ 22. None of the Capitol Police officers made threatening remarks, raised their voices, brandished weapons, or physically restrained Olaniyi or his family during the January 20, 2004, encounter. Id. ¶¶ 20-21. "The total duration of the incident was approximately 18 minutes." Id. ¶ 23.

**B.      Procedural Background**

Olaniyi instituted this action on March 3, 2005, asserting constitutional and common law

claims against the District and several federal defendants.  By Memorandum Opinion and Order

dated February 17, 2006, the Court granted dismissal of many of Olaniyi's claims on qualified

immunity grounds, but denied the federal defendants' motion to dismiss with respect to Olaniyi's

Fourth Amendment claims arising from a search of his van that was conducted following the

March 2003 incident at the Capitol Building.  See Olaniyi v. District of Columbia, 416 F. Supp.

2d 43, 59-60 (D.D.C. 2006).

On October 31, 2006, Olaniyi filed his Second Amended Complaint, again asserting

constitutional and common law claims against the District, as well as various District and federal

employees.  See generally 2d Am. Compl.  These claims stem from his arrest and detention in

March 2003, and the traffic stop in January 2004.  See id.  Olaniyi then filed a separate

complaint against the United States on December 20, 2006, alleging tort claims pursuant to the

Federal Tort Claims Act ("FTCA"), 28 U.S.C §§ 1346(b), 2674 (2006), arising out of the March

2003 and January 2004 incidents.  See generally United States Compl.

The Court issued a Memorandum Opinion on February 4, 2011, granting in part and

denying in part the United States's motion to dismiss, denying the District's motion for summary

judgment without prejudice pending further discovery, and granting summary judgment to the

individual defendants.  See Olaniyi v. District of Columbia, 763 F. Supp. 2d 70, 78 (D.D.C.

2011).  As a result of the Court's rulings, Olaniyi's remaining claims in this case are (1) a claim

against the District under 42 U.S.C. § 1983 and the Fifth Amendment of the United States

Constitution for the alleged forcible injection of Olaniyi by District authorities in March of 2003,

see id. at 96-99; and (2) a false arrest and imprisonment tort claim against the United States,

brought pursuant to the FTCA, arising out of the January 2004 traffic stop, see id. at 92-94.  The

defendants have now moved for summary judgment on these two claims.

## II.  STANDARD OF REVIEW

A motion for summary judgment must be granted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of showing the absence of

a disputed material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The party opposing

a motion for summary judgment "may not rest upon the mere allegations or denials of his

pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A material fact is one that "might

affect the outcome of the suit under the governing law."  Id.  "The evidence is to be viewed in

the light most favorable to the nonmoving party and the court must draw all reasonable

inferences in favor of the nonmoving party."  Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir.

2011) (citing Anderson, 477 U.S. at 255).  "Although summary judgment is not the occasion for

the court to weigh credibility or evidence, summary judgment is appropriate 'if the nonmoving

party fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial.'"  Id. (citations

omitted).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving

party for a [reasonable] jury to return a verdict for that party."  Anderson, 477 U.S. at 249.  "The

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;

there must be evidence on which the jury could reasonably find for the plaintiff."  Id. at 252

(emphasis added).

# III.  ANALYSIS

**A.**     **Olaniyi's Claim Against the District Based on the March 2003 Forcible Injection**

Olaniyi asserts a § 1983 claim against the District "predicated upon the deprivation of due process he suffered when D.C. Jail personnel forcibly, and without consent, injected [him] with an antipsychotic drug."  Pl.'s District Opp'n at 5.  Section 1983 creates a private cause of action against any person who, acting under color of state or District of Columbia law, deprives another of a federal constitutional or statutory right.  See 42 U.S.C. § 1983.  Under the Supreme Court's decision in Monell v. Department of Social Services, 436 U.S. 658 (1978), "municipalities are liable for their agents' constitutional torts only if the agents acted pursuant to municipal policy or custom . . . . Respondeat superior liability does not apply."  Warren v. District of Columbia, 353 F.3d 36, 38 (D.C. Cir. 2004) (citing Monell, 436 U.S. at 694).  Courts therefore "conduct a two-step inquiry" in evaluating § 1983 claims against municipalities.  Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  First, a court must determine whether the plaintiff has offered proof of a "predicate constitutional violation."[5]  Id.  Second, if step one is satisfied, a court must then assess whether the plaintiff has provided evidence "that a custom or policy of the municipality caused the violation."  Id.  In this case, the Court need not address whether Olaniyi has established a predicate constitutional violation because, even assuming such a violation occurred, he has offered no evidence of a "custom or policy" of the District that "caused the violation."  Id.

---

[5] The Court previously rejected the District's attempt to avoid liability by relying on the fact that the D.C. Jail personnel were actually independent contractors, rather than District employees.  See Olaniyi, 763 F. Supp. 2d at 97 n.23.  As the Court reasoned, the "employees at the [D.C. Jail's] Mental Health Unit were performing a municipal function, in a municipal facility, under authority granted to them by municipal law," and thus "the District cannot avoid liability merely because [Olaniyi's] alleged injury occurred at the hands of a third party contracted to perform the services he claims caused him injury."  Id.

1.      **Municipal Liability of the District Under § 1983**

A plaintiff can establish municipal liability under § 1983 by showing that (1) "the municipality or one of its policymakers explicitly adopted the policy that was 'the moving force of the constitutional violation,'" Warren, 353 F.3d at 39 (quoting Monell, 436 U.S. at 694); (2) "a policymaker 'knowingly ignore[d] a practice that was consistent enough to constitute custom,'" Jones v. Horne, 634 F.3d 588, 601 (D.C. Cir. 2011) (quoting Warren, 353 F.3d at 39); or (3) the municipality "failed to respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations," id. (quoting Baker, 326 F.3d at 1306).

Olaniyi invokes the "deliberate indifference" theory of municipal liability, claiming that "[t]here is ample evidence in the record that would allow a reasonable jury to conclude that the deprivation of [his] constitutional rights, in the form of his forcible injection with a psychoactive drug, was the direct result of the District's deliberate indifference to the risks created by the state of medical and mental health care at the D.C. Jail during the timeframe that Olaniyi was held there." Pl.'s District Opp'n at 11. Olaniyi argues that the District's deliberate indifference was manifested both in its failure to train medical personnel at the D.C. Jail, and its failure to monitor the provision of medical services by contractors at the Jail. See id. at 11-20. He further contends that "[t]he District received repeated notice of problems and abuses" at the D.C. Jail, but "failed to do anything about it." Id. at 11.

The Supreme Court recently expounded upon the standards governing municipal liability based on a deliberate indifference theory in Connick v. Thompson, __ U.S. __, 131 S. Ct. 1350 (2011). The plaintiff in that case brought a § 1983 claim against a district attorney, Harry Connick, in his official capacity, after his office "conceded that, in prosecuting [the plaintiff] for

attempted armed robbery, prosecutors failed to disclose evidence that should have been turned over to the defense under Brady v. Maryland, 373 U.S. 83 . . . (1963)." Id. at 1355.  According to the plaintiff, "Connick had failed to train his prosecutors adequately about their duty to produce exculpatory evidence and that the lack of training had caused the nondisclosure in [the plaintiff's] robbery case." Id. at 1355.  After a jury returned a verdict in the plaintiff's favor and the Fifth Circuit affirmed that verdict, the Supreme Court reversed.  Id. at 1355-56.

The Court began its analysis in Connick by explaining that under the plaintiff's "failure-to-train theory, he bore the burden of proving both (1) that Connick, the policymaker for the district attorney's office, was deliberately indifferent to the need to train the prosecutors about their Brady disclosure obligation with respect to evidence of this type and (2) that the lack of training actually caused the Brady violation in this case." Id. at 1358.  Going no further than the first prong of this analysis, the Court held that the plaintiff "did not prove that [Connick] was on actual or constructive notice of, and therefore deliberately indifferent to, a need for more or different Brady training."  Id.  In so holding, the Court was guided by the following principles:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.  A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.  To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.  The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution."

A less stringent standard of fault for a failure-to-train claim "would result in de facto respondeat superior liability on municipalities . . ."

A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

Id. at 1359-60 (internal citations omitted). Applying these standards, the Court declined to impose municipal liability because there was no evidence that would have "put Connick on notice that the office's Brady training was inadequate with respect to the sort of Brady violation at issue." Id. at 1360. Namely, the plaintiff "did not prove a pattern of similar violations that would 'establish that the policy of inaction [was] the functional equivalent of a decision by the city itself to violate the Constitution.'" Id. at 1366 (citation omitted and emphasis added). The Court also concluded that the case did "not fall within the narrow range of 'single-incident' liability hypothesized in Canton [v. Harris, 489 U.S. 378 (1989)] as a possible exception to the pattern of violations necessary to prove deliberate indifference in § 1983 actions alleging failure to train." Id. at 1366.

In support of his failure-to-train theory, Olaniyi contends that "the record shows little if any effort by the District . . . to ensure that the medical and mental health personnel at D.C. Jail were adequately trained with respect to patient care in general, and inmates' constitutional right to refuse treatment in particular." Pl.'s District Opp'n at 11. He focuses on the lack of evidence from the District showing that it had effective "procedures and policies in place with respect to training or mental health personnel prior to or during the time that Olaniyi was held in [the] D.C.

12

Jail, in March 2003," id. at 12, and asserts that the District knew of the risk of constitutional

violations associated with its failure to train its employees, see id. at 16-20.

Olaniyi's failure-to-train theory is flawed for several reasons. For starters, the evidence

offered by Olaniyi concerning deficiencies at the D.C. Jail "with respect to patient care in

general," id. at 11 (emphasis added); see id. at 16-20 (detailing various deficiencies with medical

services at the D.C. Jail that the District allegedly failed to remediate), is insufficient to establish

deliberate indifference in this case. Showing a history of general problems with medical care at

the D.C. Jail does not suffice. Olaniyi must instead point to past incidents that were "similar to

the violation at issue here," such that a reasonable jury could find that the District was "on notice

that specific training was necessary to avoid this constitutional violation." Connick, __ U.S. at

__, 131 S. Ct. at 1360 (emphasis added). The necessity of a close link between the alleged

pattern of constitutional violations and the alleged injury was illustrated in Connick. There, the

Court rejected the plaintiff's purported showing of deliberate indifference based on four prior

overturned convictions resulting from Brady violations by the same district attorney's office that

subsequently violated the plaintiff's Brady rights. Id. As the Court reasoned, "[t]hose four

reversals could not have put Connick on notice that the office's Brady training was inadequate

with respect to the sort of Brady violation at issue here [because n]one of those cases involved

failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any

kind." Id. "Because those incidents are not similar to the violation at issue here," the Court

concluded, "they could not have put Connick on notice that specific training was necessary to

avoid this constitutional violation." Id. Applying Connick's rationale here, past alleged

deficiencies in medical services at the D.C. Jail that were unrelated to the unconstitutional forced

medication of inmates could not have put the District on notice of the need for training to avoid

the particular constitutional violation at issue, and thus cannot sustain a finding of deliberate indifference in this case.

The Court must therefore examine whether Olaniyi has marshaled any evidence showing a pattern of similar constitutional violations by untrained or inadequately trained employees at the D.C. Jail that could have put the District on notice of the need for more training with respect to forced medication of inmates. He has not. The closest Olaniyi comes to offering such evidence is the deposition testimony of one of his treating nurses (Clarice Savoy) while he was detained at the D.C. Jail, who Olaniyi claims admitted "that the forcible medication of inmates with a doctor's order 'happens a lot'" at the D.C. Jail. Pls.' District Opp'n at 14 (quoting id., Ex. F (Deposition of Clarice Savoy ("Savoy Dep.")) at 27:22-28:7). But Olaniyi's selective quotation of Savoy's deposition takes her testimony of out of context. Savoy actually gave the following testimony:

Q    Let me ask you: Did you receive any training on when you were allowed to administer medications to an inmate without that inmate's consent?

A    The reason that I'm hesitating is because sometimes, if the psychiatrist evaluates a patient and the patient was not willing to take the medication but he was in danger of himself or someone else, yes, he was given medication. I will say that, but it always had to be ordered by the doctor or the psychiatrist.

Q    Do you remember specific instances when the doctor ordered medications for a patient who refused it?

A    Well, yes. It happens a lot. That's when the psychiatrist was receiving the call and said this patient is in danger of—and if there was a STAT Order written for the medication, he was given the medication.

* * * *

Q    And can you describe for me one of the specific examples of specific instances you remember when a patient was given medication without that patient's consent?

A        If—this is not the incident that happened.  [But i]f the patient was banging
         his head against the wall and he was bleeding profusely, out of control, he
         would get a STAT medication if there was one ordered.

Pl.'s District Opp'n, Ex. F (Savoy Dep.) at 27:11-28:7; 28:11-19.  Viewed in context, Savoy's

testimony indicates that medical personnel at the D.C. Jail administered medication to inmates

without their consent "a lot," but only when the inmate presented a danger to himself or others

and a doctor ordered that the medication be administered.  See id.  Notably, forced medication

under such circumstances comports with established constitutional standards.  See Washington v.

Harper, 494 U.S. 210, 227 (1990) (holding that, "given the requirements of the prison

environment, the Due Process Clause permits the State to treat a prison inmate who has a serious

mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or

others and the treatment is in the inmate's medical interest").  Thus, rather than indicating a

pattern of similar constitutional violations at the D.C. Jail, Savoy's testimony suggests a history

of compliance with constitutional standards.

        Similarly unavailing is Olaniyi's reliance on the deposition testimony of another nurse

(Juanita Wilder) at the D.C. Jail.  According to Olaniyi, Wilder testified that "she had no

obligation to inform inmates that they had a right to refuse medication."  Pl.'s District Opp'n at

14 (citing id., Ex. G (Deposition of Juanita M. Wilder, RN ("Wilder Dep.")) at 64:8-12).

Wilder's actual testimony, however, was as follows:

Q        And why would a doctor order the use of psychotropic medication?

A        Because the patient had medical—I mean a mental condition.

Q        What type of mental condition?

A        Oh, boy.  Let me see.  Maybe they are talking to voices.  They hear
         someone talking to them so they are talking, and there's nobody else
         around, but they are answering like they are talking to somebody else, you
         know.

15

Q        And so if someone was talking to voices or hearing voices—

A        The doctor may order something.

                                    * * * *

Q        . . . [P]sychotropic drugs?

A        Yeah, psychotropic.

Q        And how does it work when a patient is hearing voices?  Are they able to
         give consent to that medication?

A        Oh, yes.  They can say I want it or I don't want it, or, just—you know, a
         lot of times you say it's time for your injection or time for your pills or,
         whichever, and they say ok, and they just cooperate.

Q        And do you tell as a matter of practice typically would you tell the patient
         you don't have to take this if you don't want to?

A        You don't have to say that.  They know that.

Q        Okay.

A        You don't want to encourage a patient not to take something that the
         doctor has ordered because a doctor has ordered it for his own good.

District's Mem., Ex. 11 (Wilder Dep.) at 63:4-64:16.  Fairly construed, Wilder's testimony does

not reflect a belief that she generally "had no obligation to inform inmates that they had a right to

refuse medication," as represented by Olaniyi.  Pl.'s District Opp'n at 14.  Rather, she testified

that when a doctor ordered psychotropic medication for a delusional patient, she would not

inform the patient of their right to refuse the medication under those particular circumstances,

because they know they have the right to do so.  See District's Mem., Ex. 11 (Wilder Dep.) at

63:4-64:16.

         More to the point, Olaniyi does not explain how Wilder's testimony suggests a pattern of

constitutional violations similar to the one alleged in this case.  Nor could he, given that the

constitutional violation alleged here concerns the right to refuse medical treatment, not the right

                                          16

to be <u>informed</u> of the right to refuse medical treatment.  Olaniyi also overlooks passages from

Wilder's deposition testimony demonstrating her awareness of and sensitivity to the right of

inmates to refuse medical treatment, which undermines a finding that there was a pattern of

unconstitutional forced medications at the D.C. Jail.  <u>See, e.g.</u>, Pl.'s District Opp'n, Ex. G

(Wilder Dep.) at 38:18-21 ("The patients always have a right to refuse medical treatment if they

don't want it.  And if you try to force it on, then you are abusing them."); <u>id.</u> at 39:7-10 ("[Y]ou

don't force a patient if they say no, you know.  If they don't want an injection and they refuse it,

you just write it in your notes that they refused."); <u>id.</u> at 39:19-21 ("If the patient refuses

medication, you can't just force it on them.").  In short, neither the testimony of Savoy nor

Wilder supports Olaniyi's failure-to-train theory of liability.

Olaniyi also seeks to show deliberate indifference through the District's alleged failure to

monitor its contractor at the D.C. Jail, the Center for Correctional Health Policy and Studies

("CCHPS").  <u>See</u> Pls.' District Opp'n at 14-16.  But here again, Olaniyi fails to show a pattern

of unconstitutional forced medications by the CCHPS personnel at the D.C. Jail that could have

put the District on notice of the need for enhanced supervision.  Olaniyi instead maintains that

the District generally failed to oversee the CCHPS's operations, and that this "complete lack of

monitoring of [the] CCHPS led to Olaniyi's forcible injection." <u>Id.</u> at 15.  Yet, without a history

of prior, similar violations, this claim essentially seeks to impose negligence liability on the

District for a single incident resulting from the District's alleged inadequate supervision of the

CCHPS personnel.  Such conduct does not rise to the level of deliberate indifference.  <u>See</u>

<u>Warren</u>, 353 F.3d at 39 ("'Deliberate indifference,' . . . is an objective standard[] [that] involves

more than mere negligence.  It does <u>not</u> require the city to take reasonable care to discover and

prevent constitutional violations.  It simply means that, faced with actual or constructive

knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction." (citations omitted and emphasis in original)); <u>see also</u> <u>Connick</u>, __ U.S. at __, 131 S. Ct. at 1360 ("The city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'  A less stringent standard of fault for a failure-to-train claim 'would result in <u>de</u> <u>facto</u> <u>respondeat</u> <u>superior</u> liability on municipalities.'" (citations omitted)).

In sum, Olaniyi has not shown a pattern of unconstitutional forced medications at the D.C. Jail that a reasonable jury could find put the District on notice that either more training or enhanced supervision was necessary to prevent the specific constitutional violation at issue. Because such evidence is "'ordinarily necessary'" for a municipality to be held liable under § 1983 for failing to train or supervise its employees,[6] <u>Connick</u>, __ U.S. at __, 131 S. Ct. at 1360 (citation omitted), and because Olaniyi has presented no other basis for imposing municipal liability, the District is entitled to summary judgment on Olaniyi's § 1983 claim.

## B.     Olaniyi's Claim Against the United States Based on the January 2004 Traffic Stop

Olaniyi asserts a common law tort claim against the United States for false arrest and imprisonment arising from the January 2004 traffic stop conducted by the Capitol Police.  <u>See</u> United States Compl. ¶¶ 46-49.  The FTCA makes the United States liable for torts committed by its agents "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, "in accordance with the law of the place where the act or

---

[6] As noted, the Court in <u>Connick</u> did discuss, with some skepticism, a "narrow range of 'single-incident' liability," which was "hypothesized in <u>Canton</u> as a possible exception to the pattern of violations necessary to prove deliberate indifference in § 1983 actions alleging failure to train."  __ U.S. at __, 131 S. Ct at 1366.  Olaniyi does not assert that this case fits the "narrow" category of single-incident liability "hypothesized" in <u>Canton</u>, and the Court consequently will not consider that possibility.  Nor will the Court address whether Olaniyi has presented sufficient evidence on the element of causation, which requires proof "that the lack of training [or supervision] actually caused the [constitutional] violation in this case."  <u>Id.</u> at 1359.

omission occurred," id. § 1346(b)(1).  Under District of Columbia law, the torts of false arrest and false imprisonment are "indistinguishable as a practical matter," Enders v. District of Columbia, 4 A.3d 457, 461 (D.C. 2010), so the Court will treat Olaniyi's claim simply as one for false arrest.  To prevail on a false arrest claim, a plaintiff must show that he was unlawfully detained.  Id.  "The detention of a plaintiff by a defendant police officer is lawful if the officer effected the detention constitutionally—that is, with probable cause if the detention was an arrest, or upon reasonable suspicion if the detention amounted only to a Terry stop."  Zhi Chen v. District of Columbia, 808 F. Supp. 2d 252, 257 (D.D.C. 2011).  Alternatively, regardless of whether the detention was constitutional, "'a police officer may justify an arrest by demonstrating that (1) he or she believed, in good faith, that his or her conduct was lawful, and (2) this belief was reasonable.'"  Weishapl v. Sowers, 771 A.2d 1014, 1020-21 (D.C. 2001) (citation omitted); accord Minch v. District of Columbia, 952 A.2d 929, 937 (D.C. 2008).  The issues of probable cause and reasonable suspicion "'ordinarily [present] mixed question[s] of law and fact; however, where the facts are not in dispute , . . . the issue becomes a purely legal one which the Court can answer on its own.'"  Minch, 952 A.2d at 937 (citation omitted).

Noting that Olaniyi was not arrested during the January 2004 traffic stop, the United States defends the detention as a permissible Terry stop supported by a finding of reasonable suspicion.  See United States's Mem. at 8.  "The Fourth Amendment prohibits 'unreasonable searches and seizures' by law enforcement officials, and this protection extends to a brief investigatory stop of persons or vehicles, whether or not an arrest follows."  United States v. Bailey, 622 F.3d 1, 5 (D.C. Cir. 2010) (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)).  However, pursuant to Terry v. Ohio, 392 U.S. 1 (1968), "'an officer may briefly detain

a citizen if he has a reasonable, articulable suspicion that 'criminal activity may be afoot.'"  Id.

(citation omitted).  As the Circuit explained in Bailey:

> A Terry stop requires only a "minimal level of objective justification." . . . An
> officer may initiate a Terry stop based not on certainty but on the need "to 'check
> out' a reasonable suspicion."  Moreover, whether reasonable suspicion exists
> depends on the totality of circumstances as "'viewed through the eyes of a
> reasonable and cautious police officer on the scene, guided by his experience and
> training.'"

Id. (internal citations omitted).  "[O]fficers' actual motives do not bear on [the] objective

assessment of reasonable suspicion."  United States v. Brown, 334 F.3d 1161, 1166 (D.C. Cir.

2003) (citing Whren v. United States, 517 U.S. 806, 813 (1996)).

The Supreme Court has observed that "'most traffic stops . . . resemble, in duration and

atmosphere, the kind of brief detention authorized in Terry.'"  Arizona v. Johnson, 555 U.S. 323,

330 (2009) (quoting Berkemer v. McCarty, 468 U.S. 420, 439 n.29 (1984)); see also United

States v. Digiovani, 650 F.3d 498, 506 (4th Cir. 2011) ("Because a traffic stop is more

analogous to an investigative detention than a custodial arrest, we treat a traffic stop, whether

based on probable cause or reasonable suspicion, under the standard set forth in Terry."); United

States v. Everett, 601 F.3d 484, 488 n.4 (6th Cir. 2010) (noting that "traffic stops are governed

by Terry" under Sixth Circuit precedent, although the question has never been squarely

addressed by the Supreme Court).  Terry sets forth a two-prong inquiry for determining whether

a stop is unreasonable: "[1] whether the officer's action was justified at its inception, and [2]

whether it was reasonably related in scope to the circumstances which justified the interference

in the first place."  392 U.S. at 20.  Applying that inquiry here, the Court will first examine

whether the Capitol Police had reasonable suspicion for the initial stop of Olaniyi, after which it

will analyze whether the officers exceeded the permissible bounds of a Terry stop.

1.       **The Initial Stop**

The United States maintains that Sergeant Gissubel had reasonable suspicion to pull over Olaniyi because his van's license plate was obscured by dirt and grime in violation of the District's traffic laws. See United States's Mem. at 9-10. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren, 517 U.S. at 810; see also United States v. Mitchell, 951 F.2d 1291, 1295 (D.C. Cir. 1991) ("The Fourth Amendment does not bar the police from stopping and questioning motorists when they witness or suspect a violation of traffic laws, even if the offense is a minor one."). While not contesting this legal principle, Olaniyi disputes that "his license plate was partially obscured." Pl.'s United States Facts ¶ 4. But this bare assertion is refuted by the record evidence, including Olaniyi's own deposition testimony. See United States's Mem., Ex. 1 (Olaniyi Dep.) at 88:20-89:1 ("Q  I see at one point on the side of the van there is some dirt or grime or salt that's sort of caked on [the van].  Do you see that?  A  Yes.  It's from driving through the snow.  Q  Was that the same kind of stuff that was on the license plate?  A  Probably, yes, sir. (emphasis added)); id., Ex. 3 (Deposition of Joseph M. DePalma) at 63:17-18 ("You could barely read the license plate [on Olaniyi's van].  There was a lot of road grime, road salt."); id., Ex. 4 (Deposition of Jessica Baboulis ("Baboulis Dep.")) at 24:5-7 ("I remember not being able to read the [van's] license plate.  It was covered in like a salt-dirt mix and I was unable to read it."); id., Ex. 7 (Video of January 20, 2004 Traffic Stop) (showing Olaniyi wiping his license plate with a rag after Detective DePalma stated that it was dirty).  Thus, even viewing the record in the light most favorable to Olaniyi, as the Court must, the undisputed facts demonstrate that his van's license plate was obscured by debris at the time of the January 2004 traffic stop.

This fact is not insignificant.  The District's traffic regulations provide that "[i]dentification tags shall be maintained free from foreign materials and in a clearly legible condition," D.C. Mun. Regs. Tit. 18, § 422.5, and that "[n]o person shall operate a vehicle where the identification tag's identifying numbers or letters are covered with glass, plastic, or any other type of material or substance," id. § 422.8.  And "[a] person operating a vehicle in violation of § 422.8 shall be subject to a fine of five hundred dollars ($ 500)."  Id. § 422.9.  Olaniyi was therefore in violation of the District's traffic laws when he operated a vehicle with an obscured license plate.  Consequently, Sergeant Gissubel's initial stop of Olaniyi was permissible because she not only had reasonable suspicion, but "probable cause to believe that a traffic violation ha[d] occurred."  Whren, 517 U.S. at 810.  At the very least, the undisputed facts reveal that Sergeant Gissubel had a reasonable, good faith belief that Olaniyi's license plate was illegible, see United States's Mem., Ex. 4 (Baboulis Dep.) at 24:5-7, thus precluding liability for false arrest under District of Columbia common law, see Weishapl, 771 A.2d at 1021.

Resisting this conclusion, Olaniyi contends that the Capitol Police officers' conduct following the initial stop, including questioning his presence in the District and ordering his car searched, indicates that the Capitol's Police's "interest in [him] was not limited to his allegedly obscured license plate."  Pl.'s United States Opp'n at 6.  Rather, Olaniyi claims that the obscured license plate is a mere "pretextual, post hoc justification" for the January 2004 traffic stop.  Id. But this argument ignores the settled principle that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."  Whren, 517 U.S. at 813.  Indeed, whether the stop was a "mere pretext for a search" is irrelevant, for "a court must look to objective circumstances in determining the legitimacy of police conduct under the Fourth Amendment, rather than an officer's state of mind."  Mitchell, 951 F.2d at 1295.  Because the

objective circumstances here (namely, the van's obscured license plate) justified the traffic stop of Olaniyi, his initial seizure was reasonable under the Fourth Amendment.

>    **2.      Detention of Olaniyi Following the Initial Stop**

Olaniyi challenges several aspects of his detention following the initial stop.  According to Olaniyi, "the evidentiary record suggests that [he] was targeted for . . . harassment and investigation because of matters wholly unrelated to any alleged traffic or parking violation." Pl.'s United States Opp'n at 8.  He adds that "[t]here are factual disputes between the parties as to, among other things, the length of time of [his] detention, the scope of the canine search, and the ability of Olaniyi and his family to freely leave police custody during this time."  Id. at 7.

Many of Olaniyi's contentions must be dispensed with at the outset.  First, any challenge to the search of his van is not properly before the Court, given that the only remaining claim he has against the United States is a tort claim for false arrest.  See United States Compl. ¶¶ 46-49. Since the gist of a false arrest claim is an "unlawful detention," Enders, 4 A.3d at 461 (emphasis added), the Court does not discern how the Capitol Police's allegedly unlawful search of Olaniyi's van could form the predicate for such a claim.  Second, contrary to Olaniyi's assertion, the factual question of whether Olaniyi was free to leave the location of the stop during the period of his detention is not material.  The relevant question is whether, assuming Olaniyi was not free to leave, the Capitol Police were justified in detaining him under the Fourth Amendment.  Third, although Olaniyi asserts in his opposition brief that there is a factual dispute concerning the length of his detention, see Pl.'s United States Opp'n at 7, he concedes in his counterstatement of material facts that "[t]he total duration of the incident was approximately 18 minutes," United States's Facts ¶ 23; Pl.'s Response to United States's Facts ¶ 23.  He also makes a similar concession earlier in his opposition brief.  See Pl.'s United States Opp'n at 4

("After <u>approximately eighteen to twenty minutes of detention</u>, Sergeant Gissubel returned

Olaniyi's driver's license and Olaniyi and his family were then able to depart the scene."

(emphasis added)).

      With these clarifications, the Court will examine whether the Capitol Police officers'

detention of Olaniyi was permissible in its scope and duration, recognizing that "'a search [or

seizure] which is reasonable at its inception may violate the Fourth Amendment by virtue of its

intolerable intensity and scope.'"  <u>United States v. Vinton</u>, 594 F.3d 14, 23-24 (D.C. Cir. 2010)

(quoting <u>Terry</u>, 392 U.S. at 18).  It is undisputed that the Capitol Police detained Olaniyi for

roughly 18 minutes while they conducted a background check to determine whether he had a

valid license and any outstanding warrants in his name.  <u>See</u> United States's Facts ¶¶ 19, 22-23;

Pl.'s Response to United States's Facts ¶¶ 19, 22-23.  Upon validly stopping Olaniyi for a traffic

infraction, the officers plainly could detain him for a brief period to perform such a background

check.  <u>See</u> <u>Mitchell</u>, 951 F.2d at 1295 ("'Even a relatively minor offense that would not of itself

lead to an arrest can provide a basis for a stop for questioning and inspection of the driver's

permit and registration.'" (citation omitted)).

      Olaniyi nonetheless maintains that the Capitol Police "unlawfully extended" the detention

when they interrogated Olaniyi about matters unrelated to the alleged traffic violation, including

his presence in the District and the custody of his children.  Pl.'s United States Opp'n at 8.  Yet,

the Supreme Court has made clear that "[an] officer's inquiries into matters unrelated to the

justification for the traffic stop . . . do not convert the encounter into something other than a

lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."

<u>Johnson</u>, 555 U.S. at 333 (citing <u>Muehler v. Mena</u>, 544 U.S. 93, 100-01 (2005)).  In <u>Muehler</u>, the

Supreme Court held that an officer did not violate the Fourth Amendment by questioning a

lawfully-detained suspect about her immigration status, even though the detainee was not suspected of violating any immigration laws.  544 U.S. at 101.  The Court reasoned:

> [The court of appeals' holding], it appears, was premised on the assumption that the officers were required to have independent reasonable suspicion in order to question Mena concerning her immigration status because the questioning constituted a discrete Fourth Amendment event.  But the premise is faulty.  We have "held repeatedly that mere police questioning does not constitute a seizure." "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage."  As the Court of Appeals did not hold that the detention was prolonged by the questioning, there was no additional seizure within the meaning of the Fourth Amendment.  Hence, the officers did not need reasonable suspicion to ask Mena for her name, date and place of birth, or immigration status.

Id. at 100-101 (internal citations omitted).  The Supreme Court later applied the reasoning from Muehler in the context of a traffic stop in Johnson, finding no Fourth Amendment violation where an officer questioned a car passenger about his possible gang affiliation, while a second officer checked the driver's license, registration, and insurance information.  Johnson, 555 U.S. at 328, 333.  Although the cases arose in slightly different contexts, the common element of both Muehler and Johnson was that the officers' off-topic questioning did not substantially extend the duration of the seizures.  See id. at 333; Muehler, 544 U.S. at 100-01.

Here, as in Muehler and Johnson, there is no indication that Detective DePalma's questions regarding Olaniyi's presence in the District and the custody of his children "measurably extend[ed] the duration of the stop."  Johnson, 555 U.S. at 333.  The record instead reveals that Detective DePalma asked Olaniyi these off-topic questions while Sergeant Gissubel conducted the license check, thus indicating that the stop was not prolonged at all by his questions.  See United States's Mem., Ex. 4 (Baboulis Dep.) at 38:10-39:8.  This version of events is confirmed by the video of the January 2004 traffic stop, which depicts Olaniyi and Patel conversing with Detective DePalma for several minutes while Sergeant Gissubel confers

with other officers, after which Sergeant Gissubel approaches Olaniyi and returns his license.

See United States's Mem., Ex. 7 (Video of January 20, 2004 Traffic Stop).  Detective DePalma

is even heard on the video as stating that Olaniyi and his family would be released once his

license check was complete, which they were.  Id.  Olaniyi has highlighted no evidence to the

contrary.  Because "Muehler and Johnson make clear . . . that an officer may ask unrelated

questions to his heart's content, provided he does so during the supposedly dead time while he or

another officer is completing a task related to the traffic violation," Everett, 601 F.3d at 492

(collecting cases), Detective DePalma's off-topic questioning did not effect an unlawful

detention of Olaniyi.

   Nor has Olaniyi otherwise shown that the traffic stop was extended "beyond a reasonable

duration."  Vinton, 594 F.3d at 23.  "To 'assess[] whether a detention is too long in duration to

be justified as an investigative stop, [courts] . . . examine whether the police diligently pursued a

means of investigation that was likely to confirm or dispel their suspicions quickly.'"  Id.

(quoting United States v. Sharpe, 470 U.S. 675, 686 (1985)).  Sergeant Gissubel took

approximately 18 minutes to check Olaniyi's license and, upon completing the check, she

returned the license to Olaniyi and sent him on his way.  See Pl.'s United States Opp'n at 4.

Olaniyi has not shown that Sergeant Gissubel failed to act diligently in checking his license, nor

does the record support such a conclusion.

   In short, Olaniyi has failed to produce any evidence from which a reasonable jury could

find that the Capitol Police unlawfully detained him during the January 2004 traffic stop.

Accordingly, the United States is entitled to summary judgment on Olaniyi's false arrest claim.

## IV.  CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment are granted.

**SO ORDERED** this 11th day of July, 2012.[7]

REGGIE B. WALTON
United States District Judge

---

[7] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.